**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| [SUPPRESSED], | ) | Case No. _____ |
| | ) | |
| Plaintiffs-Relators, | ) | JURY TRIAL DEMANDED |
| | ) | |
| v. | ) | **FILED IN CAMERA AND** |
| | ) | **UNDER SEAL (Pursuant to** |
| [SUPPRESSED], | ) | **31 U.S.C. § 3730)** |
| | ) | **DO NOT PLACE ON PACER** |
| Defendants. | ) | **DO NOT PLACE IN PRESS BOX** |

# COMPLAINT

# VOL. 1 OF 2

FILED

SEP 14 2017

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**1:17-cv-06638
Judge Ruben Castillo
Magistrate Judge M. David Weisman**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| [SUPPRESSED], | ) | Case No. _____ |
| | ) | |
| Plaintiffs-Relators, | ) | JURY TRIAL DEMANDED |
| | ) | |
| v. | ) | **FILED IN CAMERA AND** |
| | ) | **UNDER SEAL (Pursuant to** |
| [SUPPRESSED], | ) | **31 U.S.C. § 3730)** |
| | ) | **DO NOT PLACE ON PACER** |
| Defendants. | ) | **DO NOT PLACE IN PRESS BOX** |

## COMPLAINT

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA, and THE STATE OF ILLINOIS *ex rel.* DR. THOMAS PROSE, | ) ) ) ) | Case No. _____ |
| | ) | JURY TRIAL DEMANDED |
| Plaintiffs-Relators, | ) ) | **FILED IN CAMERA AND** |
| | ) | **UNDER SEAL (Pursuant to** |
| v. | ) | **31 U.S.C. § 3730)** |
| | ) | **DO NOT PLACE ON PACER** |
| MOLINA HEALTHCARE OF ILLINOIS, INC. and MOLINA HEALTHCARE, INC., | ) ) | **DO NOT PLACE IN PRESS BOX** |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff-Relator Dr. Thomas Prose ("Dr. Prose" or "Relator"), by and through his undersigned counsel, hereby brings this action against Defendants Molina Healthcare of Illinois, Inc. ("Molina"), and Molina Healthcare, Inc. ("Molina Health"), alleging as follows:

## NATURE OF ACTION

1. This *qui tam* lawsuit is for damages and civil penalties in an action under the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* (the "FCA"), and the Illinois False Claims Act, 740 ILCS 175/1, *et seq.* (the "IFCA," and together with the FCA, the "FCAs"), based on Molina knowingly submitting false claims for payment to the Illinois Medicaid program.

2. Molina is a Managed Care Organization ("MCO") that has contracted with the Illinois Department of Healthcare and Family Services (the "Department") to provide health care services to Illinois Medicaid beneficiaries. Molina promised the Department that it would provide a SNFist program: coordinated care for Medicaid beneficiaries living in Skilled Nursing

-2-

Facilities ("SNFs") using licensed medical professionals. The Department and the Centers for Medicare & Medicaid Services ("CMS") have made clear that SNFist programs are mandatory and critical to an effective Medicaid program. Despite full knowledge of its obligation to provide a SNFist program, Molina has knowingly failed to have one for over two years, and concealed that fact from the Department.

3. Dr. Prose has first-hand knowledge of Molina's scheme, but non-public, sworn testimony confirms his allegations, including that:

- Molina executives knew Molina was obligated to provide a SNFist program;

- Molina executives knew Molina stopped providing any SNFist services in April 2015 and did nothing to remedy Molina's failure; and

- Molina failed to inform the Department that it was not providing the SNFist services it promised to provide.

4. This is not merely a matter of contractual non-compliance: Molina's very top executives knew all the relevant facts, but concealed them from the Department for over two years now, all the while seeking payment from the Illinois Medicaid program, and indeed, seeking to renew the very contract that Molina has intentionally refused to honor.

5. Molina's failure is unfair to competitors who do pay, as they must, to offer SNFist services; unfair to the taxpayers who are funding Molina's scheme, and the increased costs that result from the failure to provide SNFist services; and, most importantly, unfair to the vulnerable Medicaid beneficiaries in SNFs, who are denied the important care SNFists provide. The FCAs were designed to remedy precisely this type of scheme.

## PARTIES

6.     Dr. Thomas Prose is a Michigan resident and United States Citizen.

7.     Molina Healthcare of Illinois, Inc. is a corporation organized under the laws of the State of Illinois, with its principal place of business in Oak Brook, Illinois.

8.     Molina Healthcare, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business in Long Beach, California.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1345 because it arises under the laws of the United States—in particular, the False Claims Act—and because it is commenced on behalf of the United States. Further, 31 U.S.C. § 3732 specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3730.

10.    This Court has supplemental jurisdiction over the subject matter of the claims brought under state laws pursuant to 28 U.S.C. § 1367 because the claims are so related to the claims within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Further, 31 U.S.C. § 3732(b) specifically confers jurisdiction on this Court for actions brought under state laws arising from the same transaction or occurrence as an action brought under 31 U.S.C. § 3730.

11.    This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because 31 U.S.C. § 3732(a) authorizes nationwide service of process, and Defendants have sufficient minimum contacts with the United States of America.

12.    Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), and 28 U.S.C. § 1391(b) and (c), because at least one of the Defendants transacts business in this

District, and because some of the acts and omissions of which Relator complains occurred in this District.

## THE FALSE CLAIMS ACTS

13.     The FCA, as amended by the Fraud Enforcement and Recovery Act of 2009, and the IFCA, imposes liability on anyone who: "(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . . or (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government . . .". 31 U.S.C. § 3729(a)(1); *see also* 740 ILCS 175/3 (substantively identical).

14.     Any person who violates the FCAs is liable for civil penalties for each violation, plus three times the amount of the damages sustained by the Government.

15.     The FCAs allow any person having information about false or fraudulent claims to bring an action on behalf of the Government, and to share in any recovery.

16.     All allegations in this Complaint are based on evidence obtained directly by Dr. Prose independently, through his own labor and efforts. As required by the FCAs, Relator has provided to the United States Attorney General, the United States Attorney for the Northern District of Illinois, and the Attorney General of Illinois, a statement of material evidence and information that Dr. Prose possesses regarding this Complaint. Because that statement includes attorney-client communications and work product of Relator's counsel, and was submitted to the Attorneys General and the United States Attorney, in their capacity as potential co-counsel in this litigation, that statement is confidential.

17.    In accordance with 31 U.S.C. § 3730(b)(2), and 740 ILCS 175/4(b)(2), the Complaint has been filed *in camera*, will remain under seal for a period of at least 60 days, and will not be served on Defendants until the Court so orders.

## BACKGROUND FACTS

### I.    SNFIST SERVICES

18.    A "SNFist" is defined by statute in Illinois as a "medical professional specializing in the care of individuals residing in nursing homes employed by or under contract with a MCO." 305 ILCS 5/5F-15. As Mr. Ben Schoen, Molina's Chief Operating Officer, testified, a SNFist is essentially a medical professional "who takes care of nursing home residents in the skilled nursing facility." (Schoen Dep. 216 (Ex. 1).) Molina's contracts with the Department define a SNFist as:

> A Physician or APN licensed under the Illinois Nurse Practice Act who is part of an organized system of care, meaning a coordinated group working together, whose entire professional focus is the general medical care of individuals residing in a Nursing Facility and whose activities include Enrollee care oversight, communication with families, significant others, PCPs, and Nursing Facility administration.

(Contract Between United States Department of Health and Human Services Centers for Medicare and Medicaid Services In Partnership with State of Illinois Department of Healthcare and Family Services and Molina Healthcare of Illinois, Inc., Dated November 5, 2013 ("2013 Contract"), § 1.142 (Ex. 2); *see also* State of Illinois Contract between the Department of Healthcare and Family Services and Molina Healthcare of Illinois, Inc. ("2015 Contract"), § 1.142 (Ex. 3).)

19.    SNFist programs are critical to the provision of quality and cost-effective medical care for many reasons. First, SNFists provide a higher quality of care for post-acute care patients because they have a more detailed understanding of the patients' conditions, including a

personal relationship with the patients, which allows for better informed healthcare management. Second, SNFists improve the continuity of care because they are on-site, beside the patients, seeing the patients frequently and helping to determine appropriate next steps for the patients' cases. Third, SNFists help reduce unnecessary, and expensive, hospitalizations by catching illnesses and otherwise unforeseen problems before they become emergent. Fourth, SNFists improve the perception of the healthcare system—especially the Medicaid program—because SNFists have a personal relationship with the patients and their families.

20. Over the past few years, the healthcare community has increasingly recognized the value of a robust SNFist program.[1] By way of example, the American Association of Retired Persons ("AARP") has endorsed the value of SNFist programs. AARP Kansas' Executive Director, Dr. Maren Turner, testified before the Kansas House Health and Human Services Committee that SNFist programs help reduce readmission rates, and that the savings to the Kansas Medicaid program from reduced readmission rates range from $40-77 million annually.[2]

21. The Department's appreciation of the value of a SNFist program makes Defendants' disregard for its contractual obligations all the more egregious.

## II. DR. THOMAS PROSE AND GENERAL MEDICINE P.C.

22. Dr. Prose, a Medical Doctor, also has a MPH and an MBA—all from the University of Michigan. He has more than 30 years' experience in internal medicine, geriatrics and health care administration. In 1983, Dr. Prose founded a company called General Medicine

---

[1]  *See, e.g.*, "SNFists at Work,"
http://www.modernhealthcare.com/article/20120324/MAGAZINE/303249939. (Ex. 4.)

[2]  *See* "CARE Act Testimony for Kansas House Health and Human Services Committee," available at http://states.aarp.org/care-act-testimony-for-kansas-house-health-and-human-services-committee/. (Ex. 5.)

that has grown consistently since. Prior to creating General Medicine, Dr. Prose was the medical director for Cigna Insurance Company; he also served as a medical consultant for the boards of directors for many federal and state agencies, insurance carriers and health care systems. Dr. Prose has authored a collection of articles on the healthcare industry, and has presented before the United States Senate, CHFA, CMS, the National Cancer Institute, and the Association of Community Cancer Centers. He is a featured speaker of the National Geriatric Society, and several other national, state and local healthcare organizations. A copy of Dr. Prose's CV is attached as Exhibit 6.

23. Dr. Prose's company, General Medicine P.C., also known as the "Post-Hospitalist Company," is a collaborative practice of board-certified physicians and advanced nurse practitioners who specialize in the care of post-acute care patients in long-term care facilities. These post-hospitalists, sometimes referred to as SNFists, work exclusively in these facilities rather than in addition to their daily practices and hospital rounds.

24. General Medicine provides SNFist services to many MCOs, Accountable Care Organizations ("ACOs"), and state health plans, and has an extremely successful track record: among other accolades, its SNFists have achieved a nation-wide leading hospital readmission rate—a key measure of success—that is 67% lower than the national average, in addition to quality metrics in the top 10%.[3] General Medicine is recognized as the leading physician care model for post-acute care patients, including by the Illinois Health Care Association ("IHCA").[4]

---

[3]   *See, e.g.,* "General Medicine, P.C. achieves performance in the top 10 percent for audited HEDIS Rate results for 2013," Healthcare Finance, Jan. 9, 2014, available at http://www.healthcarefinancenews.com/press-release/general-medicine-pc-achieves-performance-top-10-percent-audited-hedis-rate-results. (Ex. 7.)

[4]   *See* IHCA Regulatory Beat, Aug. 9, 2016, available at http://www.ihca.com/rc_files/149/Regulatory%20Beat%20-%20August%209,%202016.pdf. (Ex. 8.)

## III.    MOLINA AND MOLINA HEALTH

25.     Molina is one of several MCOs operating in Illinois pursuant to an agreement with the Department.   Molina claims that "Contracted providers (like General Medicine) are an essential part of delivering quality care to our members," and that "Molina Healthcare of Illinois values our provider partnerships and supports the doctor-patient relationship our members share with you."   Molina also claims to oppose efforts to underutilize services.[5]

26.     Molina was recently awarded another contract with the Department, extending its existing agreement for another four years beyond 2017.    (*See* Award Announcement (Ex. 10).)

27.     As of December 2015, Molina served approximately 98,000 members, and recognized premium revenue of approximately $397 million for the year ended December 31, 2015.

28.     Molina is rapidly expanding.

(a)     On January 1, 2016, Molina closed on its acquisition of the Medicaid membership, and certain assets related to the Medicaid business of, Accountable Care Chicago, LLC, also known as MyCare Chicago. Molina added approximately 58,000 Medicaid members in this acquisition.

(b)     Also on January 1, 2016, Molina closed on its acquisition of the Medicaid membership, and certain assets related to the Medicaid

---

[5]     *See* http://www.molinahealthcare.com/providers/il/medicaid/Pages/home.aspx.  (Ex. 9.)

business, of Loyola Physician Partners, LLC. Molina added approximately 21,000 Medicaid members in this acquisition.

(c)    On November 30, 2015, Molina announced that it entered into an agreement to assume the membership and certain Medicaid assets of Better Health Network, LLC. Molina added approximately 40,000 Medicaid members in the acquisition.

29.    Molina is owned and controlled by Molina Health, a Fortune 500 company operating Medicaid programs in a variety of states. "Molina Healthcare, a FORTUNE 500, multi-state health care organization, arranges for the delivery of health care services and offers health information management solutions to nearly five million individuals and families who receive their care through Medicaid, Medicare and other government-funded programs in fifteen states."[6]

30.    Molina Health fired its Chief Executive Officer, Mario Molina, and his brother, Chief Financial Officer John Molina, in May 2017 claiming that its financial results were disappointing, even though Molina Health's earnings per share have been a healthy 16%—a particularly healthy return considering that its returns are almost exclusively a result of payments from cash-strapped Medicaid programs. In any event, Molina Heath is rapidly growing, having generated $4.029 billion in revenue in 2016, and $4.740 billion in 2017.

## IV.    THE DISPUTE BETWEEN MOLINA AND GENERAL MEDICINE, AND THE RELEVANT WITNESSES

31.    Molina and General Medicine entered into an agreement in April 2014, pursuant to which Molina hired General Medicine to satisfy Molina's obligation to the

---

[6]    *See* http://www.molinahealthcare.com/members/common/en-US/abtmolina/compinfo/Pages/compinfo.aspx. (Ex. 11.)

Department to provide a SNFist program for Medicaid beneficiaries in Illinois. (*See* Contract between Molina Healthcare of Illinois, Inc. and General Medicine, P.C. (Ex. 12).) The nature of the dispute is described in more detail below, but in short, Molina stopped paying General Medicine in January 2015 (despite General Medicine's adherence to the General Medicine contract and fine performance), forcing General Medicine to terminate the agreement. Molina continued to refuse payment to General Medicine for services already rendered, resulting in an arbitration proceeding before the American Arbitration Association.

      32.     The arbitration is still pending, but discovery is closed. The discovery process has produced evidence that indisputably demonstrates the allegation that Molina has knowingly failed to provide a SNFist program to Medicaid beneficiaries, while at the same time, claiming full payment from the Department, and seeking to renew its contract to provide services to the Department. That evidence includes sworn deposition testimony—that is not public—from the following Molina employees:

- Ben Schoen, who has been employed by Molina as the Chief Financial Officer since August 2014.[7] (Schoen Dep. 8 (Ex. 1).)

  - As the Chief Operating Officer for Molina, Mr. Schoen is responsible for network development, provider services, physician engagement, program management, and vendor oversight. (Schoen Dep. 11.)

  - Mr. Schoen reports directly to the President of Molina, Catherine Harvey. (Schoen Dep. 8.)

  - Ms. Harvey, in turn, reports to Molina Health Regional Vice President, Amy Clubbs, who lives in Ohio. (Schoen Dep. 8-9.)

- Ross Randolph (Randy) Carey-Walden, who was employed by Molina from June 2014 through December 2015 as the Director of Health Care.

---

[7]    Mr. Schoen works at Molina's Chicago office at 222 West Adams Street, Suite 450.

- o    Mr. Carey-Walden was responsible for case management activities, including managing nurse and social worker case managers, monitoring chart audits, and ensuring contractual compliance, including the completion of relevant assessments. (Carey-Walden Dep. 14-15 (Ex. 13).)

- o    Mr. Carey-Walden is currently employed by Great Lakes Caring Home Health in Springfield, Illinois, as the Director of Home Health. (Carey-Walden Dep. 12-14.)

- o    Mr. Carey-Walden ultimately ended up supervising the contract between Molina and General Medicine. (Carey-Walden Dep. 17-18.)

- Vijay Parthasarathy, who is the Director of Finance and Analytics for Molina. (Parthasarathy Dep. 8 (Ex. 14).)

## DEFENDANTS' FRAUDULENT CONDUCT

## I.    MOLINA'S PROMISE AND OBLIGATION TO PROVIDE SNFIST SERVICES

33.    Molina's contracts with the Department make perfectly clear that Molina was obligated to provide SNFist services. Molina executives fully acknowledge that obligation.

### A.    Molina's Contracts With the Department

34.    Pursuant to the 2013 Contract, and the 2015 Contract, Molina unambiguously promised to provide a SNFist program. Specifically, the 2013 Contract provides:

2.5    **Care Delivery Model**

2.5.6    **SNFist Program. The Contractor shall provide SNFist services**, either through direct employment or a sub-contractual relationship. The SNFist program shall provide intensive clinical management of Enrollees in Nursing Facilities. The Contractor shall implement one of the following for each Enrollee in a NF:

2.5.6.1.    When appropriate or necessary, the ICT will include an additional facility-based Provider (Physician or nurse practitioner) who will deliver care in identified Nursing Facilities.

2.5.6.2.    For all other Enrollees, Care Management through the SNFist program shall be performed by either telephonic or field-based Registered Nurses

> or licensed clinical social workers who will work
> within each assigned NF to provide Care
> Management and care coordination activities.

(2013 Contract (Ex. 2); *see also* 2015 Contract (Ex. 3) at § 5.6.10 (similar).)[8]

35.     The 2015 Contract provides that Molina must provide services—whether described as providing "covered services," providing "quality care," or providing "a specific type of health care services" either directly, or through "Affiliated Providers." (2015 Contract, § 2.6 (Ex. 3).) The 2013 Contract requires that covered services be available "twenty-four (24) hours a day, seven (7) days a week, as authorized by the Contractor" and be provided in the "amount, duration and scope as set forth in 89 Ill. Adm. Code, Part 140 and this Contract, and shall be sufficient to achieve the purposes for which such Covered Services are furnished." (2013 Contract, § 2.4.1 (Ex. 2); *see also* 2015 Contract, § 5.1 (similar) (Ex. 3).)

36.     In the event Molina changed "key functions for the delivery of care," or "Contractor's network of Affiliated Providers," Molina was obligated to notify the Department within five (5) days. (2013 Contract, §§ 5.1.1; 1.59 (defining terms) (Ex. 2); 2015 Contract, § 5.1 (Ex. 3).)

37.     Molina's obligation to provide a SNFist program is not unique to Molina: every Illinois MCO contracted with the Department is similarly obligated to provide a SNFist program. *See, e.g.*, Aetna Better Health of Illinois Family Health Plan/Affordable Care Act Medicare-Medicaid Alignment Initiative Integrated Care Plan 2015 Annual Report. (Ex. 17.)

---

[8]     *See also* State of Illinois Application for Managed Care Community Networks Relating to the Innovations Project, § 2.13 (requesting information regarding "Network Adequacy," including a description of "the hospitalist and SNFist program you propose to operate") (Ex. 15); Measurement, Monitoring, and Evaluation of State Demonstrations to Integrate Care for Dual Eligible Individual (noting that "Plans are required to operate SNFist programs to provide intensive clinical management for enrollees in nursing facilities. This service will be provided by registered nurses or licensed clinical social workers working by telephone or within facilities to provide care management and care coordination, or when appropriate by adding a physician or nurse practitioner. The intent is to improve health outcomes in nursing facilities, particularly those with high rates of hospitalization (Illinois three-way contract, 2013, p. 50; Illinois MOU, 2013, pp. 66–67)." (Ex. 16.)

**B. Molina Executives Acknowledge Molina's Obligations to Provide SNFist Services**

38. Molina employees unequivocally confirmed Molina's obligation to provide SNFist services. Mr. Schoen, Molina's Chief Operating Officer, explained that Molina has always been obligated to provide a SNFist program:

> Q. Okay. **All right. Does the state of Illinois, in terms of your contract with the state, does the state require that those SNFist services be provided as part of the Medicaid Program?**
>
> A. **Yes.**

(Schoen Dep. 15-16 (emphasis added) (Ex. 1).)

> Q. Did the state of Illinois require Molina to have a contract executed with a vendor to provide SNFist services?
>
> A. A clarifying question. Prior to go live or in general?
>
> Q. In general.
>
> A. **They simply state in the contract that the contractor will have a SNFist Program.**
>
> Q. And you being the contractor – Molina being the contractor?
>
> A. Molina being the contractor. Whether we chose to implement that internally with our own resources or subcontract that out is not specified in the agreement.

(Schoen Dep. 30-31 (emphasis added) (Ex. 1).)

39. Molina's Director of Health Care, Mr. Carey-Walden, agreed:

> Q. Is the reason that you ended up supervising the General Medicine providers, is that because they were providing services that were mandated under Molina's contract with the State of Illinois?
>
> A. **The State of Illinois mandated that we have what was called a "SNFist program," S-N-F being skilled nursing facility.** A SNFist program is oversight either with physicians, nurse practitioners or physician assistants to make sure that the members are being seen at least every other month. Molina's contract stated that they were to be seen monthly, so it was a little above what we were required to do.

(Carey-Walden Dep. 17-18 (emphasis added) (Ex. 13).)

Q.   So let me go back to the State of Illinois contract. Is it your understanding, if you know, **did the State of Illinois mandate in any way that Molina have a SNFist program for its members?**

A.   **Yes, it was in the contract with the State.**

(Carey-Walden Dep. 20 (emphasis added) (Ex. 13); *see also* Parthasarathy Dep. 28-31 (Ex. 14) (Molina is required to report to CMS and the State of Illinois the number of face-to-face exams ("FCNAs") Molina completes.)

## II.   MOLINA'S FAILURE TO PROVIDE SNFIST SERVICES

40.   To satisfy its obligation to provide a SNFist program to Medicaid beneficiaries, Molina entered into an agreement with General Medicine. Molina, however, breached its agreement, and after having caused the dissolution of its relationship with General Medicine, Molina failed to replace General Medicine with a SNFist program, and failed to report that failure to the Department or CMS.

### A.   Molina Contracts With General Medicine to Provide SNFist Services

41.   Recognizing its obligation to provide a SNFist program, Molina entered into a contract with General Medicine on April 1, 2014, to provide SNFist services. Catherine Harvey, Molina's President, signed the agreement with General Medicine. Molina delegated all of its SNFist responsibilities to General Medicine pursuant to the General Medicine contract—*i.e.*, General Medicine was the exclusive provider of SNFist services to Molina. (Schoen Dep. 15, 29 (Ex. 1); Carey-Walden Dep. 20, 39, 41 (Ex. 13).)

### B.   Molina Fails to Honor Its Contract With General Medicine

42.   The General Medicine contract began well: Molina paid General Medicine in full, without issue, for SNFist services General Medicine provided in September, October, November and December 2014. (Schoen Dep. 44 (Ex. 1).) Molina, however, stopped

payment to General Medicine in 2015, even though General Medicine continued to provide SNFist services from January through April of that year. (Schoen Dep. 47 (Ex. 1).)

43.     Molina appears to have been motivated by financial considerations. An email chain among Molina executives demonstrates that Ms. Harvey, Molina's President, made the decision to stop paying General Medicine after concluding that it was too expensive to continue using General Medicine. In response to an email describing payments to General Medicine, Ms. Harvey wrote: "We need to set up a meeting with them and renegotiate. I have told finance not to pay any more until we do." (Carey-Walden Dep. Ex. 20 (Ex. 18).)

44.     Molina, however, claimed that, due to a significant increase in membership in December 2014—from 500 to 1700—it conducted a review of General Medicine's work and determined that General Medicine was behind in completing two tasks: initial FCNAs, and annual comprehensive exams ("ACEs"). (Schoen Dep. 47-50 (Ex. 1).) General Medicine denied Molina's claims and provided to Molina a detailed report demonstrating that General Medicine did, in fact, complete the FCNAs and ACEs, as required. Molina did not dispute General Medicine's contention, which was based on data readily available to Molina. Instead, Molina claimed that General Medicine documented its exams in the patient charts, rather than through Molina's software. General Medicine explained that Molina's software was not functioning properly, making it impossible to document the exams electronically. Molina staff acknowledged the failure of Molina's software, but failed to repair it, and nonetheless continued to deny payment to General Medicine. Accordingly, in April 2015, General Medicine terminated the contract with Molina. (Schoen Dep. 105 (Ex. 1).)

45.     Contrary to Molina's alleged concerns about General Medicine's delayed paperwork (a delay caused only by Molina's defective software), Mr. Carey-Walden, Molina's

Director of Healthcare who supervised the General Medicine relationship, testified that General Medicine fully performed its obligations:

> Q. So can you tell me -- or whether or not you mentioned it to Rebecca -- I know you can't recall that, but can you tell me about that request from the VP?
>
> A. Well, I remember Cathy Schilling asking me how it had been working with General Medicine. She was just asking my opinion. She wanted to know if I had reviewed the scope of work, and I said, "yes." **I remember telling her I didn't feel that they had any deficiencies in any area.**

(Carey-Walden Dep. 108 (emphasis added) (Ex. 13).)

> Q. Randy, with regard to the time when you took over as supervisor, supervising General Medicine, which I think we indicated was in mid-December of 2014 until the time that General Medicine terminated April 1st, **is it your opinion that General Medicine performed its contract with Molina in the scope of work included therein in a satisfactory manner?**
>
> A. **Yes.**

(Carey-Walden Dep. 120-21 (emphasis added) (Ex. 13).)

46.     In February or March 2015, Dr. Prose spoke with John Molina, Molina Health's now-former Chief Financial Officer, about Molina's failure to pay General Medicine, and Mr. Molina promised that he "would take care it." He never did.

47.     Molina's decision to stop paying General Medicine, despite General Medicine's fine work, was financially driven, as revealed by Ms. Harvey's email, and also a breach of Molina's contracts with the Department. (*See* 2015 Contract, § 5.25 ("Timely Payments to Providers") (Ex. 3).)

### C.     Molina Fails to Replace General Medicine or Re-Establish a SNFist Program

48.     With full knowledge of its obligation to provide a SNFist program, Molina simply failed to make any legitimate efforts to provide one after forcing General Medicine out of its contract in April 2015. Molina's Chief Operating Officer, Mr. Schoen, testified unequivocally that Molina had *absolutely no* SNFist program after General Medicine:

Q. Okay. Did you take any steps at that point to do anything to replace the services that General Medicine was providing under the SNFist Program?

A. I contacted my attorney.

Q. Okay. I don't want to ask about your conversations with your attorney. But subsequent to contacting your attorney, did you do anything to replace these services?

A. Replace?

Q. The SNFist services that General Medicine was providing.

A. Oh. No.

Q. All right. So that's April the 2nd, 2015. At some point in time -- now, you still had a contract with the state of Illinois to provide SNFist services, correct?

A. Correct.

Q. So—

A. Well, we had a contract with the state of Illinois. One of the provisions in there is to develop and implement a SNFist Program.

Q. Did you -- at some point in time following April 2nd, did you do something to cover the services that General Medicine had been providing to you?

A. I believe we had discussions on implementing a Molina SNFist Program and not carving it out. We were going to attempt to execute it ourselves; to date, which we have not completed.

Q. What do you mean by "not completed"?

A. It's not implemented.

Q. As of today?

A. Um-hum.

Q. "Yes"?

A. Yes.

(Schoen Dep. 192-94 (Ex. 1).)

**Q. All right. So you have not hired a -- you have not delegated these [SNFist] services to another subcontractor?**

**A. No.**

Q. Are you doing any of them in-house?

A. No.

(Schoen Dep. 194 (emphasis added) (Ex. 1).)

49.     Mr. Carey-Walden, Molina's Director of Health Care, contemplated beginning an in-house SNFist program to satisfy Molina's obligations (Carey-Walden Dep. 105-06, 113 (Ex. 13)), and did have in-house staff complete some of the unfinished FCNAs, but Mr. Schoen, Molina's Chief Operating Officer, acknowledged that having some staff complete a few forms does *not* constitute a SNFist program:

> Q.     Okay.  So according to paragraph 2, it indicates that: "Molina pulled healthcare providers off its own staff and required them to perform the FCNAs and care plans that were incomplete." Is that correct?
> A.     Correct.
>
> Q.     And was that done after Gen Med terminated their contract?
> A.     Correct.
>
> Q.     So that was done in-house by Molina employees, correct?
> A.     Correct.  We did these administrative functions.
>
> Q.     Okay.  Here you go.
> A.     **But we're still absent the SNFist Program.**

(Schoen Dep. 214 (Ex. 1); *see also* Parthasarathy Dep. 53 (Ex. 14) (Molina continued to do FCNAs in-house, but did not contract with anyone after April 2015, when General Medicine terminated the contract).)

50.     Indeed, Mr. Schoen acknowledged that Molina staff were not capable of providing SNFist services:

> A.     Yeah.  The SNFist Program is more in the sense of monitoring a patient as they're in these skilled nursing facilities to make sure that they're not digressing in the acuity of their condition and that they are receiving traditional med/surg services that they otherwise would have to go to the hospital for which costs, obviously, more money, **which was why we engaged in the agreement—arrangement with Gen Med, P.C.** Our providers—or, pardon me—**our staff did not have the ability or licensure to render those services**.  They were only able to go in and do the administrative, "Fill out this form."

(Schoen Dep. 215 (Ex. 1).)

## III.  MOLINA FAILS TO INFORM THE DEPARTMENT OF ITS FAILURE

51.     Despite (or, perhaps, because of) its intentional failure to provide SNFist
services, Molina did not report to the Department, or CMS, its refusal to provide SNFist services.
Mr. Schoen admitted that Molina had not informed the State of Illinois that it was no longer
providing SNFist services to its members, and further admitted that he "did not know" how the
Department would react to such a failure:

> Q.    You don't believe that there have been any FCNAs or care plans done for
> the SNFist --I'm sorry-- for the SNFist members that are in skilled nursing
> facilities?
> A.    No.
>
> Q.    Is that an issue that you would have with the state of Illinois if you have
> not been doing that since 2015?
> A.    I don't know.  I don't know how they would take that.

(Schoen Dep. 196 (Ex. 1).)

52.     Both Mr. Schoen and Mr. Carey-Walden explained that neither the State
of Illinois, nor CMS, would know that Molina was no longer providing SNFist services, because
Government reporting did not require SNF-specific reports, and Molina was still completing
FCNAs and ACEs for members who were not in skilled nursing facilities:

> Q.    Have you been -- have you received any notification from the state of
> Illinois that you are in any way deficient --
> A.    No.
>
> Q.    --under the contract-- let me just finish the question, then you can say
> "no"—for not providing those SNFist services?
> A.    No.
>
> Q.    All right.  You haven't been sanctioned, then, by the state for any reason,
> for not providing SNFist services?
> A.    No.

Q.  What about the federal government?
A.  No.

Q.  Have you been audited by the state of Illinois in the two years since for the services that you provide under the contract with the state of Illinois?
A.  Yes.

. . .

Q.  In those audit reports, have you provided the information to the state that you have not been doing SNFist FCNAs or care plans or ACEs in the two years since General Medicine left?
A.  So we have been doing them.  We just have not been doing them in the skilled nursing facilities or able to go into the skilled nursing facilities under a traditional SNFist Program.

Q.  Right.  But in your –
A.  They just look at aggregate numbers.

Q.  So you have been – you have been producing the numbers of the ones that have been done in the home setting?
A.  Correct.

Q.  You don't have to distinguish between the home setting and the facilities setting?
A.  No.

(Schoen Dep. 197-99 (Ex. 1); *see also* Carey-Walden Dep. 40 (Ex. 13).)

    53.    Mr. Carey-Walden similarly explained that the State of Illinois might not discover Molina's failure to provide SNFist services because routine audits did not specifically target the SNFist program:

Q.  You said that the State never required or never did a survey.  Could you expand on that a little bit?
A.  The health plans were audited quarterly by a contract that -- a company that was contracted with the State of Illinois to make sure that we were meeting our contractual requirements, and there was never -- in those audits, there was never a specific audit of the SNFist program itself.

(Carey-Walden Dep. 31 (Ex. 13).)

54.     None of this is to say that the Governments were not concerned with the SNFist program.  To the contrary, Mr. Carey-Walden explained that CMS held monthly conference calls and regularly asked about the SNFist program:

> Q.     Mr. Schoen testified that CMS would audit Molina monthly.  Is that an accurate statement?
>
> A.     They had a monthly call with CMS, a conference call where they would ask questions.  They would have an agenda specific to -- you know, they might ask questions about the SNFist program, or they might ask questions about how we accomplish the FCNAs.  You know, what best practices were and so forth.  I don't know of any specific report that they had to make monthly to CMS.

(Carey-Walden Dep. 38 (Ex. 13).)

55.     Not surprisingly, Molina's contract with the Department required it to report fraud and abuse.  (*See* 2015 Contract, § 5.31 (Ex. 3).)

## IV.     MOLINA'S FAILURE ADVERSELY IMPACTS PATIENT CARE

56.     The benefits of a SNFist program, as set forth above, are significant— most notably, cost savings and improved patient care and outcomes.  Molina employees, with first-hand knowledge of the benefits a SNFist program can provide, agreed:

> A.     Yeah.  **The SNFist Program is more in the sense of monitoring a patient as they're in these skilled nursing facilities to make sure that they're not digressing in the acuity of their condition and that they are receiving traditional med/surg services that they otherwise would have to go to the hospital for which costs, obviously, more money**, which was why we engaged in the agreement—arrangement with Gen Med, P.C.  Our providers—or, pardon me—our staff did not have the ability or licensure to render those services.  They were only able to go in and do the administrative, "Fill out this form."

(Schoen Dep. 215 (emphasis added) (Ex. 1).)

57.     The only reason to eliminate a SNFist program is to eliminate the immediate, short-term costs associated with the program.  Mr. Carey-Walden, Molina's Director of Health Care, acknowledged Molina's profit motive:

Q. All right. So the goal was to provide services at an amount that was less than what the State was giving Molina, a capitation basis for each member?

A. Yes.

(Carey-Walden Dep. 25 (Ex. 13).)

## V. MOLINA HEALTH'S LIABILITY FOR MOLINA'S FAILURE

58. Molina Health, as the parent of Molina, is responsible in all senses for the conduct of Molina. As Molina witnesses have already testified, Molina Health oversees Molina's work for the Department. Indeed, Molina Health requires Molina to regularly send information regarding its work to Molina Health's Long Beach, California offices for review, including the FCNAs and ACEs that Molina is required to provide to both the Department and to CMS. (Schoen Dep. 152-53 (Ex. 1).) Accordingly, Molina Health took ownership of Molina's execution of its contracts with the Department, and with the "profit motive" that Molina Health imposed on its subsidiaries (Carey-Walden Dep. 25 (Ex. 13)), Molina Health knowingly caused Molina to cut corners for short-term gain by eliminating the SNFist program in violation of Molina's contracts with the Department.

## DEFENDANTS' INTENTIONAL FAILURES GIVE RISE TO FCA LIABILITY

59. The Medicaid program provides healthcare services for low-income and disabled individuals. It is jointly funded by the federal Government and the states, and is administered on a state-by-state basis. 42 U.S.C. § 1396, *et seq.*

60. CMS oversees the Medicaid program on behalf of the federal Government, and the Department oversees the Medicaid program on behalf of the State of Illinois.

61. Molina is a MCO that has entered into risk contracts with the Department to provide managed care to Illinois Medicaid members in return for a per-member, per-month

capitated payment. *See* 2013 Contract (Ex. 2) and 2015 Contract (Ex. 3); *see also* 42 U.S.C. § 1396b(m) (defining MCOs); 42 C.F.R. § 438.1 (rules regarding MCOs and state contracts); 42 C.F.R. § 438.2 (defining risk contract).

62. As a MCO, Molina is required to provide the Department with reports known as Encounter Data Reports that record all Medicaid-covered services reported on an inpatient or outpatient claim to Molina. *See* 2013 Contract (Ex. 2) and 2015 Contract (Ex. 3); *see also* 42 C.F.R. §§ 438.604 and 438.608.

63. The Encounter Data Reports must include an attestation from Molina that the data or documents are recorded and complete, accurate, and truthful, and in accordance with all federal and state laws, regulations, policies, and contracts. 42 C.F.R. §§ 438.604 and 438.608.

64. In order to receive federal Medicaid funds, each state must submit a quarterly report to CMS for estimated costs, including MCO services (Form CMS-37), and a quarterly expenditure report (Form CMS-64). Both forms—CMS-37 and CMS-64—include a certification attesting that the reported data include only allowable expenditures in accordance with applicable federal, state, and local statutes, regulations, policies, and the state plan approved by CMS.

65. Molina failed to provide SNFist services in violation of its 2013 Contract and 2015 Contract, rendering its Encounter Data Reports—upon which the Department relies in its CMS-37 and CMS-64 filings—false. Molina's Encounter Data Reports could only be properly paid if Molina were in compliance with its contractual obligations.

66. Molina also failed to inform the Department that it had terminated General Medicine and was not providing SNFist services, in violation of its obligation to notify the

Department within 5 days in the event Molina changed "key functions for the delivery of care," or changed its "network of Affiliated Providers." (2013 Contract, §§ 5.1.1; 1.59 (defining terms) (Ex. 2); 2015 Contract, § 5.1 (Ex. 3).)

67.     Moreover, the quarterly "fraud reports" Molina was required to provide to the Department were false because Molina failed to acknowledge its failure to provide a SNFist program. 2015 Contract, 5.31.1.4 ("Contractor shall submit a quarterly report certifying that the report includes all instances of suspected Fraud, Abuse and financial misconduct, or shall certify that there was no suspected Fraud, Abuse or misconduct during that quarter.") (Ex. 3); *see also id.* at 9.1.29 (Ex. 3).

68.     Molina's failure to provide SNFist services goes to the essence of its bargain with the Department. Had CMS or the Department known the truth, it would have had a material affect on their decision to pay Molina and the continuance or renewal of its contracts. The Department has the authority to terminate Molina's contract if the Department determines that Molina failed to "[c]arry out the substantive terms of its contract." 42 C.F.R. § 438.708.

69.     Molina's silence, despite its obligation to report its deficiencies and its knowledge that it had no plan to address its deficiencies, was designed to keep the funding spigot open.

70.     The federal Government and state Governments, including Illinois, have long used the FCAs to hold MCOs responsible for failing to provide the services they promised to provide, and courts have long held that such conduct violates the FCA. *See, generally, United States ex rel. Tyson v. Amerigroup Illinois, Inc.*, 488 F. Supp. 2d. 719 (N.D. Ill. 2007) (failure to comply with MCO contract obligations violates FCAs); *see also, e.g., United States ex rel. Fisher v. Iasis*, 2016 WL 6610675 (D. Ariz. Nov. 9, 2016) (MCO's failure to provide

contracted-for services in violation of FCAs); *United States ex rel. Upton v. Family Health Network, Inc.*, 2013 WL 791441 (N.D. Ill. Mar. 4, 2013).

<u>COUNT I</u>
**VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729, *ET SEQ.***

71.    Plaintiff-Relator Dr. Thomas Prose realleges and incorporates by reference the allegations made in each of the preceding Paragraphs of this Complaint as though fully set forth herein.

72.    As set forth above, the FCA provides, in relevant part, that any person who:

(A)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . .

(G)    knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . plus 3 times the amount of damages which the Government sustains because of the act of that person. 31 U.S.C. § 3729(a)(1).

73.    The term "knowingly" means that a person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or

(iii) acts in reckless disregard of the truth or falsity of the information; and (B) require[s] no proof of specific intent to defraud." 31 U.S.C. § 3729(b)(1).

74. Through the acts described above, Defendants and their agents and employees knowingly presented, or caused to be presented, to officers, employees, or agents of the United States Government false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

75. Through the acts described above, Defendants and their agents and employees knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, and to get false or fraudulent claims paid or approved by the United States Government in violation of 31 U.S.C. § 3729(a)(1)(B).

76. Through the acts described above, Defendants and their agents and employees knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the United States Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the United States Government in violation of 31 U.S.C. § 3729(a)(1)(G).

77. The United States Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay claims that would not have been paid but for the acts and/or conduct of Defendants as alleged herein.

78. The United States has been damaged by Defendants' acts, and continues to be damaged, in a substantial amount to be determined at trial.

## COUNT II
## VIOLATIONS OF THE ILLINOIS FALSE CLAIMS ACT, 740 ILCS 175/1, *ET SEQ.*

79.     Plaintiff-Relator Dr. Thomas Prose realleges and incorporates by reference the allegations made in each of the preceding Paragraphs of this Complaint as though fully set forth herein.

80.     As set forth above, the IFCA provides, in relevant part, that any person who:

(A)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . .

(G)     knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the State for a civil penalty of not less than $5,000 and not more than $11,000, plus 3 times the amount of damages which the State sustains because of the act of that person. 740 ILCS 175/3(a)(1).

81.     The term "knowingly" means that a person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require[s] no proof of specific intent to defraud." 740 ILCS 175/3(b)(1).

82.     Through the acts described above, Defendants and their agents and employees knowingly presented, or caused to be presented, to officers, employees, or agents of the State of Illinois false or fraudulent claims for payment or approval in violation of 740 ILCS 175/3(a)(1)(A).

83.     Through the acts described above, Defendants and their agents and employees knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, and to get false or fraudulent claims paid or approved by the State of Illinois in violation of 740 ILCS 175/3(a)(1)(B).

84.     Through the acts described above, Defendants and their agents and employees knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State of Illinois, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State of Illinois in violation of 740 ILCS 175/3(a)(1)(G).

85.     The State of Illinois, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay claims that would not have been paid but for the acts and/or conduct of Defendants as alleged herein.

86.     The State of Illinois has been damaged by Defendants' acts, and continues to be damaged, in a substantial amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff-Relator Dr. Thomas Prose requests that judgment be entered against Defendants Molina Healthcare of Illinois, Inc. and Molina Healthcare, Inc., ordering that:

(a)     Defendants cease and desist from violating the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* and the Illinois False Claims Act, 740 ILCS 175/1, *et seq.*;

(b)     Defendants pay an amount equal to three (3) times the amount of damages the United States and the State of Illinois have sustained because of Defendants' actions, plus a civil penalty against Defendants for each violation of 31 U.S.C. § 3729 and 740 ILCS 175/3;

(c)     Plaintiff-Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) and 740 ILCS 175/4(d)(1);

(d)     Plaintiff-Relator be awarded all costs of this action, including attorneys' fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d) and 740 ILCS 175/4(d)(1); and

(e)     The United States, the State of Illinois, and Plaintiff-Relator be granted all such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff-Relator Dr. Thomas Prose hereby demands a trial by jury.

Dated: September 14, 2017

Respectfully submitted,

DR. THOMAS PROSE

By _____
Matthew K. Organ
David J. Chizewer
William C. Meyers
GOLDBERG KOHN LTD.
55 East Monroe Street
Suite 3300
Chicago, Illinois 60603
(312) 201-4000
matthew.organ@goldbergkohn.com
david.chizewer@goldbergkohn.com
william.meyers@goldbergkohn.com

*Counsel for Plaintiff-Relator*