# EXHIBIT 1

AMERICAN ARBITRATION ASSOCIATION

GENERAL MEDICINE, P.C.,          )
            Petitioner,          )
            v.                   )     Case No.
MOLINA HEALTHCARE OF             )     01-15-0003-3317
ILLINOIS, INC.,                  )
            Respondent.          )


        The deposition of BENJAMIN SCHOEN,
called as a witness herein for examination, taken
pursuant to the Rules of the American Arbitration
Association, taken before ROSANNE M. NUZZO, a
Notary Public within and for the County of Will,
State of Illinois, and a Certified Shorthand
Reporter of said state, at the law offices of
Lewis Brisbois, 550 West Adams Street, Suite 300,
Chicago, Illinois on Wednesday, April 5, 2017,
commencing at approximately 9:37 a.m.



Job No. 4311

**Fortz Legal Support**

**www.FortzLegal.com**

**844.730.4066**



1          AMERICAN ARBITRATION ASSOCIATION

2

3    GENERAL MEDICINE, P.C.,         )

4                 Petitioner,        )

5            v.                      )       Case No.

6    MOLINA HEALTHCARE OF            )    01-15-0003-3317

7    ILLINOIS, INC.,                 )

8                 Respondent.        )

9

10

11

12          The deposition of BENJAMIN SCHOEN,

13    called as a witness herein for examination, taken

14    pursuant to the Rules of the American Arbitration

15    Association, taken before ROSANNE M. NUZZO, a

16    Notary Public within and for the County of Will,

17    State of Illinois, and a Certified Shorthand

18    Reporter of said state, at the law offices of

19    Lewis Brisbois, 550 West Adams Street, Suite 300,

20    Chicago, Illinois on Wednesday, April 5, 2017,

21    commencing at approximately 9:37 a.m.

22

23

24

25    Job No. 4311

Page 2

```
 1  PRESENT:
 2
 3        SEYBURN KAHN, P.C.
 4        BY:  BARRY M. ROSENBAUM, ESQUIRE
 5             brosenbaum@seyburn.com
 6        2000 Town Center, Suite 1500
 7        Southfield, Michigan  48075
 8        248-351-3587
 9             appeared on behalf of the Petitioner,
10             General Medicine, P.C.
11
12        LEWIS BRISBOIS BISGAARD & SMITH LLP
13        BY:  JUDITH S. SHERWIN, ESQUIRE
14             judith.sherwin@lewisbrisbois.com
15        550 West Adams Street, Suite 300
16        Chicago, Illinois  60661
17        312-345-1718
18             appeared on behalf of the Respondent,
19             Molina Healthcare of Illinois, Inc.
20
21
22
23  REPORTED BY:  ROSANNE M. NUZZO, RMR, CRR,
24                CSR License No. 84-1388.
25
```

Page 3

1  MR. ROSENBAUM: Whenever you're ready.
2  MS. SHERWIN: I'm ready.
3  MR. ROSENBAUM: All right. Rosie, start it
4  up.
5      (WHEREUPON, the witness was duly
6      sworn.)
7  **THE WITNESS: I do.**
8  THE COURT REPORTER: Thank you.
9  MR. ROSENBAUM: All right. The record should
10 reflect this is the date and time set for the
11 deposition of Mr. Benjamin Schoen. We introduced
12 ourselves earlier. We met before. My name is
13 Barry Rosenbaum. I represent General Medicine
14 with regard to the arbitration proceedings being
15 filed by General Medicine against Molina.
16
17      BENJAMIN SCHOEN,
18 called as a witness herein, having been first duly
19 sworn, was examined and testified as follows:
20
21      EXAMINATION
22 BY MR. ROSENBAUM:
23   Q.  So, again, state your -- please state
24 your full name and your address for the record.
25   **A.  Company address or personal?**

Page 4

1    Q.  Company or home. It doesn't matter,
2  whatever you want.
3    **A.  Okay. Benjamin Schoen. And our**
4  **address is 222 West Adams Street, Suite 450.**
5    Q.  And how old are you, Mr. Schoen?
6    **A.  I am 38 years old.**
7    Q.  Okay. And have you ever had your
8  deposition --
9    **A.  Thirty-seven. Jesus, I'm sorry.**
10   Q.  Oh.
11   **A.  Did I already lie? Did I already**
12 **perjure myself? Oh, my God.**
13   Q.  Have you had your deposition taken
14 before?
15   **A.  No.**
16   Q.  Have you ever sat in on a deposition?
17   **A.  No.**
18   Q.  Okay. Let me explain a little bit of
19 the ground rules. I'm going to be asking you a
20 series of questions regarding the arbitration
21 proceedings and the contract situation between
22 General Medicine and Molina. If I ask you a
23 question that you don't understand, please ask me
24 to rephrase it. If you don't know the answer,
25 just say you don't know. That's perfectly fine.

Page 5

1  I just don't want you to guess at something.
2      If I ask you a question and you give me
3  an answer, I'm going to assume that you understood
4  the question. Okay?
5    **A.  Okay.**
6    Q.  And all of your answers have to be
7  verbal so that Rosie can take them down as opposed
8  to a nod or a shake of the head.
9    **A.  Understood.**
10   Q.  Okay. And Ms. Sherwin may on occasion
11 interpose an objection, but unless she instructs
12 you not to answer the question, the objection is
13 just for the record, and then we will generally
14 take an answer over the objection at that point.
15   **A.  Okay.**
16   Q.  Unless she says otherwise.
17   MS. SHERWIN: Right.
18 BY MR. ROSENBAUM:
19   Q.  She is your boss.
20   **A.  Understood.**
21   Q.  All right. Did you do anything to
22 prepare for this deposition other than talking to
23 Ms. Sherwin or any other attorney?
24   **A.  Just reviewing the contract and some**
25 **e-mail exchange.**

Page 6

1 Q. Okay. The contract that you're
2 referring to is the one between General Medicine
3 and Molina?
4 A. Correct.
5 Q. All right. Did you review both the
6 original contract and the amendment to the
7 contract?
8 A. Yes.
9 Q. Did you review the attachments to the
10 contract?
11 A. The ones that I could find and that
12 I had, yeah.
13 Q. Okay.
14 A. Yeah. There was a lot of ins and outs
15 to it, so...
16 Q. What about in terms of the e-mail
17 exchanges, had you saved e-mails that were
18 relevant to the General Medicine relationship?
19 A. As soon as the litigation started, they
20 tell you save everything, so I tried to do that.
21 Outlook archives things kind of funny, so it's
22 been sent on, and it just kind of archives things
23 differently, so I don't know if I got everything.
24 There seemed to be some things that may have been
25 missing relative to exchanges that could have

Page 7

1 occurred internally at Molina back then between
2 myself and counsel. I don't know if I went
3 through everything, but I tried to review or make
4 myself as abreast of the situation as I could.
5 Q. All right. Generally, for purposes of
6 refreshing your recollection about events?
7 A. Chronology of events. It's been a
8 couple years ago. In starting this organization
9 and when I came in the organization, they had
10 about 8,000 lives. We're now 200,000, so the
11 growth was incredible. We came into Cook County
12 which houses, obviously, Chicago. It's just been
13 a whirlwind, so I just want to make sure that to
14 the best of my ability, I recall the chain of
15 events.
16 Q. When you refer to the "lives," you're
17 referring to the --
18 A. The covered beneficiaries.
19 Q. -- the membership of Molina?
20 A. Correct.
21 Q. Okay. All right. Did you speak to
22 anybody at Molina in terms of trying to refresh
23 your recollection or to prepare for the
24 deposition?
25 A. No.

Page 8

1 Q. So tell me where you're currently
2 employed.
3 A. Molina Healthcare.
4 Q. And what is your position?
5 A. COO.
6 Q. All right. Chief operating officer?
7 A. Correct.
8 Q. And how long have you been at Molina?
9 A. August of 2014, so two years eight
10 months.
11 Q. And have you been the COO for the
12 entire time that you have been there?
13 A. Yes.
14 Q. Okay. Who do you report to at Molina?
15 A. Cathy Harvey, claim president.
16 Q. And is she based in Chicago?
17 A. She is.
18 Q. And she is the plan president?
19 A. Correct.
20 Q. Is there -- my understanding is that
21 Molina has a corporate headquarters out of state.
22 A. Yes, in Long Beach, California.
23 Q. Okay. When folks at Molina refer to
24 "corporate," is that the office they're referring
25 to?

Page 9

1 A. It depends in which circumstance. If
2 you're talking -- for the most part, yes. You
3 might have corporate employees that are -- I mean,
4 with a company our size, we have remote employees
5 all across the country. We have corporate claims
6 processing. Now, that -- some of that is done in
7 Detroit, and some of that is done in Washington,
8 so you -- and credentialing is done in Washington.
9 So depending on the context of the
10 conversation, it might have different intimations.
11 For the most part, yes, corporate is out of
12 Long Beach. I don't know if that color helps at
13 all.
14 Q. No, I think it does.
15 And is there somebody in particular in
16 Long Beach that supervises or that Cathy Harvey
17 would report to?
18 A. Not in Long Beach. It would be part of
19 corporate. She lives in Ohio. She is the
20 regional vice president that oversees about four
21 or five different states. Her name is Amy Clubbs,
22 with two b's.
23 Q. K or -- K-l- or C-l- --
24 A. Oh, C-l-u-b-b-s, sorry.
25 Q. Gotcha. Okay.

Page 10

1      Now, before you joined Molina in 2014,
2  where were you employed?
3      A.   Humana.
4      Q.   And that's another healthcare --
5      A.   Correct.
6      Q.   -- group?
7      A.   Correct.
8      Q.   All right.  And how long had you been
9  with Humana?
10     A.   One year.
11     Q.   What was your position at Humana?
12     A.   Corporate market lead.
13     Q.   What kind of duties did you have as
14 corporate market lead?
15     A.   I was the contemporary to the plan
16 president of Illinois.  So I moved to Louisville,
17 Kentucky as -- Humana has a little bit of a
18 different model.
19     Q.   Different than Molina's?
20     A.   Yes, in the sense that Molina is an
21 organization that was founded in Medicaid, and
22 that's really the corner it defends.  And it
23 appreciates having the individual Medicaid markets
24 kind of run themselves in a lot of ways as where
25 Humana is a Medicare Advantage Program that's

Page 11

1  national, so they're used to doing most things out
2  of the hub.  You have to have some -- some market
3  representation but, really, everything comes out
4  of Louisville.
5      So we have a president -- we had a
6  president here that would run the day-to-day
7  operations in the state, and then I was his
8  counterpart in Louisville, Kentucky.
9      Q.   And what would be your duties presently
10 as COO of Molina?
11     A.   I'm over network development, provider
12 services, physician engagement, program
13 management, delegation and vendor oversight --
14     Q.   All right.
15     A.   -- operations, claims, encounters,
16 credentialing, member engagement, member call
17 center.
18     Q.   The whole ball of wax?
19     A.   It's a scene.
20     Q.   Okay.  In terms of the relationship --
21 or the engagement, let's call it -- with General
22 Medicine, which of these categories would you
23 oversee?
24     A.   Delegation and vendor oversight.
25     Q.   Okay.  As opposed to provider services?

Page 12

1      A.   Yeah.
2      Q.   And would you consider, in the
3  terminology of Molina, that General Medicine was a
4  vendor for purposes of the services it was
5  providing?
6      A.   I would -- I would call it a delegated
7  subcontract.
8      Q.   Okay.  And I think that --
9      A.   Because we delegated certain services
10 to them.
11     Q.   And I think that terminology is used
12 throughout the contract, is it not?
13     A.   Yeah.  Yeah.
14     Q.   All right.  So, in general, you
15 mentioned that Molina's focus is more on the
16 Medicaid side as opposed to Medicare.  In general,
17 I describe Molina's business model and how it works
18 with Medicaid.
19     A.   In the most broad sense?
20     Q.   Yes.
21     A.   Okay.  So we hold a contract between --
22 or with the state of Illinois or often -- or
23 sometimes CMS, depending on the program, where one
24 of those agencies funds us on a -- what they call
25 a PMPM or per member per month model.  So they

Page 13

1  give us a certain dollar amount depending on, one,
2  the program, or the acuity of the condition that
3  the member has.
4      And those dollars are then used to
5  provide covered benefits which are medically
6  necessary for members who are enrolled with Molina
7  on a day of -- on a certain date of service.
8      Q.   Strictly for Medicaid services or also
9  for Medicare?
10     A.   It depends on which program.  In
11 Illinois, we have three.
12     Q.   Okay.
13     A.   We have what they call the FHP
14 Program.  That's the Family Health Program, and
15 that's traditionally moms and babies.
16     Q.   All right.
17     A.   And then there's the ICP Program,
18 Integrated Care Program, and that's -- they
19 formerly used to call it aged, blind, and
20 disabled, but now they call it seniors and persons
21 with disabilities; so your people with more
22 chronic conditions, over the age of 19, et cetera.
23     And then there is the MMP Program or
24 Medicaid -- Medicare/Medicaid Program.  And that's
25 where there is a merging of Medicare as the

1 primary payer for services, then Medicaid picks up
2 a cost-sharing or the secondary payer.
3        So we have a three-way contract with
4 the state of Illinois, CMS and Molina.
5     Q.    You mentioned that you get paid by the
6 state of Illinois a per capita payment -- "PMPM"
7 is the term that you used -- and that those
8 dollars are utilized by Molina to provide the
9 benefits that your members are entitled to under
10 the Medicaid Program, correct?
11    A.    Correct.
12    Q.    Okay.  Do you get any other income --
13 in other words, do the members themselves in any
14 way contribute to the cost of those services?
15    A.    No.  It's -- it is against the law.
16    Q.    Okay.  All right.
17    A.    Now, there are some Medicaid programs
18 where that exists, but those members are not
19 enrolled into managed care organizations.
20    Q.    Okay.
21    A.    So the state of Illinois retains
22 responsibility for them.
23    Q.    All right.  So focusing in just on the
24 delegated services that General Medicine was
25 providing, would it be fair to say that came under

1 the ICP portion of your three programs that you
2 described to me?
3     A.    The majority would be MMP and ICP and
4 very, very few FHP.
5     Q.    Okay.  All right.  What about the --
6 you're familiar with the term "SNFist"?
7     A.    Um-hum.
8     Q.    Skilled nursing -- skilled nursing
9 facilities?
10    A.    Yes.
11    Q.    All right.  Yes, yes, I won't use that
12 term too often.
13        But did those services fall under one
14 of the three programs, or could they be shared by
15 both -- by any of the three?
16    A.    All three.
17    Q.    All three?  Okay.  All right.
18        And General Medicine was -- those
19 SNFist responsibilities were generally delegated
20 to General Medicine under the contract that you
21 executed with them?
22    A.    Correct.
23    Q.    Okay.  All right.  Does the state of
24 Illinois, in terms of your contract with the
25 state, does the state require that those SNFist

1 services be provided as part of the Medicaid
2 Program?
3     A.    Yes.
4     Q.    Do you know when the state of Illinois
5 first started requiring those types of services to
6 be provided?
7     A.    It is ambiguous in the contract and
8 says that the managed care or contractor, is how
9 they refer to it in the agreement, must have a
10 SNFist Program.
11    Q.    All right.
12    A.    That's about how they put it, and
13 that's about how they word it.
14    Q.    Do you know when that began, though?
15 In other words, at what --
16    MS. SHERWIN:  You're talking --
17    MR. ROSENBAUM:  Chronologically.
18    MS. SHERWIN:  -- just for clarification --
19    MR. ROSENBAUM:  Well, here.
20    MS. SHERWIN:  -- on the state level or --
21 or for --
22    MR. ROSENBAUM:  I'll put it into a different
23 context.
24 BY MR. ROSENBAUM:
25    Q.    You joined Molina in 2014.

1     A.    Um-hum.
2     Q.    All right.  At the time that you joined
3 Molina, was the state requiring, even ambiguously,
4 that --
5     A.    Yeah, it was in the contract.
6     Q.    Okay.  All right.  Do you know --
7     A.    It didn't say when it had to be
8 implemented by.
9     Q.    And when you refer to "the contract,"
10 you're referring to a specific contract between
11 the state of Illinois and Molina?
12    A.    Yes.
13    Q.    All right.  Was that contract in place
14 when you joined Molina?
15    A.    Yes.
16    Q.    Do you know when that contract was
17 executed?
18    A.    I do not for Molina.
19        But the ICP Program, we started
20 enrolling members in, oh, about August of 2013 for
21 the ICP Program and February-ish for -- oh, I just
22 want to say February-ish for FHP; or maybe,
23 actually, I want to say later than that, maybe
24 around August for FHP.
25        So ICP and MMP -- let me do it this

Page 18

1 way. ICP, August of 2013.
2    Q.   Okay.
3    A.   MMP, January 1 of 2014. FHP, August of
4 2014.
5    Q.   Okay.
6    A.   That's about as close as I can get it;
7 all of which, you can tell, precede my --
8    Q.   Right.
9    A.   -- my tenure here. And when I was
10 working with Humana, they're in a different
11 geographic location, so they wouldn't all match
12 up.
13    Q.   Okay. What did Molina have to do in
14 order to qualify for this PMPM payment from the
15 state of Illinois? What were your obligations?
16    A.   We had to win the agreement -- or the
17 bid, the RFP, the response.
18    Q.   Okay. And then, once you -- in
19 exchange for the payment, Molina has to provide
20 the benefits, obviously?
21    A.   Right.
22    Q.   And you have to do that through either
23 delegated services or what other -- how else do
24 you provide benefits other than delegating it
25 through various subcontractors? Do you have your

Page 19

1 own providers on your payroll as employees,
2 independent contractors?
3    A.   Sorry. I was -- no. We contract
4 directly with medical/surg providers to be part of
5 what we call an in- -- our in-network physician
6 group or practitioner group or provider group,
7 depending on if it's a hospital or a practitioner,
8 and I call them belly buttons --
9    Q.   Okay.
10    A.   -- or other allied health professionals
11 so that a member may seek direct care from them.
12    Q.   How often does Molina receive the
13 PMPM payment?
14    A.   Monthly.
15    Q.   And it's based on the number of members
16 that are enrolled in -- that are receiving the
17 Medicaid services?
18    A.   Correct.
19    Q.   Did you have to -- do you have to
20 submit anything on a monthly basis to the state of
21 Illinois in order to qualify for their PMPM
22 payment?
23    A.   No. The state of Illinois determines
24 eligibility, and they send us a file.
25    Q.   Okay.

Page 20

1    A.   It's called an 834 file. And then
2 sometime around two months later, the state of
3 Illinois will send us an 820 file. It's
4 essentially a reconciliation file to say these are
5 the members that we're actually going to pay you
6 for.
7         And some of them may have dropped off.
8 Even though we told them you were -- they were
9 your member, now it's your responsibility to tell
10 the provider you're not the primary payer. And
11 under federal regulations, Medicaid has to be the
12 payer of last resort. You have to tell the
13 provider to go seek payment elsewhere.
14    Q.   Okay.
15    A.   So the state, as they call it, retro --
16 retro-eligibility. Sometimes they add members,
17 sometimes they subtract them.
18    Q.   Is there anything that you have to
19 provide to the state, though, on a regular basis
20 just as part of your reporting obligations as to
21 what you're doing with regard to the members in
22 terms of providing the benefits?
23    A.   On a monthly basis, no.
24    Q.   Or on a quarterly, annual?
25    A.   No.

Page 21

1    Q.   All right. Only when the state audits
2 and requests information?
3    A.   Correct.
4    Q.   Is there any -- are you receiving
5 any --
6    A.   Actually, I take that back.
7    Q.   Okay.
8    A.   On an annual basis, we have to submit
9 what we call our cost report which shows, out of
10 the money that they have provided us, how much of
11 it did you spend on delivering medical care to the
12 population.
13         And each one of the contracts has
14 minimum medical cost-ratio thresholds. And by
15 that, I mean for every dollar that they give us,
16 we have to demonstrate that 85 cents of that
17 dollar went to the Medicaid population. Some of
18 the -- different programs have different
19 thresholds.
20    Q.   Do you have to account for every
21 dollar? So if 85 cents went to the program, do
22 you have to account for where the other 15 percent
23 went?
24    A.   Absolutely.
25    Q.   All right. And that would be --

Page 22

1   A.   **Administrative costs.**
2   Q.   Okay. I was going to say operational
3  costs; salaries, overhead?
4   A.   **Quality programs. You got it.**
5   Q.   Okay. And that's on an annual basis
6  that you provide that information?
7   A.   **Correct, or as otherwise requested.**
8   Q.   Or as otherwise requested.
9      What about with regard to the federal
10  government, any sort of subsidized -- subsidies
11  that you receive from the federal government for
12  the services you provide?
13   A.   **No.**
14   Q.   Any reporting that you have to do to
15  the federal government either on a -- on any sort
16  of periodic or annual basis?
17   A.   **Yes.**
18   Q.   Okay. What type of reports?
19   A.   **Utilization reports. They will have**
20  **specific agenda items that they've -- they**
21  **essentially change it each quarter. So sometimes**
22  **they may be looking at care plans that you've**
23  **delivered or health risk screenings or health risk**
24  **assessments or claims payments within 30 days,**
25  **claims payments within 90 days, members' appeals,**

Page 23

1  **member grievances, provider appeals, provider**
2  **grievances, credentialing time frames, number of**
3  **providers that are in your network by a specific**
4  **provider type; if there is a specific issue with a**
5  **specific provider type, how many issues are**
6  **related to X, Y or Z, whatever they have come up**
7  **with and that they want you to research.**
8   Q.   All right. You mentioned that in
9  preparation for today's deposition, you had a
10  chance to review the contract with General
11  Medicine.
12      Did you also have a chance to review or
13  have you reviewed even lately the contract between
14  Molina and the state of Illinois?
15   A.   **I got that one pretty --**
16   Q.   You know that one pretty well?
17   A.   **There's a lot there, but I'm --**
18   Q.   It's pretty thick, isn't it?
19   A.   **Yeah, it's pretty thick, and there's**
20  **three of them, but I'm -- I'm relatively familiar**
21  **with them.**
22   Q.   All right.
23   A.   **Enough to where I can get through most**
24  **of the day-to-day activities unless I need to get**
25  **incredibly specific on something.**

Page 24

1   Q.   You say there are three of them. Of
2  those three, is there one that would pertain to
3  the services that General Medicine was providing,
4  or would all three somehow be relevant?
5   A.   **All three would be relevant.**
6   Q.   Okay. Are there any provisions in any
7  of the three state contracts -- let's forget the
8  General Medicine contract. Let's talk just about
9  the contracts that Molina has with the state. Are
10  there any provisions in there that require Molina
11  to make timely payments to its providers?
12   A.   **Yes.**
13   Q.   Are there any provisions in the state
14  contract that require Molina to set up some sort
15  of a grievance or dispute resolution process with
16  its providers?
17   A.   **Yes.**
18   Q.   Would you consider, from a terminology
19  standpoint, General Medicine to be a provider in
20  the context of those contracts subject, in other
21  words, to the timely payment requirements, the
22  dispute resolution requirements?
23   A.   **No.**
24   Q.   And that's because of the distinction
25  between a provider and a delegated subcontractor?

Page 25

1   A.   **It's -- in my position and perspective,**
2  **it's relative to claim submission.**
3   Q.   Explain what you mean by that.
4   A.   **The way the state defines specific**
5  **criteria relative to time frames for our end**
6  **claims payment is relative to when a provider**
7  **submits a clean claim for a medically necessary**
8  **covered benefit that was enrolled with Molina on**
9  **the date of service and followed the utilization**
10  **management guideline, a/k/a prior authorization is**
11  **obtained for them, for example.**
12      **When they submit a claim, from the time**
13  **of receipt, we have 30 days to pay 90 percent of**
14  **those; and 99 percent have to be paid within**
15  **90 days.**
16   Q.   You used the terminology "clean claim."
17  Are we talking about, like, similar to what a
18  provider would when he was dealing with -- when
19  you're dealing directly with CMS, when they're
20  enrolled in the Medicare Program and they submit
21  their claims to a CMS contractor?
22   A.   **Exactly tantamount to that.**
23   Q.   All right. You look at it or you
24  process those claims in the same way that CMS
25  would process a Medicare claim?

Page 26

1    A.   Right.  And they call it ANSI
2 standards.
3    Q.   Okay.
4    A.   It's federal ANSI standards.
5    Q.   In the contract with General
6 Medicine -- and I hate to jump back and forth, but
7 I'll try to be clear.  You let me know if I
8 confuse you on that.
9    A.   That's okay.
10   Q.   There were -- and we'll get into this a
11 little deeper a little bit later on, but there
12 were two types of payments under the contract that
13 General Medicine was receiving, correct?
14   A.   Correct.
15   Q.   All right.  One was the PMPM payment,
16 similar to what I think what you were -- what
17 Molina receives from the state of Illinois?
18   A.   Correct.
19   Q.   Okay.  And then the second one sounds
20 more like the payment you were just describing to
21 us, the clean claim submission for medically
22 necessary services.
23   A.   Correct.
24   Q.   Okay.  All right.
25        MS. SHERWIN:  And just for a moment, just for

Page 27

1 the record --
2        MR. ROSENBAUM:  Sure.
3        MS. SHERWIN:  -- I think what we're talking
4 about in the "clean claim" context is the FFS --
5        MR. ROSENBAUM:  That's correct.  That's my
6 understanding.
7        MS. SHERWIN:  -- which is not at issue anymore
8 because that's been settled.
9        MR. ROSENBAUM:  Right.
10       MS. SHERWIN:  Okay.
11       MR. ROSENBAUM:  And I was going to ask --
12       THE WITNESS:  Right.
13       MR. ROSENBAUM:  And I was going to ask
14 Mr. Schoen to confirm that.
15 BY MR. ROSENBAUM:
16   Q.   But, yes, that's my understanding --
17   A.   Yes.
18   Q.   -- is that the FFS claims are all
19 settled at this point.
20   A.   Yes, and I would expect -- yeah.
21       THE WITNESS:  I'm sorry?
22       MS. SHERWIN:  Yes, they have been settled.
23 BY THE WITNESS:
24   A.   Those are the ones that I would say,
25 had those been submitted, those would have been

Page 28

1 subject to that same time frame.
2        MS. SHERWIN:  PMPMs.
3        THE WITNESS:  The PMPMs is a little bit
4 different.
5        MR. ROSENBAUM:  Right.
6        THE WITNESS:  I'm going to get up and grab a
7 cup of coffee.
8        MR. ROSENBAUM:  Absolutely.  Go right ahead.
9        (WHEREUPON, discussion was had off
10       the record.)
11 BY MR. ROSENBAUM:
12   Q.   All right.  Going back to the
13 distinction in the state contract between the
14 provisions that apply to providers and the
15 provisions that would be applicable to a vendor in
16 the role of General Medicine, is it your position,
17 then, that the provisions that deal with timely
18 payments and dispute resolution and grievance
19 procedures would not be applicable to General
20 Medicine?
21   A.   From the sense of the contract held
22 between Molina and the state --
23   Q.   Yes.
24   A.   -- I don't believe it's explicitly
25 defined.

Page 29

1    Q.   All right.  Was Molina's SNFist Program
2 in place when you became COO of Molina?
3    A.   I believe they executed the agreement
4 the week that I either showed up or the week
5 before.
6    Q.   Which agreement are you referring to
7 now?
8    A.   The one between Molina and Gen Med,
9 P.C.
10   Q.   So was Gen Med the first SNFist -- the
11 first vendor that was going to be implementing the
12 SNFist Program on Molina's behalf?
13   A.   To my knowledge.
14   Q.   Had you had any personal experience
15 with a SNFist Program in your roles at Humana or
16 any other occupations that you may have had in the
17 healthcare industry?
18   A.   I spoke with Dr. Prose when I was at
19 Meridian Health Plan.
20   Q.   Okay.  We didn't even talk about
21 Meridian.  Was that pre-Humana?
22   A.   Pre-Humana.
23   Q.   Okay.
24   A.   When the RFP had come out, Dr. Prose
25 had come out to give a presentation, and that's

Page 30

1 the extent of my experience.
2    Q.  What was your role at Meridian?
3    A.  I started it here in Illinois, and
4 I was the director of network development and
5 provider services.
6    Q.  Was Meridian a national company at the
7 time?
8    A.  No.  Meridian is a privately-held
9 organization formerly known as Health Plan of
10 Michigan out of --
11    Q.  Oh.
12    A.  -- Michigan, and it -- Illinois was the
13 first state that it expanded to outside.
14    Q.  Okay.  How long were you with Meridian?
15    A.  Ten years.
16    Q.  Was that immediately before Humana?
17    A.  Six months, I think. I think I left in
18 February and then began working for Humana in
19 September -- August. That sounds about right.
20 It's been a while.
21    Q.  Did the state of Illinois require
22 Molina to have a contract executed with a vendor
23 to provide SNFist services?
24    A.  A clarifying question. Prior to
25 go live or in general?

Page 31

1    Q.  In general.
2    A.  They simply state in the contract that
3 the contractor will have a SNFist Program.
4    Q.  And you being the contractor -- Molina
5 being the contractor?
6    A.  Molina being the contractor. Whether
7 we chose to implement that internally with our own
8 resources or subcontract that out is not specified
9 in the agreement.
10    Q.  Got it.
11    A.  And the sophistication of that program
12 is not defined, and not -- not much direction is
13 given.
14    MR. ROSENBAUM: Okay. We will make this
15 No. 1. Here you go. I have a copy for you.
16       (WHEREUPON, said document was
17       marked Schoen Exhibit No. 1 for
18       identification as of 04/05/2017.)
19 BY MR. ROSENBAUM:
20    Q.  All right. Mr. Schoen, I'm going to
21 have you take a look at what I have had marked as
22 Deposition Exhibit No. 1 and ask you if you can
23 identify that for me, please.
24    A.  Yes. This looks to be a standard
25 Molina Healthcare of Illinois Provider Services

Page 32

1 Agreement.
2    Q.  All right. I note on the first page,
3 there is a signature of Catherine Harvey. That is
4 the same Catherine Harvey that you identified
5 earlier as your immediate superior at Molina?
6    A.  That is correct.
7    Q.  And the date on this contract -- her
8 date is April 1st of 2014; so I assume this
9 predated your employ at Molina, correct?
10    A.  Yes, by about four months, five months.
11    Q.  You said this is a standard Provider
12 Services Agreement, meaning that this particular
13 form is utilized for many different providers;
14 this wasn't customized for General Medicine?
15    A.  Correct.
16    Q.  And is this one of the documents that
17 you reviewed in preparation for your deposition
18 today?
19    A.  No.
20    Q.  No? All right. When you said that you
21 did review the contract with General Medicine,
22 other than the amendment, which we will get to, was
23 there --
24    A.  That's what I was referring to. I did
25 see this document.

Page 33

1    Q.  Okay.
2    A.  But it appeared to be the standard
3 Provider Services Agreement which, really, is only
4 addressing those fee-for-service on traditional
5 covered med/surg benefits that Gen Med, P.C. would
6 have been rendering.
7    Q.  Would it be fair to say that the
8 Provider Services Agreement is standard with
9 regard to providers and is customized through the
10 various attachments that are referenced?
11    A.  Yes.
12    Q.  Okay.
13    A.  If, in fact, customization is required.
14 Otherwise, it's signed.
15    And then, if it's a covered benefit
16 under Illinois Medicaid, you provide the service,
17 you bill the claim, we reimburse it. It's
18 traditional fee-for-service, and that's that
19 second component.
20    Q.  Do you know -- and I understand this
21 predated your tenure at Molina -- but do you know
22 whether General Medicine had actually begun seeing
23 patients -- or seeing members of Molina prior to
24 your coming to Molina?
25    A.  Not that I can recall.

Page 34

1    Q.   All right. Do you know why they --
2    why, even though this contract was signed on
3    April 1st, they were not seeing any patients --
4    any members until some subsequent date?
5    A.   A clarifying question. Seeing members
6    in a fee-for-service component, or seeing them
7    under the SNFist, or both?
8    Q.   Either.
9    A.   I was not aware of any of it.
10   Q.   All right. Do you know why an
11   amendment to this agreement was needed for the
12   General Medicine relationship?
13   A.   To address the specific Statement of
14   Work for the SNFist Program.
15   Q.   All right. Were you involved in the
16   negotiating of that amendment?
17   A.   I was not. And that's the one that
18   I believe was executed directly before my arrival.
19   Q.   Do you know who on behalf of Molina was
20   involved in negotiating that with General
21   Medicine?
22   A.   I've heard two names, Carol Rupert and
23   Mike Smigielski.
24   Q.   I know how to spell Carol's name.
25   A.   Well, that makes two of us.

Page 35

1    Q.   Can you spell Mike's last name?
2    A.   S-m-i-g-i-e-l-s-k-i.
3    Q.   Close enough. All right.
4         Carol Rupert is no longer with Molina,
5    correct?
6    A.   Neither.
7    Q.   Neither one? All right. What was
8    Carol's Rupert's title or position at the time
9    that this agreement -- that the amendment was
10   negotiated?
11   A.   The director of care management or case
12   management, one of those two.
13   Q.   Would the SNFist Program have fallen
14   under her supervision, under her supervisory
15   duties?
16   A.   I believe so.
17   Q.   And what was Mike Smigielski's title?
18   A.   Vice president of finance and
19   analytics.
20   Q.   Is that the position that is currently
21   held by Vijay?
22   A.   Vijay is the director of analytics.
23   Q.   Okay. Does Vijay report to the current
24   vice president?
25   A.   Yes.

Page 36

1    Q.   All right. You can put that one away,
2    and we will get to the one that's a little bit
3    more germane.
4         MR. ROSENBAUM: This will be No. 2.
5              (WHEREUPON, said document was
6              marked Schoen Exhibit No. 2 for
7              identification as of 04/05/2017.)
8    THE WITNESS: Thank you.
9    BY MR. ROSENBAUM:
10   Q.   And, Mr. Schoen, I'll ask you if you
11   can identify what has been marked as Deposition
12   Exhibit 2.
13   A.   This is the amendment to the Provider
14   Services Agreement.
15   Q.   All right. And you did review this in
16   preparation for today's deposition, I believe?
17   A.   To some degree, yes.
18   Q.   Okay. Look at, if you would,
19   Attachment D, which should be the second page of
20   this exhibit.
21        I see in the very first sentence a
22   reference to the "ICP," which is actually
23   "Medicaid (ICP)," and the "MMP (MMAI)" plans in
24   Illinois. Those are two of the three plans that
25   you referred to earlier --

Page 37

1    A.   Correct.
2    Q.   -- as being part of your -- of Molina's
3    contract with the state of Illinois, correct?
4    A.   Correct.
5    Q.   All right. And that contract mandates
6    the SNFist services that are being delegated, if
7    you will, to General Medicine under this
8    amendment, is that correct?
9    A.   Correct.
10   Q.   And we've already covered the fact that
11   1.1 and 1.2 of this Attachment D covers the two
12   types of payments that -- compensation that
13   General Medicine was to receive under this
14   contract, correct?
15   A.   Correct.
16   Q.   1.1 being the PMPM payment, and
17   1.2 being what we've referred to as the FFS
18   payment, fee-for-service?
19   A.   Correct.
20   Q.   All right. And just more for an
21   informational background and not because that's at
22   issue in this arbitration, we talked earlier about how it
23   appears to be tantamount to the way a provider
24   would bill CMS for Medicare services.

Page 38

1     In effect, what General Medicine was
2 doing for fee-for-service was billing Molina for a
3 certain level of service as opposed to billing
4 Medicare directly?
5     A.   Correct.
6     Q.   Okay. All right. How did -- you
7 mentioned Molina would receive a PMPM payment from
8 the state of Illinois. Did that same PMPM payment
9 have to cover both the per capita payment that's
10 described in 1.1 and the fee-for-service payment
11 in 1.2; or were you getting another -- a second
12 payment from the state to deal with the 1.2 FFS
13 payments?
14    A.   We only received one PMPM payment.
15    Q.   All right. And from that one payment,
16 you had to provide the services to the members,
17 correct?
18    A.   To all members.
19    Q.   To all members. And one of the costs
20 that would be part of providing the services was
21 what you had to pay to General Medicine,
22 I presume?
23    A.   Correct.
24    Q.   If you can go to the next page,
25 Attachment D-1, which is entitled the SNFist

Page 39

1 Program Statement of Work.
2     And just as a point of clarification,
3 on the first page of Exhibit 2 in the recitals,
4 this is designated as Attachment G, but in the
5 actual document itself, it appears to be referred
6 to as D-1. Are we -- we are talking about the
7 same Statement of Work, are we not, the one that
8 is --
9     A.   Can you point out where G --
10    Q.   Sure.
11    A.   -- Attachment G is.
12    Q.   Look on the very first page of
13 Exhibit 2 in the recitals under No. 2:
14 "Attachment G - (SNFist Program Contract
15 Statement of Work)."
16     But when I actually turn to the
17 attachment, it's labeled D-1, but it's also
18 entitled "SNFist Program Statement of Work."
19 I just want to make certain we're not dealing with
20 two different statements.
21    MS. SHERWIN: If you know.
22 BY MR. ROSENBAUM:
23    Q.   If you know.
24    MS. SHERWIN: If you don't know, then say
25 "I don't know."

Page 40

1 BY THE WITNESS:
2     A.   I don't know because it also references
3 Attachment H.
4 BY MR. ROSENBAUM:
5     Q.   And we will get to Attachment H.
6     A.   Okay.
7     MS. SHERWIN: So then --
8     MR. ROSENBAUM: I will represent to you --
9     MS. SHERWIN: Yeah.
10    MR. ROSENBAUM: -- that I have never seen an
11 Attachment G, but I just wondered whether you were
12 aware of the discrepancy.
13    MS. SHERWIN: Yeah. I mean, if you know, then
14 you know. If you don't know --
15 BY THE WITNESS:
16    A.   Yes, at this point --
17    MS. SHERWIN: -- then let's just move on.
18 BY THE WITNESS:
19    A.   (Continuing) -- I don't know.
20    MS. SHERWIN: Okay.
21    MR. ROSENBAUM: That's fine. That's fine.
22 BY MR. ROSENBAUM:
23    Q.   Do you know who at Molina was
24 responsible for preparing this Statement of Work
25 for the SNFist Program?

Page 41

1     A.   I do not.
2     Q.   Are there SNFist programs -- are you
3 aware of SNFist programs in other states that are
4 administered by Molina?
5     A.   I am not.
6     Q.   In your experience at Humana and
7 Meridian, had you seen this type of compensation
8 system before, a combination of a per capita
9 payment, the PMPM, and fee-for-service work? Had
10 you ever dealt with it before?
11    A.   In this capacity?
12    Q.   Yes.
13    A.   For this provider type?
14    Q.   For any providers.
15    MS. SHERWIN: Could you clarify the question.
16    MR. ROSENBAUM: Sure, sure.
17    MS. SHERWIN: I don't understand it.
18    MR. ROSENBAUM: Sure.
19 BY MR. ROSENBAUM:
20    Q.   I'm just wondering as a foundation,
21 this contract provides for two types of payments
22 to General Medicine. I'm just wondering whether
23 you've seen that type of setup -- compensation
24 setup for other providers either in your
25 experience at Molina or in your prior experience

Page 42

1  with other healthcare companies.
2      MS. SHERWIN: Do you understand the question?
3      THE WITNESS: I don't know how to answer the
4  question.
5      MS. SHERWIN: Okay. Maybe you can clarify it.
6  BY MR. ROSENBAUM:
7      Q.  Well, is the question unclear, or --
8      MS. SHERWIN: It must be.
9  BY THE WITNESS:
10     A.  Yes.
11 BY MR. ROSENBAUM:
12     Q.  Okay. You understand the two types of
13 compensation that General Medicine was receiving
14 under this contract, Exhibit 2, correct?
15     A.  Yes.
16     Q.  Have you ever seen this type of a setup
17 or compensation system with other providers other
18 than General Medicine, either at Molina or Humana
19 or Meridian?
20     A.  I have seen variations of capitated
21 plus fee-for-service arrangements.
22     Q.  Okay.
23     MS. SHERWIN: Do you want -- perhaps you need
24 one more clarification on what a "capitated"
25 service is, just so the record is clear?

Page 43

1      MR. ROSENBAUM: Sure.
2  BY MR. ROSENBAUM:
3      Q.  I mean, am I correct that a capitated
4  service is a payment per member as opposed to a
5  particular fee for a service, for a level of
6  service?
7      A.  It is some -- some amount for a payment
8  per member.
9      MR. ROSENBAUM: Okay?
10     MS. SHERWIN: Okay.
11 BY MR. ROSENBAUM:
12     Q.  And the payments you were receiving --
13 "you"? When I say "you," I mean Molina. The
14 payments that Molina was receiving from the state
15 of Illinois under the Medicaid Program were
16 capitated payments?
17     A.  Correct.
18     Q.  And the first part of the compensation
19 that you were paying General Medicine under this
20 amendment were capitated payments?
21     A.  Correct.
22     Q.  All right. Now, is it your
23 understanding that this Attachment D-1 that's in
24 front of you, the program -- the SNFist Program
25 Statement of Work is an outline of General

Page 44

1  Medicine's obligations to Molina in terms of what
2  it was to provide, what services it was to
3  provide?
4      A.  Yes.
5      Q.  Now, is it true that Molina paid
6  General Medicine in full the PMPM payment for
7  September, October, November and December of 2014,
8  to your best of your understanding?
9      A.  We paid them, yes.
10     Q.  Okay. You paid them a PMPM payment?
11     A.  Yes.
12     Q.  You also paid them fee-for-services,
13 but let's agree to --
14     A.  Yes.
15     Q.  That's not in dispute, so I'm only
16 going to be referring to PMPM payments from here
17 on out.
18     A.  Okay.
19     Q.  All right. Was there something about
20 my question, when I said you paid them "in full"
21 for those months that you disagreed with?
22     A.  Yes.
23     Q.  Okay. Why would you draw a distinction
24 between what I said and your answer?
25     A.  I don't understand the term "in full."

Page 45

1      Q.  Okay. It's my understanding that
2  General Medicine did not invoice Molina for the
3  PMPM payment. Is that true?
4      A.  Correct.
5      Q.  All right. That it was somewhat
6  similar to how you described it with the state of
7  Illinois, that Molina would send a payment to
8  General Medicine based on the number of members
9  that had been assigned to General Medicine on a
10 given month, is that correct?
11     A.  Yes.
12     Q.  All right. So is it your understanding
13 that Molina sent a member list to General Medicine
14 for September, October, November and December of
15 2014?
16     A.  Based on the state of Illinois'
17 criteria -- member criteria list, yes, that's what
18 we sent.
19     Q.  And is it your understanding that
20 Molina paid the contractually required payment --
21 PMPM payment to General Medicine for those four
22 months based on the list that you sent to General
23 Medicine?
24     A.  For those members that were eligible at
25 that time, yes.

Page 46

1    Q.   All right. Is it also true that Molina
2  made a subsequent PMPM payment to General Medicine
3  at some point in 2015 prior to the termination of
4  the contract? If you know.
5    MS. SHERWIN: Could you -- I'm confused. Are
6  you talking about the capitated?
7    MR. ROSENBAUM: Yes.
8    MS. SHERWIN: PMPM?
9    MR. ROSENBAUM: Yeah.
10   MS. SHERWIN: Okay.
11 BY MR. ROSENBAUM:
12   Q.   If it helps refresh your recollection,
13 I understood there was, like, a $64,000 payment
14 that was made in those -- in the first three
15 months of 2015. Does that --
16   A.   The number 64,000 makes sense to me.
17   Q.   Okay. Do you have any recollection of
18 what that was based on or why that was paid at
19 that particular time?
20   A.   I am unable to recall.
21   Q.   Did you have anything to do with
22 authorizing that particular payment?
23   A.   I don't -- I'm unable to recall.
24   Q.   Is there somebody at Molina who would
25 know perhaps better than you at this point why

Page 47

1  that particular payment was made?
2    A.   At this point, without research,
3  I don't -- I don't know who would.
4    Q.   Okay. Is it possible that the person
5  who would know is no longer at Molina?
6    A.   It is possible.
7    Q.   All right. Would you agree with me
8  that Molina did not make a PMPM payment -- let's
9  leave aside the 64,000 since you don't have any
10 specific recollection about the basis for that.
11       Would you agree with me that Molina did
12 not make a PMPM payment to General Medicine for
13 the members that were assigned to General Medicine
14 for January, February and March of 2015?
15   A.   I would agree, excluding that 64,000,
16 that no additional payment was made.
17   Q.   Do you know why no additional payment
18 was made?
19   A.   Yes.
20   Q.   All right. Tell me why.
21   A.   At -- in roughly December, some point
22 in mid-December, an increase in membership had
23 occurred in the population that was being sent to
24 Gen Med, P.C. for them to conduct the work
25 described in Attachment D-1, and it was a rather

Page 48

1  large jump. And based on the contractual
2  requirements held between Molina and the state of
3  Illinois, I wanted to make sure that the provider
4  was indeed rendering these services.
5    Q.   Okay.
6    A.   And I began asking questions to my
7  healthcare services staff on whether or not it was
8  being completed because I had heard through the
9  grapevine that we were not getting what we needed
10 from Gen Med, P.C.
11   Q.   Okay.
12   A.   At that time, I asked for, before the
13 payment went out, which was usually around the
14 15th of the month --
15   Q.   Let me just stop you just to clarify
16 the chronology. The 15th, let's say, of
17 January --
18   A.   Of the following month.
19   Q.   All right. So for the January list,
20 the payment would have gone out February 15th?
21   A.   Correct.
22   Q.   Okay. Go ahead and finish your answer.
23   A.   And I was trying to get an
24 understanding of what it was that General
25 Medicine P.C. was doing.

Page 49

1        As we spoke earlier, Carol Rupert, this
2  would have been under her purview.
3    Q.   Okay.
4    A.   So I was checking in to see if the
5  face-to-face comprehensive exams were being
6  completed, if the ACE forms were being completed,
7  and if the care plans were being completed, to
8  which my team informed me they were not.
9    Q.   When did you get that information that
10 they were not?
11   A.   Roughly at the end of December or
12 January-ish.
13   Q.   Oh, okay. End of December, early
14 January?
15   A.   Yeah, right around there.
16   Q.   Around the turn of the year?
17   A.   And with the holidays, I think it was
18 January that I was really able to dig in.
19   Q.   Okay. The information that your team
20 was giving you, then, was based on the General
21 Medicine services for the last four months of
22 2014, then, September through December?
23   A.   Correct.
24   Q.   All right. So let me go back and sort
25 of break down some of the points you made in your

Page 50

1 answer.
2        You said there was a large increase in
3 the membership in December of 2014. Am I correct
4 that for the -- call it September through
5 November, the membership that had been assigned to
6 General Medicine was in the area of maybe
7 500 members a month?
8    A.   Correct.
9    Q.   Okay. And am I correct that in
10 December, the membership jumped up to, like,
11 1700 members?
12   A.   Correct.
13   Q.   All right. Am I also correct that
14 Molina did not -- that you simply in one month did
15 not add 1200 new members that suddenly enrolled in
16 Molina, is that correct?
17   A.   I believe we did. I believe we had a
18 huge spike in December.
19   Q.   I see. All right. You don't believe
20 that you had actually had the 1700 members in your
21 system and just didn't realize it, and they had
22 not been assigned to General Medicine?
23   A.   No. It was an increase in membership.
24   Q.   Okay. Have you had a similar spike in
25 membership of that size since --

Page 52

1 General Medicine in December?
2    A.   We will eventually or had eventually,
3 yes.
4    Q.   Wait. When you say "we will," I mean,
5 have you received the payment? We are now three
6 years down the road.
7    A.   Yeah, and they owe us a billion
8 dollars, so...
9    Q.   Well, okay. So there's a -- that's a
10 whole new topic we're going to get into.
11   A.   Yeah.
12   Q.   All right. Well, you know, we will get
13 into that.
14        But let me ask you, then, with regard
15 to the first three months of the General Medicine
16 contract -- September, October and November -- did
17 you actually get paid by the state of Illinois?
18 Have you been paid yet by the state of Illinois
19 for those three months?
20   A.   I would have to defer to Dennis Akotia,
21 our CFO.
22   Q.   Okay.
23   A.   He does the reconciliation.
24   Q.   All right. So you don't know at this
25 point?

Page 51

1    A.   Frequently.
2    Q.   Going 1200 members over the prior
3 month?
4    A.   Um-hum.
5    Q.   "Yes"? That's a "yes"?
6    A.   Yes.
7    Q.   Okay.
8    A.   We just received -- we received,
9 I believe, 1000 members last -- last month in this
10 population.
11   Q.   Right. Were you getting a commensurate
12 payment, then, from the state of Illinois -- let's
13 say for September, October and November, was your
14 payment from the state of Illinois based on the
15 500 members for those three months?
16   A.   Yes.
17   Q.   All right. And then, did you get a
18 payment from the state of Illinois commensurate
19 with the 1700 members starting for the month of
20 December of 2014?
21   A.   We would have if the state paid on
22 time, yes.
23   Q.   Well, okay. Did you eventually get a
24 payment from the state of Illinois that would have
25 covered the 1700 members that were assigned to

Page 53

1    A.   I don't.
2    Q.   And it's fair to say, then, you don't
3 know if you've been paid for the big jump in
4 December or any of the 2015 services?
5    A.   I cannot -- I cannot say with any
6 degree of certainty.
7    Q.   Okay. Did you know at the time -- in
8 December of 2014 or January of 2015, did you know
9 whether or not Molina had actually -- had received
10 the funds from the state of Illinois?
11   A.   No. I assumed that we hadn't.
12   Q.   You assumed that you had not?
13   A.   Correct.
14   Q.   Okay. Were they supposed to pay you --
15 "they," the state of Illinois -- supposed to pay
16 you on roughly the same timetable that you were
17 obligated to pay General Medicine; in other words,
18 by the 15th of the following month?
19   A.   Well, we --
20        MS. SHERWIN: You know, I don't -- I have to
21 object. I mean, I don't know that Ben knows the
22 ins and outs of how the state of Illinois pays --
23        MR. ROSENBAUM: Well, if he doesn't --
24        MS. SHERWIN: -- if he knows how they pay, so
25 it's really speculation at this point. He can

Page 54

1 tell you whether they were paid, if he can; which,
2 apparently, he can't, or who might know if they
3 were paid. But how they paid and when they paid
4 and all that other stuff, that's really --
5      MR. ROSENBAUM: Well, I don't want him to
6 speculate.
7      MS. SHERWIN: My understanding from what I'm
8 hearing is he doesn't know.
9      MR. ROSENBAUM: Well, I don't -- yeah, I don't
10 want him to speculate. And if he does not know,
11 you know, the basis -- well, I'll ask you a
12 preliminary question.
13 BY MR. ROSENBAUM:
14     Q.   You started in August of 2014, so it
15 was not like you had some history with the state
16 of Illinois on these payments, correct?
17     **A.   I have history with the state of**
18 **Illinois reaching back to 2008, which sometimes**
19 **they pay on a monthly basis, which they're**
20 **supposed to; sometimes they pay every six months;**
21 **sometimes they pay every twelve months; sometimes**
22 **they pay three months.**
23        **From a financial forecasting**
24 **perspective, it is an absolute nightmare.**
25     Q.   How about with regard to the contract

Page 55

1 between Molina and the state of Illinois, did the
2 contract, if you know, require the state of
3 Illinois to pay Molina --
4      **A.   Yes.**
5      Q.   -- the per capita on a certain
6 timetable?
7      **A.   Yes.**
8      Q.   And what would have been that
9 timetable?
10     **A.   I believe it's every 60 days.**
11     Q.   All right. And sitting here today, you
12 don't know whether they actually did in the time
13 frame that we're talking about?
14     **A.   I am -- I am not certain.**
15     Q.   All right. And you mentioned that the
16 services that General Medicine was supposed to be
17 providing under this Attachment D-1 were under the
18 purview of Carol Rupert, correct?
19     **A.   To the best of my knowledge.**
20     Q.   And Carol Rupert left Molina in
21 December of 2014, is that -- if you recall?
22     **A.   I would say towards the end of 2014,**
23 **early 2015.**
24     Q.   Okay. And who replaced her as the
25 supervisor for the services General Medicine was

Page 56

1 to provide?
2      **A.   I believe those responsibilities were**
3 **transferred under Randy Carey-Walden.**
4      Q.   And that's Carey-Walden with a hyphen
5 between those last two names?
6      **A.   Yes.**
7      Q.   Okay. So when you asked your staff to
8 determine whether General Medicine was performing
9 the tasks or the services that were delegated to
10 them, would you have gone to Randy Carey-Walden
11 for those answers?
12     **A.   I would have gone to Cathy Schilling,**
13 **the vice president of healthcare services, who is**
14 **over Randy Walden.**
15     Q.   Give me -- all right. So Cathy
16 Schilling reports to you?
17     **A.   She reports to Cathy Harvey, the plan**
18 **president.**
19     Q.   So you and Cathy Schilling are, like,
20 on a lateral position, would you say? No?
21     **A.   No.**
22     Q.   Okay. I'm trying to --
23     **A.   But the reporting structure is of that**
24 **nature, and there is --**
25     Q.   All right.

Page 57

1      **A.   -- Cathy Harvey at the top. I'm the**
2 **chief operating officer. There is Cathy**
3 **Schilling, and she is over healthcare services.**
4 **Underneath Cathy Schilling is Mary Jo Coyne.**
5      Q.   Okay.
6      **A.   And underneath Mary Jo Coyne are**
7 **several different reports, but Randy Carey-Walden**
8 **being one of them.**
9      Q.   I see. All right. The bottom line
10 being, though, that Cathy Schilling does not
11 report --
12     **A.   To me.**
13     Q.   -- to you?
14     **A.   Correct.**
15     Q.   So if you wanted answers, then, as to
16 what General Medicine was doing, you would have
17 gone to Cathy Schilling?
18     **A.   That's where I would have started, yes.**
19     Q.   And then she would have gone down
20 chain to, eventually, Randy Carey-Walden and
21 perhaps --
22     **A.   Maybe looped us in, correct.**
23     Q.   Understood. Okay. All right.
24        Now, you mentioned three
25 responsibilities that General Medicine was

Page 58

1 supposed to provide under the Statement of Work.
2 We referred to them by the acronyms yesterday in
3 Vijay's deposition, so our reporter is familiar
4 with them, but let's just go over them.
5      "FCNA" is the initial face-to-face
6 assessment?
7   **A.   Correct.**
8   Q.   "ACE" is an annual comprehensive
9 assessment?
10  **A.   Exam.**
11  Q.   Exam; exam, okay. And care plans?
12  **A.   Care plan or treatment plan.**
13  Q.   Okay. All right. So looking back at
14 Attachment D-1 in front of you, I see 24 items
15 under "Scope of Work."
16  **A.   Um-hum.**
17  Q.   Can you tell me which one would be
18 the -- is No. 4 the one that would correspond to
19 the FCNA?
20  **A.   Correct. Well, that -- that talks
21 about the -- that talks about the face-to-face --
22 or the FCNA relative to the time frame in which it
23 will be performed. Subsequent provisions talks
24 about what is included in the FCNA.**
25  Q.   That's what I was going to ask you.

Page 59

1 No. 6, am I correct, that is a much more detailed
2 statement of what constitutes the FCNA?
3   **A.   Correct.**
4   Q.   Okay. All right. And then, turning to
5 the next page, would No. 7 -- and there may be
6 others, but at least would No. 7 be the care plan
7 or treatment plan that you referenced earlier?
8   **A.   Correct.**
9   Q.   And would also No. 8 also be part of
10 that same care plan?
11  **A.   Correct.**
12  Q.   Am I correct in saying that No. 7, when
13 it refers to "treatment plan," and No. 8, when it
14 refers to "care plan," are we talking, basically,
15 about the same document or --
16  **A.   Yes.**
17  Q.   Okay. They're used interchangeably in
18 the contract?
19  **A.   They are.**
20  Q.   Okay.
21  **A.   And in the industry.**
22  Q.   All right. And then, No. 9, the
23 "annual comprehensive assessment," is that the
24 same as the ACE that we talked about?
25  **A.   Correct.**

Page 60

1   Q.   Okay. That's not called ASA?
2   **A.   Right.**
3   Q.   All right. So I know there are -- as
4 I said, there are 24 items here.
5      Are there any other items in this list
6 that you determined that General Medicine was not
7 providing or was tardy in providing?
8   **A.   Not to my knowledge.**
9   Q.   All right. When you say that -- now,
10 let's go back to the FCNA for a moment.
11     Are you -- is it Molina's position or
12 your position that when you examined General
13 Medicine's performance for the last four months of
14 2014, is that General Medicine was not doing
15 the FCNAs at all, or was it that they were not
16 doing them completely, or was it that they were
17 late, or any of those three?
18  **A.   Sorry. Ask the question one more time.**
19  Q.   Sure. I'll break it down. It will be
20 easier.
21     What was your concern with the FCNAs?
22 Was it that they were not being done at all?
23  **A.   I don't know if I had a specific issue
24 with the FCNAs. It was the amalgamation of the
25 three different large components -- the major**

Page 61

1 **components not being all completed for each one of**
2 **the members.**
3   Q.   All right.
4   **A.   So FCNA, ACE, care plan.**
5   Q.   And when you say "amalgamation," are
6 you saying -- are you saying that it's -- are you
7 saying that as a group, there were patients that
8 did not have all three done?
9   **A.   Correct.**
10  Q.   Okay. In theory, they all could have
11 had the FCNA and the ACEs; but if none of them had
12 care plans, that would have -- that would be part
13 of your amalgamation argument?
14  **A.   Correct. But they should have.**
15  Q.   I understood. Okay.
16     In the information that you received
17 from your staff, and sitting here today, can you
18 tell me whether or not there were patients that
19 did not have an FCNA done that were supposed to
20 have an FCNA done?
21     MS. SHERWIN: If you know.
22 BY THE WITNESS:
23  **A.   I don't know.**
24 BY MR. ROSENBAUM:
25  Q.   The same question with regard to ACE.

Page 62

1    A.   I cannot say with certainty, but I
2 believe that number, when I'm looking -- when I'm
3 dialing back in my Rolodex, that that number was
4 lower than FCNAs that were completed.
5    Q.   Now, as I understand the scope of work,
6 the FCNA is something that is done when a member
7 is first assigned to Molina, correct?
8    A.   Correct.
9    Q.   Okay. You don't do an FCNA every month
10 if the member stays on the plan every month, is
11 that correct?
12    A.   You don't do an FCNA?
13    MS. SHERWIN: If you know. Do you know?
14 BY THE WITNESS:
15    A.   Correct.
16 BY MR. ROSENBAUM:
17    Q.   Okay. And then the ACE, being an
18 annual comprehensive exam, my understanding from
19 the contract is, that is done one year after the
20 FCNA. Is that an accurate statement?
21    A.   No.
22    Q.   That's not accurate? Okay. Take a
23 look at No. 9.
24       "An annual comprehensive assessment
25    will be performed within thirty days of

Page 63

1    the anniversary date of the initial
2    comprehensive assessment."
3       So the way I read it -- and you can
4 tell me if I'm wrong -- is that if General
5 Medicine did an FCNA, they would not have to go
6 back and do an ACE on that member until a year
7 later.
8    MS. SHERWIN: Now I'm confused. I don't
9 understand.
10    MR. ROSENBAUM: Well --
11    MS. SHERWIN: Are you saying --
12    MR. ROSENBAUM: I'm just reading from No. 9,
13 my understanding of what No. 9 says. Do you want
14 to take a look at it?
15    MS. SHERWIN: Which?
16    MR. ROSENBAUM: It's on Exhibit 2, page 4 of
17 4.
18    MS. SHERWIN: I mean, but you just referred to
19 two different kinds of assessment. This No. 9
20 says --
21    MR. ROSENBAUM: Well --
22    MS. SHERWIN: -- "An annual comprehensive
23 assessment" --
24    MR. ROSENBAUM: "Will be performed" --
25    MS. SHERWIN: -- "will be performed within

Page 64

1 30 days of the anniversary date of the initial
2 comprehensive assessment."
3    MR. ROSENBAUM: Right. That's why I
4 referred -- that's why I referred to two different
5 things.
6    MS. SHERWIN: So that would seem to me we're
7 talking about one of the same thing. I do an ACE
8 on this day, I do an ACE --
9    MR. ROSENBAUM: Well --
10    MS. SHERWIN: -- a year later.
11    MR. ROSENBAUM: Judy, with all due respect,
12 that's not really --
13    MS. SHERWIN: I mean, I don't know what you're
14 --
15    MR. ROSENBAUM: That's not really an
16 objection. I'm asking the expert here.
17    MS. SHERWIN: Well, no, I understand.
18 I understand.
19       But you referred to FCNA and then you
20 referred to ACE, so try to refer -- they are two
21 different things.
22    MR. ROSENBAUM: I understand that.
23    MS. SHERWIN: Okay. So, then, let's --
24    MR. ROSENBAUM: All right. Well, let me
25 ask -- let me ask Dr. Schoen the questions.

Page 65

1    MS. SHERWIN: Okay.
2 BY MR. ROSENBAUM:
3    Q.   No. 9 --
4    THE WITNESS: Oh, I'm no doctor.
5    MR. ROSENBAUM: I understand. I did call you
6 a doctor.
7       Now, let me ask Mr. Schoen the
8 question.
9    MS. SHERWIN: Okay.
10 BY MR. ROSENBAUM:
11    Q.   No. 9, "an annual comprehensive
12 assessment," that is the ACE, as you understand
13 it, is it not?
14    A.   No. 4 says "a face-to-face Initial
15 Comprehensive Assessment."
16    Q.   Right.
17    A.   Which is different than the annual
18 comprehensive assessment.
19    Q.   Right. But then, at the end of No. 9,
20 there is a reference to "the anniversary date of
21 the initial comprehensive assessment," which I
22 understood to be No. 4.
23    MS. SHERWIN: If that's your understanding,
24 then --
25    MR. ROSENBAUM: Well, that's what I'm asking.

**Page 66**

1 MS. SHERWIN: I mean, I -- it doesn't read
2 that way. I don't know. Go ahead.
3 BY THE WITNESS:
4 **A. All right. Perhaps my confusion stems**
5 **from the requirement of CMS ACE comprehensive**
6 **assessments, which we do annually. Regardless of**
7 **an initial assessment or not --**
8 BY MR. ROSENBAUM:
9 Q. Okay.
10 **A. -- the forms have to be completed.**
11 Q. Okay.
12 **A. So as you're reading it, I believe**
13 **that's correct.**
14 Q. Okay. That's fine. And just from a
15 layman's standpoint, it seems to me that common
16 sense says, if a member comes in to Molina, you
17 have to do that initial very comprehensive
18 assessment because you haven't seen this member
19 before.
20      And as we agreed earlier, you don't
21 have to repeat it every single month; but
22 certainly, there's a point in time when you have
23 to update it or at least, you know, give another
24 comprehensive assessment as opposed to simply
25 doing a monthly visit?

**Page 67**

1 MS. SHERWIN: All right. I have to object
2 because this is just muddying the waters.
3      There were three requirements, and I --
4 the question, I know you're not trying to do this,
5 but it certainly is coming across that way to me.
6 There were FCNAs, there were ACEs, and there were
7 care plans. They had different requirements at
8 different times.
9      If you want to ask him with reference
10 to those terms, then the record will be clearer.
11 What you're asking now, nobody will know a week
12 from now what you were talking about. I'm sorry.
13 I have to object.
14      MR. ROSENBAUM: I understand your objection.
15      MS. SHERWIN: Okay. So -- and unless you can
16 understand whether he's talking about an FCNA, an
17 ACE or a care plan, then I would direct you not to
18 answer.
19      So would you please try --
20      MR. ROSENBAUM: Well, no, no, no.
21      MS. SHERWIN: No. Please try --
22      MR. ROSENBAUM: Judy, you cannot direct him
23 not to answer a question.
24      MS. SHERWIN: Well --
25      MR. ROSENBAUM: He can tell me he doesn't

**Page 68**

1 understand, and that's fine.
2      MS. SHERWIN: I think he doesn't understand.
3      MR. ROSENBAUM: Then he can tell me that.
4      MS. SHERWIN: Okay. All right. So --
5      MR. ROSENBAUM: But you can't direct him not
6 to answer.
7      MS. SHERWIN: I can direct him not to answer a
8 question.
9      MR. ROSENBAUM: Not if it's not a privileged
10 question.
11      MS. SHERWIN: Look.
12      MR. ROSENBAUM: And it's certainly relevant.
13      MS. SHERWIN: I think what is relevant is to
14 try to make a clear record, and this is not a
15 clear record right now.
16      MR. ROSENBAUM: I'm trying to make --
17      MS. SHERWIN: And I know what it's referring
18 to, so I am reading this in my head two months
19 from now, and nobody is going to know what it
20 means. So please try to make the question
21 clearer. That's all.
22 BY MR. ROSENBAUM:
23 Q. Mr. Schoen, you testified earlier that
24 No. 9 refers to the ACE, correct?
25 **A. Yes.**

**Page 69**

1 Q. Okay. I am trying to determine, from
2 your understanding, what the timing is of when an
3 ACE has to be done. Do you understand No. 9 to
4 address that, that timing issue?
5 **A. It will be performed within 30 days of**
6 **the anniversary date of the initial comprehensive**
7 **assessment.**
8 Q. All right. Do you know what is meant
9 by an "anniversary date"?
10 **A. I do.**
11 Q. Would that -- is it your understanding
12 that that's one year from some triggering point?
13 **A. Yes. But I don't know if it's meant to**
14 **address Molina's initial comprehensive exam or**
15 **another one that the provider may have on file.**
16 Q. Fair enough. Fair enough.
17      Do you know whether or not, since
18 General Medicine was beginning the SNFist Program
19 for Molina, do you know whether any of Molina's
20 members had an initial comprehensive assessment
21 done before General Medicine began providing
22 SNFist services?
23 **A. Sorry. Can you repeat the question.**
24 Q. Sure. Since you testified that General
25 Medicine was beginning -- was the first vendor to

Page 70

1  do the SNFist Program --
2      **A.  Yes.**
3      Q.   -- do you know whether any of Molina's
4  members had an initial comprehensive assessment
5  done before General Medicine started doing them at
6  the end of 2014?
7      **A.  Yes, we did do them.  I do not know if**
8  **they were done on this -- any -- for any of the**
9  **members that were also given to --**
10     Q.   Fair enough.
11     **A.   -- General Med, P.C.**
12     Q.   Fair enough.
13     **A.   And this is within 30 days.**
14        **So I guess what's important to**
15 **understand is, we could do an initial**
16 **comprehensive exam in December.  In January, the**
17 **clock starts over again, and you're able to do it**
18 **then.**
19     Q.   All right.  But would you consider
20 January to be the anniversary date of the initial
21 comprehensive assessment if it was done in
22 December, or would it not be the following
23 December, if you know?
24     **A.   It just says "within 30 days of the**
25 **anniversary date."  It doesn't say that you have**

Page 71

1  got to do it 30 -- in those 30 days.
2      Q.   Okay.  So going back to the ACEs, your
3  testimony was, you believe that not all of them
4  were done by General Medicine that should have
5  been done?  That's your recollection, sitting here
6  today?
7      **A.   Correct.**
8      Q.   Okay.  And the same with care plans.
9  Is it your understanding that General Medicine did
10 not do all the care plans at the end of 2014 that
11 they were supposed to do?
12     **A.   That is correct.**
13     Q.   Did you have a problem with the timing
14 requirements in the Statement of Work with regard
15 to the FCNAs?  They're supposed to be performed,
16 according to this contract, within 24 hours of
17 receipt of referral.
18     **A.   I didn't have a problem with it.**
19     Q.   Okay.  You just wanted them done, not
20 whether they were done within 24 hours of the
21 referral?
22     **A.   No.  Let me clarify.**
23     Q.   Okay.
24     **A.   I wanted them done pursuant to what was**
25 **defined in the agreement.**

Page 72

1      Q.   Okay.  All right.
2      **A.   Sorry.  Did I answer correctly?**
3      Q.   When you said you didn't have a
4  problem, does that mean somebody else would have
5  had a problem?
6      **A.   No, no.  It means that -- no.  It's**
7  **24 hours.  I don't have a problem with that.  If**
8  **they can do all the comprehensive exams within**
9  **24 hours, then...**
10     Q.   Okay.  Do you have an opinion as to
11 in December of 2014, whether it would have been
12 possible to do a comprehensive exam on the -- an
13 initial comprehensive exam on the 1200 new members
14 that were added to the list within 24 hours?
15     **A.   In the absence of knowing the structure**
16 **and fundamentals of General Medicine, P.C.,**
17 **I don't know.**
18     Q.   You have no opinion on that?
19     **A.   I have no opinion.**
20     Q.   Okay.  When it refers to "referral" --
21 stupid question.
22        When it says "referral," "receipt of
23 referral from Health Plan," do you see that in
24 No. 4, is that a reference to the -- excuse me --
25 to the member list that was given to General

Page 73

1  Medicine on a monthly basis?
2      **A.   It includes that.**
3      Q.   What else would be included in that?
4      **A.   I believe that Randy or Carol were also**
5  **able to make determinations on individuals that**
6  **required them.**
7      Q.   Over and above what's on the list?
8      **A.   When we became aware of**
9  **retro-eligibility, for instance.**
10     Q.   Do you have a specific recollection of
11 notifying General Medicine in writing that FCNAs
12 or ACEs or care plans were not being done by
13 General Medicine on all of the members that should
14 have had them done?
15     MS. SHERWIN:  I have to object.  Are you
16 asking him if he sent them a writing or if
17 somebody else sent them a writing?
18     MR. ROSENBAUM:  All right.  I'll clarify it if
19 that's -- yeah.
20     MS. SHERWIN:  Yes.
21 BY MR. ROSENBAUM:
22     Q.   Do you have a recollection of yourself
23 sending a writing to General Medicine at any
24 point, notifying them that either the FCNAs, the
25 ACEs, or the care plans were not being done on all

Page 74

1 Molina members?

2   A.   I have a recollection of communicating
3 my concern for the performance of General Med --
4 General Medicine's work as it relates to the
5 contract, verbally and in writing.

6   Q.   Okay. I'm not asking about verbally at
7 this point, just in writing.

8   A.   Sorry.

9   Q.   You do have a specific recollection of
10 communicating your concern to General Medicine
11 about that?

12   A.   Yes.

13   Q.   Okay. Other than communicating your
14 concern in writing -- and I'm only asking about
15 writings at this point -- do you have a
16 recollection of actually you personally
17 communicating specific instances where General
18 Medicine has not done FCNAs --

19   A.   Yes.

20   Q.   -- or ACEs or care plans as the
21 contract requires?

22   A.   Yes.

23   Q.   Do you have a specific recollection of
24 you personally identifying the members of which
25 General Medicine had failed to do any of those

Page 75

1 three tasks that we've talked about?

2   A.   I have a recollection of attempting to
3 go down that path to decipher if the -- if the
4 information that I was inquiring on that per my
5 analysis didn't meet the provisions of the
6 agreement is something that Gen Med was aware of.

7       I remember -- I recollect a
8 conversation occurring to try and understand where
9 the delta was.

10   Q.   A conversation with who?

11   A.   A communication, pardon me, a written
12 communication.

13   Q.   With who?

14   A.   I believe it was Dr. Prose. And he had
15 other individuals that would be cc'd on there that
16 I am not familiar with.

17   Q.   And when you are referring to the
18 "delta," you are referring to the difference
19 between the members that required one or more of
20 those tasks and the tasks that were actually done?

21   A.   Correct.

22   Q.   Okay. Did you have any written
23 communications -- strike that.

24       You received information, though, from
25 your staff that tasks were not being done as

Page 76

1 required by the contract, correct?

2   A.   Correct.

3   Q.   Did you ever -- did your staff ever
4 give you specifics or identify -- just use a fake
5 name, Mary Smith, did not -- needed to have an
6 FCNA and it was not done; or John Doe should have
7 had -- did not have a care plan done and it should
8 have been done?

9       Did you ever get to that level of
10 specifics with your staff, as communicated to you?

11   A.   Correct, yes.

12   Q.   You did?

13   A.   Yes.

14   Q.   Did you then pass on that information
15 in writing to General Medicine?

16   A.   Yes.

17   Q.   Okay. When you reviewed e-mails in
18 preparation for this deposition, did you see that
19 particular writing communicating to General
20 Medicine the specifics of who had -- who needed to
21 have one of the tasks done that it hadn't been
22 done?

23   A.   Not by individual.

24   Q.   Just in general terms?

25   A.   We began compiling an analysis of these

Page 77

1 are the members that we sent, here's the three
2 columns, ACE, face-to-face exam, care plan.

3       Anecdotally, I can't remember the names
4 off the top of my head, but we will use the number
5 that you used earlier for September, October and
6 November; roughly 500 members, and X many were
7 completed.

8   Q.   Okay. Would you take a look again at
9 No. 8 on that Exhibit 2. It says:

10       "Recommendations for the care plan
11   will be communicated to Health Plan within
12   seventy-two hours of completion of the
13   assessment and will be reviewed with
14   Health Plan and updated at least monthly
15   as indicated."

16       Was there a specific contractual
17 requirement for how the recommendations for the
18 care plan and the updates were to be communicated
19 to Molina?

20   A.   Between which parties?

21   Q.   Between the --

22   A.   We used "contract" a lot. The one
23 between myself and the state, between --

24   Q.   Good point. As between General
25 Medicine -- well, let me ask a foundational

Page 78

1 question.
2       General Medicine's clinicians were
3 doing the -- were supposed to be doing the care
4 plan, correct?
5    A.   Yes.
6    Q.   Okay. And they were supposed to
7 communicate the recommendations for the care plan
8 to -- it says "Health Plan," but that's Molina, is
9 that correct?
10   A.   Correct.
11   Q.   Is there any contractual requirement as
12 to how that communication was to take place?
13   A.   In that specific provision?
14   Q.   Yes.
15   A.   Not in that provision.
16   Q.   Okay. Was your concern -- Molina's
17 concern with regard to the care plans that they
18 weren't being done at all, or they weren't being
19 done timely?
20   A.   That we weren't receiving them.
21   Q.   Whether they were done or not, you
22 weren't getting them? They were not being
23 communicated to you? Was that your concern?
24   A.   We were not going to be able to get
25 credit for them being completed by the state of

Page 79

1 Illinois or CMS because we were not in receipt of
2 them.
3    Q.   Sitting here today, you do not know
4 whether the treatment plan or the care plan was
5 actually noted on the patient charts at the
6 facilities by General Medicine, do you?
7    A.   I do not.
8    Q.   But it's Molina's position that if it
9 was, that doesn't constitute communication to
10 Molina for purposes of the contract between
11 General Medicine and Molina?
12   A.   Correct.
13   Q.   Did you have to report the specifics of
14 the care plans to CMS or the state of Illinois on
15 a regular basis?
16   A.   Yes.
17   Q.   Okay. When I -- I said "specifics," do
18 you know what I meant by "specifics"? I meant the
19 actual -- the actual treatment plan as opposed to
20 the fact that a treatment plan was done.
21       Did you have to do the specifics or
22 simply just indicate that a treatment plan was
23 done?
24   A.   I'm aware of that it -- just the
25 treatment plan was done.

Page 80

1    Q.   How often did that have to be
2 communicated to the state of Illinois?
3    A.   I believe monthly.
4    Q.   And how --
5    A.   And CMS monthly.
6    Q.   As well?
7    A.   Yes.
8 MR. ROSENBAUM: Okay. You can put that one
9 away.
10 MS. SHERWIN: Can we take a break?
11 MR. ROSENBAUM: Sure.
12 MS. SHERWIN: Just five minutes.
13 MR. ROSENBAUM: Sure.
14       (WHEREUPON, a recess was had from
15        11:01 a.m. until 11:08 a.m.)
16       (WHEREUPON, a certain document was
17        marked Schoen Exhibit No. 3 for
18        identification as of 04/05/2017.)
19 MR. ROSENBAUM: All right. Back on the
20 record.
21 BY MR. ROSENBAUM:
22   Q.   All right. Mr. Schoen, I have had this
23 marked as Exhibit 3 and ask you if you can
24 identify that for me.
25   A.   Yes, sir.

Page 81

1    Q.   Okay. And what is it?
2    A.   This is the delegation of services
3 amendment.
4    Q.   Okay. And do you understand this to be
5 part of the amendment to the General Medicine
6 agreement?
7    A.   Yes, sir.
8    Q.   This is the Attachment H you referred
9 to earlier?
10   A.   Yes, sir.
11   Q.   And you had an opportunity to review
12 this, actually, in preparation for your
13 deposition, or do you believe you did?
14   A.   Yes.
15   Q.   One initial question. If you turn to
16 page 6 of this document under the "4.7 SNFist
17 Services," there is a list of "Delegated
18 Responsibilities."
19       What is your understanding of why
20 this -- how this interacts with the Attachment D-1
21 that we just -- that we were talking -- that's
22 Exhibit 2 that we talked about earlier?
23   A.   Good question. This is related to the
24 agreement from a contractual perspective
25 (indicating) and not -- this isn't. But this is

Page 82

1 what NCQA requires related to the delegated
2 services.
3    Q.   Okay.  When you said "this" before --
4    A.   Pardon me.
5    Q.   -- you were referring to Exhibit 2?
6    A.   My apologies.
7    Q.   That is, for the record, Exhibit 2?
8    A.   Exactly, yes.
9    Q.   Okay.
10    A.   I was referring to and pointing to
11 Exhibit 2.
12    Q.   Okay.  So tell me again on -- and I do
13 see references to "NCQA" in this document.  So
14 this is something that is required by what
15 organization?
16    A.   The National Commission for Quality
17 Assurance, the independent review organization the
18 state of Illinois requires us to comply with.
19    Q.   Is this Attachment H a form document
20 that is used for any kind of provider of delegated
21 services?
22    A.   From Molina, yes, sir.
23    Q.   All right.  And customized as needed
24 for the particular services that are being
25 delegated?

Page 83

1    A.   Correct.
2    Q.   And in this case, would you say that
3 the SNFist Services, 4.7, is one of the
4 customizations?
5    A.   Correct.
6    Q.   Is it fair to say, then, that the
7 Article -- that the Article One, "Definitions,"
8 and the "General Terms and Conditions," those
9 are -- and Article Three, the "Remedies for
10 Non-Performance," are those all standard
11 provisions?
12    A.   We refer to them as boilerplate.
13    Q.   Boilerplate, yes.
14    A.   Yes.
15    Q.   Perfect.  Very good.  There is a
16 reference on the first page, the first paragraph
17 above Article One, it says:
18       "This Addendum supersedes all previous
19       Delegation Agreements, Attachments,
20       Exhibits and/or Addendums."
21       Is that your understanding, that this
22 document superseded Attachment D-1 as opposed to
23 supplementing it?
24    A.   Barry, I'm sorry, can you point me to
25 the provision again.

Page 84

1    Q.   Sure.  The very first page, the
2 paragraph just above Article One.
3    A.   Now I'm tracking.
4    Q.   Right in the middle of that paragraph,
5 it says:
6       "This Addendum supersedes all previous
7       Delegation Agreements, Attachments,
8       Agreements and/or Addendums."
9       MS. SHERWIN: I'm sorry.  I don't know what
10 you are reading.
11       MR. ROSENBAUM: Right in the middle of that
12 paragraph there (indicating).
13       MS. SHERWIN: Oh, okay.  Yeah, all right.
14 Good.
15 BY THE WITNESS:
16    A.   No.  I believe that this precedes any
17 other delegated agreements, attachments, exhibits
18 or addendums.
19 BY MR. ROSENBAUM:
20    Q.   And there weren't any with regard to
21 General Medicine, were there, other than this is
22 the first?
23    A.   Correct.
24    Q.   Okay.  All right.  And then the next
25 sentence says:

Page 85

1       "Provider shall begin performing the
2       specific function delegated as of the date
3       indicated by the Health Plan's quality
4       committee in its notice to Provider of its
5       approval of delegation (the 'Start Date')."
6       Did Molina have a quality committee?
7    A.   Yes.
8    Q.   All right.  Were you on that committee?
9    A.   No.
10    Q.   Do you know whether there was a notice
11 to General Medicine of the approval of delegations
12 or that there was a start date?
13    A.   I do not know.
14    Q.   All right.  And so is it fair to say,
15 then, that you don't know what the start date was
16 for General Medicine's delegated duties?
17    A.   That is fair to say.
18    Q.   If you would take a look on page 5,
19 this also is part of the boilerplate,
20 "Article Three, Remedies for Non-Performance."
21    A.   Page 5?  I'm sorry.
22    Q.   Do you see that?
23    A.   Yes, sir.
24    Q.   Okay.  3.1 refers to "Corrective
25 Action."  Have you reviewed that provision, and do

Page 86

1  you have an understanding of --
2  **A.  Yes.**
3  Q.  -- what is required under there?  All
4  right.
5  Is it fair to say that this is a -- I'm
6  paraphrasing -- this is a provision in which
7  Molina could put General Medicine on notice that
8  it was deficient in its performance and require
9  General Medicine to give a -- to prepare a
10  corrective action --
11  MS. SHERWIN:  I'm sorry.
12  MR. ROSENBAUM:  Let me finish my question.
13  MS. SHERWIN:  Okay.  Which --
14  MR. ROSENBAUM:  Oh, I'm sorry.
15  MS. SHERWIN:  Which paragraph are you
16  referring to?  That's all.
17  MR. ROSENBAUM:  3.1.
18  MS. SHERWIN:  That's what I thought.  Okay.
19  We're fine.
20  MR. ROSENBAUM:  All right.  I'm in the middle
21  of my thought here.
22  MS. SHERWIN:  I'm sorry.
23  MR. ROSENBAUM:  That's all right.
24  BY MR. ROSENBAUM:
25  Q.  (Continuing) -- to prepare a corrective

Page 87

1  action plan in which General Medicine could
2  correct the deficiencies within a certain period
3  of time?  Is that what you understand 3.1 to
4  provide?
5  **A.  Yes.**
6  Q.  Okay.  And 3.2, this "Revocation"
7  provision, this is an alternate provision where
8  Molina would have the authority to basically tell
9  General Medicine, "We are revoking your authority
10  to do one or more of the delegated tasks"?
11  **A.  Yes.**
12  Q.  All right.  Is there any other remedy
13  for non-performance that you see that is provided
14  for under this Article Three?
15  **A.  Not under Article Three.**
16  Q.  Okay.  Would you agree with me that
17  under this Article Three, one of the remedies for
18  non-performance is not simply not paying General
19  Medicine any of the compensation or even a part of
20  the compensation provided for in its contract?
21  **A.  I'm sorry.  Would you be willing to**
22  **repeat the question.**
23  Q.  I would.
24  Would you agree with me that under
25  this Article Three, one of the remedies for

Page 88

1  non-performance does not include Molina not paying
2  General Medicine for its compensation that is due
3  under the contract?
4  **A.  I acknowledge that provision 3 does not**
5  **discuss payment.**
6  Q.  Would you also agree with me that at
7  no time did Molina exercise either 3.1 or 3.2 of
8  this Article Three as a remedy for what it
9  perceived to be General Medicine's deficiencies in
10  performance?
11  **A.  I acknowledge that Molina did not have**
12  **an opportunity to engage General Medicine P.C. in**
13  **a corrective action plan.**
14  Q.  Okay.  When you say "opportunity," can
15  I make it -- I'd like to make it clear.  It's sort
16  of "yes" or "no."
17  Did Molina ever notify General Medicine
18  that it was requiring a corrective action plan?
19  **A.  No, it did not.**
20  Q.  Okay.  And it's also true that Molina
21  did not actually -- it never revoked General
22  Medicine's obligation to perform any of its
23  delegated services under 3.2?
24  **A.  Not at that time.**
25  Q.  Okay.  Is this Article Three, these

Page 89

1  Remedies for Non-Performance, this is something
2  that is mandated by the state of Illinois to be in
3  your contracts?
4  **A.  NCQA.**
5  Q.  NCQA, which is -- how does that relate
6  to the state of Illinois?
7  **A.  It is written in our contract,**
8  **"contract" meaning the agreement held between the**
9  **state of Illinois or CMS and Molina --**
10  Q.  Right.
11  **A.  -- that we must be an accredited**
12  **organization by NCQA as a provision of the**
13  **agreement.**
14  Q.  And to be accredited, you would have to
15  have a provision -- this provision, this
16  Article Three -- boy, I'm having a problem -- in
17  your contracts?
18  **A.  You have to address, for delegated**
19  **providers, corrective action plans and revocation**
20  **plans that meets the criteria of NCQA.**
21  Q.  And just turning to the next page, the
22  SNFist -- the delegated services under SNFist on
23  page 6 of the agreement, I just want to make sure
24  we're talking about some of the same terminology.
25  Would you agree with me that No. 2,

1 "Completion of Initial Comprehensive Assessment
2 (ICA)," would you equate that with the FCNA that
3 we've been talking about?
4 **A. Correct.**
5 Q. And No. 3, the "Development of a
6 treatment plan," would you agree with me that that
7 is the same as the treatment plan or care plan
8 that we've previously referred to?
9 **A. Correct.**
10 Q. Look at No. 5, "Making updates to care
11 plan in Clinical Care Advanced (CCA) after all
12 visits." Now, that's the same care plan that we
13 have been referring to, correct?
14 **A. Correct.**
15 Q. Is this the method that Molina wanted
16 to receive the communication that the care plan
17 was done?
18 **A. Correct. It's the mechanism to enter**
19 **the care plan.**
20 Q. Right. This was not mentioned or
21 specified in the previous -- in Exhibit 2,
22 correct? We talked about the fact that they
23 talked, you know, as to how it was to be
24 communicated.
25 **A. CCA is not mentioned in the --**

1 Q. Right.
2 **A. -- in the amendment to the Provider**
3 **Services Agreement.**
4 Q. And what is your understanding of what
5 the CCA is?
6 **A. It is our healthcare services IT**
7 **platform, care management platform.**
8 Q. All right. And is it your understanding
9 that the General Medicine clinicians were trained
10 on how to input data into this platform?
11 **A. My understanding is that that occurred**
12 **several times.**
13 Q. Okay. And that they were trained not
14 only to put input -- to input data for the care
15 plan but also for other required delegated duties,
16 is that correct?
17 **A. Correct.**
18 Q. Did you ever attend any of the training
19 on the CCA?
20 **A. I did not.**
21 Q. Have you ever reviewed the training
22 materials for the CCA that were given -- that were
23 provided to the clinicians?
24 **A. I have not.**
25 Q. Is it fair to say, then, that you

1 yourself have never been trained on how to input
2 data into the CCA?
3 **A. That is fair.**
4 Q. When you mentioned that in early
5 January -- the end of December, early January,
6 I don't think you were exactly clear on the date,
7 but when you mentioned that you were first told by
8 your staff that General Medicine was not -- was
9 not doing all the tasks that it was supposed to be
10 doing, were you told that they were failing to
11 enter care plan -- care plans or care plan data
12 into the CCA? Is that part of what you were
13 informed of?
14 **A. As a result of my inquiries and review,**
15 **yes.**
16 Q. Is it fair to say that to the best of
17 your recollection, the earliest point in time that
18 you determined that General Medicine was not
19 entering -- was not entering care plans into the
20 CCA would have been at the end of December, right
21 around the holidays of 2014?
22 **A. I would say more of January, but I**
23 **think you have a good grasp of the time.**
24 Q. Either just before or just after the
25 holidays?

1 **A. Somewhere around that time.**
2 Q. Okay. You said that at General
3 Medicine, you understood the clinicians were
4 trained on the CCA on multiple occasions. Do you
5 know exactly how many times they would receive
6 training?
7 **A. I do not.**
8 Q. Do you know why they received -- well,
9 let me ask you this. Do you know when they
10 received their training?
11 **A. I do not.**
12 Q. Do you know generally what years,
13 whether it was at the beginning of the
14 relationship or in the middle of the relationship?
15 **A. I have no idea.**
16 Q. Do you know why they received training
17 more than once on the CCA?
18 **A. I do not.**
19 Q. Do you know whether or not the training
20 that they received initially was later determined
21 by Molina to be improper or deficient in some way?
22 **A. I do not.**
23 Q. Were you aware of whether or not there
24 were problems with the CCA in terms of being able
25 to log into it at different times during the time

Page 94

1  period when General Medicine was performing
2  services?
3     A.   I do not.
4     Q.   Had you ever heard that the system was
5  down or heard any people complaining that they
6  couldn't get into the system or couldn't log onto
7  the system?
8     A.   No.
9     Q.   All right.  Either contemporaneously or
10 even after the fact, had you ever heard that?
11    A.   No.
12    Q.   Were you aware -- were you involved at
13 all in the credentialing process of General
14 Medicine's clinicians?
15    A.   I don't understand the question.
16    Q.   Do you understand what I mean by
17 "credentialing"?
18    A.   Yes.
19    Q.   All right.  What's your understanding
20 of "credentialing"?
21    A.   The primary source verification and
22 requirement of needed documentations to get the
23 providers loaded into the system.
24    Q.   So credentialing had a direct
25 relationship with inputting data into the CCA?

Page 95

1     A.   Providers needed to be credentialed and
2  eligible to participate in the program in order
3  for them to be able to render services to our
4  members.
5     Q.   All right.  So backing it out to
6  different steps, in order to render the services,
7  you had to be -- you had to be credentialed?  If
8  you weren't -- right?  Is that correct?
9     A.   Am I allowed to answer the questions?
10    Q.   Yeah, yeah.
11    A.   You have to be eligible under the
12 state of Illinois Medicaid Program for the ICP
13 population in order to be credentialed and in
14 order to render services.  If you're not eligible,
15 we don't even get to the next step.
16    Q.   Okay.  All right.
17    A.   So that's where I get a little bit --
18 sorry for that.
19    Q.   I understand.
20         So if a General Medicine clinician was
21 not credentialed, they would not be allowed to
22 render services to your members?
23    A.   Incorrect.
24    Q.   Incorrect?  All right.  Tell me where
25 I'm wrong again.

Page 96

1     A.   If they're not eligible -- if they're
2  not registered with the state of Illinois --
3     Q.   Yes.
4     A.   -- then they're not eligible.  Then
5  they cannot do anything.
6     Q.   Okay.
7     A.   If they are eligible but not
8  credentialed, they must receive prior
9  authorizations per our utilization management
10 guidelines.
11    Q.   Okay.
12    A.   Then they become eligible for
13 credentialing, which takes a couple weeks.
14    Q.   Okay.
15    A.   And then they can be in the system.
16 And then information, they -- even as -- even as a
17 non-credentialed provider, if they're getting
18 prior authorization, their information can be in
19 the system.
20    Q.   Okay.
21    A.   But it all starts from the state
22 registration.
23    Q.   Gotcha.
24    A.   They -- that's in our contract between
25 us and the state of Illinois.

Page 97

1     Q.   Okay.  Were you aware of any --
2     THE WITNESS:  Is there a tissue?  I'm sorry.
3     MS. SHERWIN:  Oh, I don't know.
4         (WHEREUPON, there was a short
5          interruption.)
6     THE WITNESS:  I'm ready.
7  BY MR. ROSENBAUM:
8     Q.   All right.  So were you ever aware
9  that -- were you aware that there were issues with
10 delays in getting General Medicine's clinicians
11 credentialed so that -- or authorized so that they
12 could log into the system and input data?
13    A.   Yes.
14    Q.   All right.
15    A.   But not because of them logging in.
16 It was brought to my attention, "You didn't
17 credential the providers."  That's how it was
18 brought up.
19    Q.   All right.  Staying with Exhibit 3 for
20 a moment -- where did I see that?  Ah, okay.
21         The next page after page 6, page 7,
22 "SNFist Reporting Requirements," do you know
23 whether or not these are -- these requirements
24 were customized for your contract with General
25 Medicine, or were these standard that were

Page 98

1 required by the NCQA?
2     **A.   I do not know.**
3     Q.    Under SNFist Reporting Requirements
4 No. 2, "Monthly Admissions reports," do you know
5 whether or not General Medicine was providing the
6 monthly admissions reports to Molina?
7     **A.   I do not.**
8     Q.    Would that have been something within
9 your duties that would have come to you if they
10 were?
11    **A.   No.**
12    Q.    All right. Would that have gone up the
13 other chain, through Randy Carey-Walden and Carol
14 Rupert, that group?
15    **A.   Correct.**
16    Q.    Okay. Would you have ever asked Cathy
17 Schilling, who was the head of that group, would
18 you have ever asked -- would you have ever asked
19 Schilling, "Has General Medicine been
20 providing the monthly admissions reports required
21 under the contract"?
22    **A.   No.**
23    Q.    Would your supervisor -- the last name
24 again? Cathy --
25    **A.   Harvey.**

Page 99

1     Q.    -- Harvey, would she have been
2 requesting those from Cathy Schilling, if you
3 know?
4     **A.   I doubt it, but no.**
5     Q.    All right. I note in the monthly
6 admissions reports, there is a requirement that
7 General Medicine report the "total number of ICAs
8 completed" -- that's sub "f" -- "total number of
9 thirty day treatment plans completed," and the
10 "total number of ACA completed."
11          I think the "ACA" refers to the ACE.
12 Would you agree with me, probably?
13    **A.   I would say that's a good assumption.**
14    Q.    Okay. Would you agree with me that
15 somebody at Molina -- that somebody at Molina, if
16 they had been receiving the monthly admissions
17 reports, would have known whether or not General
18 Medicine was performing the correct number of
19 FCNAs, ACEs or care plans?
20    **A.   I cannot say that.**
21    Q.    Do you have a -- can you tell me why
22 you cannot say that?
23    **A.   I'm not intimate enough with the**
24 **difference in the process of how data is**
25 **abstracted relative to reporting, if one is just**

Page 100

1 **a number of completed, which is different than**
2 **specifics that would be requested in CCA.**
3     Q.    Okay. Would you agree with me that if
4 General Medicine was not providing any monthly
5 admissions reports, that somebody at Molina in
6 that group should have been requesting them?
7     **A.   I would agree that someone should have**
8 **been ensuring that every provision of this**
9 **agreement should have been overseen at every**
10 **provision of this agreement. A number of ICAs or**
11 **treatment plans doesn't satisfy the state**
12 **requirement of a treatment plan.**
13    Q.    But would you agree with me that if
14 you --
15    MR. ROSENBAUM: You've got the nose, I've got
16 the throat.
17    **THE WITNESS: Yeah. We're a good bunch.**
18 BY MR. ROSENBAUM:
19    Q.    Would you agree with me that if an
20 admissions report had been provided to somebody at
21 Molina in that group, that Molina would have had
22 an opportunity to question as early as October,
23 November, December, to question whether or not
24 General Medicine was doing what it was required to
25 do under its contract?

Page 101

1     **A.   I can't say.**
2     Q.    Okay. Do you see letter "E," the
3 "Performance Standards" down at the bottom?
4     **A.   Um-hum.**
5     Q.    It says here:
6          "Provider will be evaluated on an
7          ongoing and annual basis against current
8          SNFist requirements."
9          Would you -- do you understand that --
10 is it your understanding that the current SNFist
11 requirements are those that are in the delegation
12 in this Attachment H, or do you believe there's
13 some other SNFist requirements?
14    **A.   I believe that the SNFist requirements**
15 **are described in Attachment H.**
16    Q.    All right. Do you know whether or not,
17 prior to you making an inquiry around the holidays
18 of 2014, whether or not Molina conducted any
19 ongoing or annual evaluation of General
20 Medicine performance?
21    **A.   I do not.**
22    Q.    And, again, that would not have -- go
23 ahead.
24    **A.   Sorry. That's okay.**
25    Q.    That would not have been part of your

1 ongoing duties as COO, to monitor General
2 Medicine's performance?
3    **A.    It would have been.  At that time,**
4 **I was transitioning over from a different part --**
5 **department to operations. I would not have been**
6 **reviewing SNFist reporting requirements. I would**
7 **have been reviewing the Provider Services**
8 **Agreement relative to overall function.**
9    Q.    So what was it, again, that -- and
10 I apologize if I asked you this.  What was it,
11 again, that triggered your inquiry into General
12 Medicine's performance at the time that you did
13 take an interest in it?
14    **A.    I was in conversations when we were**
15 **preparing for state audits and federal audits --**
16 **and CMS audits on a monthly basis where we were**
17 **reviewing the number of care plans completed,**
18 **HRAs completed, or FCNAs, and health risk**
19 **screenings, and they were low.**
20        **And I was getting monthly requests for**
21 **payment to Gen Med, P.C. And I said now that this**
22 **has transitioned underneath me, let's see what**
23 **their performance standard is.**
24    Q.    So that it coincided with the
25 transition of certain new duties to your

1 department or your purview?
2    **A.    Correct.**
3    Q.    And then the last sentence of that
4 Performance Standards:
5        "Corrective action will be implemented
6      for any deficiencies identified in daily
7      and monthly reports."
8        Now, you testified you didn't
9 actually -- you didn't --- personally did not
10 actually get any daily or monthly reports,
11 correct?
12    **A.    Correct.**
13    Q.    The first report you received was the
14 one that you requisitioned, if you will, back when
15 this -- these duties first started coming to your
16 attention or within your department around the
17 holidays?
18    **A.    Yes.**
19    Q.    Okay.  And you drew that -- I believe
20 you testified that sometime in January of 2015,
21 you reached the conclusion that General Medicine
22 was deficient in its duties?
23    **A.    No.**
24    Q.    Okay.  When would that have been?
25    **A.    I don't have dates specific; sometime**

1 **in -- I don't know if the conclusion ever occurred**
2 **before General Med, P.C. terminated the**
3 **relationship.**
4    Q.    Ah.
5    **A.    It was sometime in January that I began**
6 **receiving analytics that intimated to me what was**
7 **negotiated in the amendment was not being**
8 **delivered.**
9    Q.    All right.  So, then, would that be the
10 reason that the last sentence, "Corrective action
11 will be implemented for any deficiencies," you had
12 not -- is it fair to say you had not reached the
13 conclusion that corrective action was needed?
14    **A.    I didn't know what was needed at that**
15 **point.**
16    Q.    Okay.
17    **A.    Correct.**
18    Q.    I think you testified earlier that you
19 did not have the opportunity to implement
20 corrective action. Is that --
21    **A.    Good memory. Yes.**
22    Q.    Is that what you are referring to,
23 then?
24    **A.    Yes.**
25    Q.    All right.  But you would agree with

1 me -- let's lay a foundation.
2        Is it your recollection that General
3 Medicine terminated the contract as opposed to
4 Molina terminating the contract? Is that true?
5    **A.    Yes.**
6    Q.    And General Medicine did so on
7 April 1st of 2015 or April 2nd; April 1st or 2nd?
8    **A.    About as close as I can recall, yes,**
9 **I think that's fair.**
10    Q.    Okay.  And did General Medicine
11 communicate to you that the reason it was
12 terminating the contract was because it had not
13 received its PMPM payments for all of 2015?
14    **A.    Yes.**
15    Q.    And would you agree with me that
16 General Medicine had not received, as of April 1st
17 or 2nd, its PMPM payments for all of 2015?
18    **A.    Yes.**
19    MR. ROSENBAUM: Okay.  Now we will take a
20 break.
21    **THE WITNESS:  Fair enough.**
22        (WHEREUPON, discussion was had off
23        the record.)
24 BY MR. ROSENBAUM:
25    Q.    All right.  So you first had -- is it

Page 106

1 fair to say you had an inkling that General
2 Medicine was not doing what it was supposed to do
3 as early as January of 2015, but you had not
4 concluded your investigation by the time General
5 Medicine terminated on April 2nd?
6    **A.   The sniff test wasn't passed until**
7 **sometime around January because February -- or the**
8 **December payment was made.  We make payments on**
9 **the 15th. So that means sometime after January --**
10 **right around that area, we allowed the December**
11 **payment to occur, and that's when deep analytics**
12 **began.**
13    Q.   All right.  So, really, the only two
14 payments -- the two payments under the contractual
15 timetable that were missed would have been the
16 February -- the mid-February and the mid-March
17 payments, before the termination?
18    **A.   If we sent those files.**
19    Q.   Meaning that?
20    **A.   If we sent member files --**
21    Q.   Yes.  Do you know whether members'
22 files were or were not sent?
23    **A.   I cannot recall.**
24    Q.   Oh, okay.  All right.
25         And I asked you this question with

Page 107

1 regard to Attachment D-1, which had 24 delegated
2 responsibilities.  Attachment H has 17.  We have
3 identified the ones that relate to the FCNA, the
4 ACE and the care plans.
5         Would it still be your testimony that
6 the only deficiencies in the delegated
7 responsibilities that you are aware of --
8    MR. ROSENBAUM: Gesundheit.
9    MS. SHERWIN: Gesundheit.
10    THE WITNESS: Pardon me.
11 BY MR. ROSENBAUM:
12    Q.   (Continuing) -- are those three out of
13 the list?
14    **A.   Those were the three that I was looking**
15 **at.**
16    Q.   Okay.  Would you also agree with me
17 that during the months of January, February and
18 March, General Medicine was seeing the members and
19 providing the -- providing the overall services,
20 the SNFist services it was supposed to do, other
21 than perhaps doing those three components that
22 you're referring to?
23    **A.   I believe that they were -- they were**
24 **seeking reimbursement on a fee-for-service basis**
25 **for services during those months.**

Page 108

1    Q.   Okay.  By mid-February -- assume for a
2 moment that you had given them a member list for
3 January.  I know you said you don't recall, but
4 let's assume that you did.
5         By mid-February, that payment -- the
6 PMPM payment would have been due for the January
7 list, correct?
8    **A.   That is accurate.**
9    Q.   Okay.  And the reason you didn't make
10 the payment is because you were concerned about
11 the performance deficiencies that you were being
12 made aware of?  Is that accurate?
13    **A.   I -- yes.**
14    Q.   Okay.  And did you communicate in
15 mid-February that, "The reason that you're not
16 getting your PMPM payment, General Medicine, is
17 because we have concerns about your performance
18 deficiencies"?
19    **A.   Yes.**
20    Q.   And did you do that verbally, in
21 writing, or both?
22    **A.   At that time, I believe it was**
23 **verbally.**
24    Q.   Okay.  And tell me about that verbal
25 conversation.

Page 109

1    **A.   It was between Dr. Prose and myself,**
2 **and he called about not receiving payment.**
3         **And I had relayed to him that I was**
4 **investigating -- investigating the performance of**
5 **General Med, P.C. relative to the data that I was**
6 **receiving internally.**
7         **And his response indicated that there**
8 **was a difference in understanding on what was**
9 **being completed.**
10    Q.   Can you articulate what the difference
11 was from that conversation?
12    **A.   He believed that care plans were being**
13 **completed and entered and sent and followed as**
14 **prescribed in the agreement, and my team was**
15 **pulling data out of CCA and saying, "No, it's**
16 **not."**
17    Q.   All right.  Was the conversation with
18 regard to deficiencies, was it limited just to --
19 was the difference of opinion limited just to the
20 care plans?
21    **A.   I believe that's what started it.**
22    Q.   At that point, did you have any
23 indication that the FCNAs or the ACEs were not
24 being completed?
25    **A.   I did not at that point.**

Page 110

1    Q.   Did you subsequently get information
2  that suggested to you that maybe they weren't all
3  being done?
4    A.   As I went through the agreement and
5  started identifying those deliverables, that's
6  when I asked for that additional detail.  But the
7  care plans were the progenitor.
8    Q.   Does the state of Illinois audit the
9  FCNAs, the ACEs and the care plans?
10   A.   Yes.
11   Q.   Is that the reason why you placed a
12  greater emphasis on those three things than all
13  the other responsibilities that General Medicine
14  had per the contracts?
15   A.   Yes, greater responsibility being the
16  key word -- or greater review, I believe you said.
17  I'm sorry.
18   Q.   Okay.  Would you agree with me that of
19  the exhibits that we have looked at -- Exhibits 1,
20  2, and 3, which are the standard Provider
21  Agreement, the Amendment to the Provider
22  Agreement, and the Attachment H which is part of
23  the amendment -- would you agree with me that
24  there is nowhere in those three contracts where
25  Molina is permitted to withhold the PMPM payment

Page 111

1  from General Medicine for what it perceives to be
2  a deficiency in service unless Molina terminates
3  the contract?  If you know.
4    A.   I would agr- -- I would state that we
5  were in compliance with Attachment D-1, point 1 of
6  Exhibit 2 and still able to make a retrospective
7  payment for members residing in a post-acute
8  facility.
9    Q.   Okay.  When you say "retrospective,"
10  what's the time frame?  I mean, how many months
11  can you go before you make that payment?
12   A.   Barry, that's not identified in
13  Attachment D-1, point 1.
14   Q.   All right.  Was the custom and practice
15  for the preceding -- for the first four months of
16  the contract such that you would make the PMPM
17  payment the middle of the following month, as you
18  testified earlier?
19   A.   The first four, I believe, were made in
20  that fashion.
21   Q.   All right.  So the first time that a
22  payment wasn't made in that fashion was when you
23  started to investigate the --
24   A.   Potential breach of contract.
25   Q.   I was going to phrase it a different

Page 112

1  way.
2        (Continuing) -- investigate what you
3  perceived to be performance deficiencies by
4  General Medicine?
5    A.   That's accurate.
6    Q.   Okay.  All right.  So, no, but -- but,
7  seriously -- seriously --
8    MS. SHERWIN:  Are you finished?
9    MR. ROSENBAUM:  I think it's funny.  No, no,
10  it's great.  I think this is great.
11  BY MR. ROSENBAUM:
12   Q.   Your position under 1.1, though, is
13  that there is no timing provision for when you
14  have to make that PMPM payment?
15   A.   Right.
16   Q.   So that's why you felt justified in
17  withholding the payment until you were satisfied
18  that there had not been a breach of contract by
19  General Medicine?
20   A.   Correct.
21   Q.   Okay.  And the reason you didn't
22  implement the two remedies for non-performance
23  under Article Three is because you had not come
24  to that conclusion yet, that either of those was
25  warranted?

Page 113

1    A.   I just didn't know yet.
2    Q.   Okay.  And you don't know, sitting here
3  today, whether or not Molina was receiving the
4  PMPM payment it was supposed to be getting from
5  the state of Illinois for all those members that
6  were being assigned to General Medicine?
7    A.   Correct.
8    Q.   You don't even know today whether you
9  have been paid for that?
10   A.   Correct.
11   Q.   I think you said earlier they owe you
12  a billion dollars?
13   A.   The MCOs is well over a billion at this
14  point.  I don't -- I don't believe it goes back
15  that far concurrently right now, but they are
16  consistently delayed.
17   Q.   Then is it possible that you were
18  getting paid by the state of Illinois for those
19  members that were assigned to General Medicine
20  during the whole time period when General Medicine
21  was seeing your members?
22   A.   Correct.
23   Q.   Okay.  Just as background, is this an
24  ongoing problem between the state of Illinois
25  and --

Page 114

1     MS. SHERWIN: Are we on the record now?
2     MR. ROSENBAUM: I knew I was going to ask
3 that.
4     **THE WITNESS: Yeah, if you want to go off the**
5 **record for a second?**
6     MR. ROSENBAUM: Yeah, yeah. I'm going on the
7 record.
8 BY MR. ROSENBAUM:
9     Q.   Is this an ongoing problem, not just
10 with Molina, but --
11     MS. SHERWIN: Are we off the record?
12 Seriously.
13     MR. ROSENBAUM: No, no. Seriously, I want --
14 I'd prefer --
15     MS. SHERWIN: Is it on the record?
16     MR. ROSENBAUM: Yeah, on the record.
17     MS. SHERWIN: Okay.
18 BY MR. ROSENBAUM:
19     Q.   On the record, if you know, I mean, is
20 this an ongoing issue between the state of
21 Illinois and other healthcare plans other than
22 Molina?
23     **A.   Yes.**
24     Q.   Okay. There is an issue in terms of
25 the state not having the funds to make their

Page 115

1 contractual payments for Medicare and Medicaid?
2     **A.   Correct.**
3     Q.   Okay.
4     MS. SHERWIN: I mean, just for the record,
5 it's kind of irrelevant to what we're talking
6 about, but go ahead.
7     MR. ROSENBAUM: Okay. No, I just wanted to
8 know if it was -- if it was something that was
9 pertinent to just Molina as opposed to an ongoing
10 issue in the state.
11     **THE WITNESS: Gotcha.**
12 BY MR. ROSENBAUM:
13     Q.   Okay. Before General Medicine
14 terminated the agreement in April of 2015, Molina
15 had not delegated the SNFist duties to any other
16 provider, is that correct?
17     **A.   Correct.**
18     Q.   Did you notify the state of Illinois --
19 "you" being Molina -- that you had not made the
20 PMPM payment to General Medicine for January,
21 February or March of 2015?
22     **A.   No.**
23     Q.   Were you required to notify the state
24 of Illinois of that fact?
25     **A.   No.**

Page 116

1     Q.   If the state of Illinois had paid you,
2 Molina, the PMPM payment required for those three
3 months, would you have been required to refund all
4 or a portion of that payment to the state because
5 of the deficiencies that you saw in the General
6 Medicine performance?
7     MS. SHERWIN: If you know. I mean, that
8 would --
9 BY MR. ROSENBAUM:
10     Q.   If you know.
11     MS. SHERWIN: I mean, it's --
12 BY THE WITNESS:
13     **A.   No.**
14 BY MR. ROSENBAUM:
15     Q.   Okay.
16     MS. SHERWIN: No, you don't know?
17 BY MR. ROSENBAUM:
18     Q.   The answer is no, that you would not
19 have to --
20     **A.   No, we would not have had to.**
21     Q.   Okay. All right.
22     **A.   For the PMPM payments?**
23     Q.   Yes.
24     **A.   Okay, no.**
25     Q.   Yes.

Page 117

1     MR. ROSENBAUM: Okay. This is a good spot to
2 break here.
3     MS. SHERWIN: Yes, I think so.
4     MR. ROSENBAUM: Okay.
5         (WHEREUPON, a lunch recess was had
6         from 11:58 a.m. until 12:16 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 118

```
1              - - - - -
2        A F T E R N O O N   S E S S I O N
3              - - - - -
4        MR. ROSENBAUM:  All right.  This will be
5  No. 4.
6              (WHEREUPON, said document was
7              marked Schoen Exhibit No. 4 for
8              identification as of 04/05/2017.)
9        THE WITNESS:  Thank you.
10 BY MR. ROSENBAUM:
11       Q.   Mr. Schoen, I'm going to represent to
12 you that Exhibit 4 is a page from the
13 counterclaim, the first page of it being a form
14 that really doesn't say much.  But this is a page
15 from the counterclaim that Molina filed in the
16 arbitration.
17           I will ask you if you have ever seen
18 this particular document before.
19       A.   The document itself or the content?
20       Q.   Well, let's start with the document,
21 and then we will go to the contents.
22       A.   I don't believe the document.
23       Q.   Okay.  And, again, I don't want to
24 inquire into your confidential communications
25 with counsel, but to your knowledge, did you
```

Page 119

```
1  participate in the content that ends up in this
2  counterclaim?
3        A.   I was in conversations with counsel on
4  the relationship, and they developed this
5  document.
6        Q.   Fair enough.  Fair enough.  All right.
7  Let me turn your attention to No. 1 of the
8  counterclaim.  About midway through, it says --
9  the sentence begins:
10           "In January, 2015, Molina determined
11           that General Medicine was meeting its
12           obligations with respect to FCNA and care
13           plans in approximately 10% of the cases
14           for which it was submitting and receiving
15           payment."
16           Is that still, based on your testimony,
17 an accurate statement; that in January 2015, you
18 said that -- Molina made that determination?
19       A.   Yes.
20       Q.   Okay.  Why, then, in January 2015 did
21 Molina not notify General Medicine of that fact
22 and request a corrective action plan be
23 implemented?
24       A.   "Determined" might be a better way to
25 have said it, maybe "was determining."
```

Page 120

```
1        Q.   Okay.
2        A.   "In the process of determining."
3        Q.   All right.  So because I'm going on
4  your earlier testimony, you said you really
5  hadn't reached a final conclusion even as of
6  April the 2nd.
7        A.   Right.
8        Q.   Okay.
9        A.   Well, I want to -- hopefully, I can
10 elucidate there.  April 2nd is when we received
11 termination.
12       Q.   Yes.
13       A.   Sometime in late February, after the
14 January payment must have been expected, that is
15 when deep dive analysis occurred.  And we
16 attempted to engage in conversation to relay
17 findings or further identify opportunities with
18 those findings with General Med, P.C. but were
19 unable to do so --
20       Q.   Okay.
21       A.   -- and unable, then, to move forward
22 with a corrective action plan.
23       Q.   Is it still Molina's position today --
24 and I want to break this down with regard to the
25 10 percent versus 90 percent.
```

Page 121

```
1            Is it your position today that
2  90 percent of the FCNAs were not done in September
3  through December of 2014?
4        A.   Ninety percent of the FCNAs and care
5  plans.
6        Q.   Okay.  So it's that amalgamation that
7  you said earlier?
8        A.   Correct.
9        Q.   Is it -- in theory, is it possible it
10 could be 100 percent care plans and zero percent
11 FCNAs?
12       MS. SHERWIN:  I -- you know, I object.  It
13 says here what it says here.
14 BY MR. ROSENBAUM:
15       Q.   Well, based on what you now know?
16       A.   I would say the inverse of that.
17 I know that we have 185 -- if that's not an exact
18 number, it's very close -- care plans completed of
19 the approximately 1800 that should have been.
20           The number of FCNAs, I'm not as
21 familiar with that completion number.
22       Q.   All right.  So that was my question.
23 So, then, you don't know whether or not it may be
24 just the care plans that they are deficient in,
25 possibly?
```

Page 122

1    A.   Possibly.
2    Q.   And assuming that the combined FCNA and
3  care plans as a combined number were not done in
4  90 percent of the members for those four months,
5  is it your position, then, that General Medicine
6  should have to repay Molina 90 percent of the
7  compensation it received for the PMPM?  Is that
8  the basis for your No. 1 counter --
9    A.   Yes.
10   Q.   Okay.  So you're not assigning any
11 value to the other tasks -- delegated tasks that
12 General Medicine did over those four months?
13   A.   Correct.
14   Q.   And because you don't know whether or
15 not Molina has been paid by the state of Illinois
16 for its capitation payment for those four months,
17 you do not know whether Molina has suffered any
18 loss of -- or any sanction from the state of
19 Illinois as a result of only, as you have
20 testified, only --
21       MS. SHERWIN:  I object.
22 BY MR. ROSENBAUM:
23   Q.   -- only --
24       MR. ROSENBAUM:  Let me just finish the
25 question.

Page 123

1       MS. SHERWIN:  Yeah.
2  BY MR. ROSENBAUM:
3    Q.   (Continuing) -- only 90 percent -- I'm
4  sorry -- only 10 percent of the care plans and
5  FCNAs combined being done, correct?
6       MS. SHERWIN:  I object because there's a
7  couple of -- I think you need to break the
8  question down.  It's very confusing to me.
9  I don't know how confusing it might be, but
10 I think it needs to be broken down.
11 BY MR. ROSENBAUM:
12   Q.   Did you find the question confusing?
13   A.   Could you repeat the question, please.
14   Q.   I don't know if I can repeat it.  I'll
15 restate it.  All right.
16       You testified that you don't know
17 whether the state of Illinois paid you for those
18 four months of 2014 the capitation payment, the
19 PMPM payment, correct?
20   A.   Correct.
21   Q.   Okay.  I don't know if I asked you this
22 earlier.  Is there a provision in the contract
23 with the state of Illinois that they can refuse to
24 pay a PMPM payment or ask you to refund a PMPM
25 payment if they find that required services were

Page 124

1  not provided?  If you know.
2    A.   There are two ways that they can ask.
3  One is if a member is retroactively terminated and
4  they pay us for it, they can say those dollars are
5  gone.  There is an annual provision that says we
6  have to hit a medical cost-ratio threshold.  If
7  they gave us money and we didn't hit this
8  threshold, we would have to pay the state of
9  Illinois money back.
10   Q.   Have you ever had to pay the state of
11 Illinois money back since you became the COO of
12 Molina?
13   A.   I think in one of -- I'm trying to
14 remember, but I think in one of the programs,
15 a de minimis amount.  My CFO would know, is the
16 best answer I can give on that.
17   Q.   Did you have to report to the state of
18 Illinois that 90 percent of the FCNAs and care
19 plans for those last four months of 2014 were not
20 completed?  Did you ever have to --
21   A.   I had to report to the state and CMS
22 the number of care plans that were completed.
23   Q.   All right.  Well, I think you testified
24 earlier that you believe that there were 185 care
25 plans done out of approximately 1800 that should

Page 125

1  have been done?
2    A.   For that population.
3    Q.   Right.  Did you have to report that
4  fact; that, in other words, that it was 185 out of
5  1800, or just that we did 185?
6    A.   Neither.  It was rolled up into our
7  complete population.
8    Q.   And sitting here today, is it fair to
9  say that you have no idea whether Molina will ever
10 face any sanction from the state of Illinois as a
11 result of General Medicine's performance
12 deficiencies in 2014?
13   A.   Correct.  And I am unaware if we will
14 receive any acknowledgment for high performance as
15 a response of doing very well.
16   Q.   Okay.  In paragraph 2 of your
17 counterclaim, you state that you had "to take
18 remedial action to preserve" your "contractual
19 standing with the state of Illinois" by having
20 your own healthcare providers "perform the FCNAs
21 and care plans that were incomplete."  Was that a
22 true statement?
23   A.   Yes.
24   Q.   Okay.  Did the folks that did the --
25 now, my understanding, the FCNAs, because they

**Page 126**

1 require a comprehensive exam, have to be done by
2 licensed professionals, correct?
3    A.    Um-hum.
4    Q.    They can't just be done by a case
5 manager or a social worker, correct?
6    A.    Correct.
7    Q.    Okay. Did you have people on your own
8 staff, employees that you had perform the FCNAs
9 that should have been done, or did you have to
10 hire an outside vendor to do them?
11    A.    Molina staff did it. I was confusing
12 the ACE, sorry, internally. To complete ACE, we
13 had to hire an outside firm --
14    Q.    Okay.
15    A.    -- or we utilized the services of an
16 outside firm.
17    Q.    All right. This paragraph 2, as well
18 as paragraph 1, only refers to FCNAs and care
19 plans.
20         Is it fair to say, then, that Molina is
21 not seeking any sort of reimbursement from General
22 Medicine for ACE exams that were not performed?
23    A.    I would say that we are -- we are
24 limiting it to the FCNA references in provisions 1
25 and 2 here.

**Page 127**

1    Q.    And while you have given me a specific
2 number on the care plans, sitting here today, you
3 cannot tell me exactly how many FCNAs were not
4 done?
5    A.    Not off the top of my head.
6    Q.    Okay. And do you know how the $30,000
7 in paragraph 2 was computed?
8    A.    Yes. It was some time ago. We took
9 the delta on the number of individuals that
10 qualified for requiring FCNA and a care plan, and
11 we took the average number of care plans and FCNAs
12 that are completed by our own staff. And then we
13 did arithmetic to come to the conclusion on how
14 much it would cost us to execute those.
15    Q.    Okay. I guess I'm not -- I didn't
16 understand the computation.
17         Did the salaries or the compensation
18 you paid your people on your staff figure into
19 this calculation at all?
20    A.    Yeah. We had it broken down to
21 essentially how many widgets can you make in an
22 hour --
23    Q.    Okay.
24    A.    -- how many widgets did we have to go
25 get completed --

**Page 128**

1    Q.    Okay.
2    A.    -- how much did we pay each of our
3 employees by an hour.
4    Q.    Was this a calculation you yourself
5 performed for the benefit of counsel, or did you
6 have somebody else do it?
7    A.    Our CFO did it. Actually, it might
8 have been Matt Wolf.
9    Q.    Okay. He's not your CFO?
10    A.    No. He was our director of program
11 management.
12    Q.    When you had your conversation with
13 Dr. Prose in February that you testified about
14 when you first notified him verbally that you had
15 concerns that FCNAs and care plans were not being
16 done for all of the members, did you at that point
17 offer him the opportunity to go and -- you know,
18 in other words, identify for him the ones that
19 weren't done so his people could go out and remedy
20 the situation?
21    A.    We did. We sent him information, and
22 his response was, "We are completing these care
23 plans."
24    Q.    Okay. You sent him information so that
25 that would be a written communication?

**Page 129**

1    A.    I believe there was an e-mail exchange
2 of -- with the detail that we had. In kind, he
3 responded, "We have been completing these."
4    Q.    Okay. The detail being, obviously, the
5 members -- the names of the members that --
6    A.    Names, IDs, yeah, tantamount to the
7 file that we would have initially sent.
8    Q.    The information that you gave him in
9 February related to the 2014 member lists,
10 correct?
11    A.    It could have included January if that
12 was sent as well.
13    Q.    Well, for example, you mentioned
14 185 done out of, let's say, 1800.
15    A.    Right.
16    Q.    Those were 2014s, weren't they?
17    A.    '14, through December, yes.
18    Q.    Okay. Then are you saying that there
19 was a communication -- a written communication
20 with approximately 1600 ballpark names in which
21 you told General Medicine, "There are 1600 people
22 on the list from 2014 that you need to do care
23 plans on"?
24    A.    Um-hum.
25    Q.    That's a "yes"?

Page 130

1   A.   Yes.
2   Q.   Okay. Did you -- is that a document
3   that you reviewed in preparation for your
4   deposition today?
5   A.   No.
6   Q.   Do you know who sent that? Did it come
7   from you, the communication?
8   A.   Matt Wolf created it, and I most likely
9   sent it.
10     Q.   And is it -- do you know whether or not
11  General Medicine ended up doing any of those care
12  plans, those 1600 care plans that you identified?
13     A.   I would say that's when the
14  conversation became less than amicable.
15     Q.   Okay. You would agree with me that an
16  FCNA does not have to be done every single month
17  on every member, correct?
18     A.   Correct.
19     Q.   All right. So if General Medicine got
20  a list of 500 names, and of those 500 names, there
21  were only 100 new names on it, those 100 new names
22  would need to have an FCNA, is that correct?
23     A.   Correct.
24     Q.   And just leaving the care plans out of
25  it for now, just talking about FCNAs, would you

Page 131

1   agree with me, though, that General Medicine would
2   still be entitled to a PMPM payment for all
3   500 names even though they may have only done
4   FCNAs for the new members, assuming that they did
5   everything else they were supposed to?
6   A.   So assuming that they did everything
7   else?
8   Q.   Yes.
9   A.   That means they would have honored and
10  completed everything in the agreement?
11     Q.   Yes.
12     A.   Correct?
13     Q.   Yes.
14     A.   If I'm understanding the question.
15     Q.   Exactly.
16     A.   I would agree that if they performed
17  pursuant to the agreement, they would be entitled
18  to their PMPM.
19     Q.   Okay. I'll make an even more -- not
20  necessarily ludicrous example, but a hypothetical.
21  Let's say you have 500 members in October and you
22  have 500 members in November. They're the exact
23  same 500, okay, no new members, nobody termed,
24  nobody new came in.
25         As long as General Medicine -- they

Page 132

1   would not have to do a new FCNA if they had done
2   one the previous month?
3   A.   Not an initial, correct.
4   Q.   Right. Okay. And let's assume there
5   were no ACEs due because it hadn't been an annual
6   time.
7   A.   Sure.
8   Q.   All right. So, then, as long as they
9   did everything else, including a care plan, they
10  would get the full 500 -- payment on the full 500?
11     A.   If they did the care plan/treatment
12  plan and visited them every month and --
13     Q.   Right.
14     A.   Yes, I would agree with that.
15     Q.   Okay. You testified earlier that you
16  had a spike in enrollment in December where you
17  went from roughly 500 members to 1700 members.
18     A.   Correct.
19     Q.   Do you recall, were you involved at all
20  in notifying General Medicine, "You have got to
21  get out and do -- you know, do all of these FCNAs,
22  this is -- you know, this is important"?
23         Was that anything that was -- that you
24  were involved in, or would that have been your
25  other staff?

Page 133

1   A.   That would have been the other staff.
2   Q.   All right. Carol Rupert was still in
3   charge of the SNFist Program in December of 2014,
4   wasn't she, up to a point?
5   A.   I would say to the best of my
6   recollection, yes.
7   Q.   Do you know whether or not -- do you
8   have any knowledge on whether or not Carol Rupert,
9   when the new enrollment list came out with all
10  these members, instructed General Medicine,
11  "Don't worry about doing care plans, just get the
12  FCNAs done because we have 1200 new members here"?
13     A.   No, I am not aware of that.
14     Q.   Okay. You hadn't heard that before?
15     A.   I would remember that.
16     Q.   All right. Take a look at No. 3 on the
17  counterclaim. This is a -- to paraphrase it, it's
18  a paragraph where you're seeking damages for
19  tortious interference with business relationships,
20  claiming that General Medicine is somehow
21  interfering with the relationship.
22         Do you have any firsthand knowledge of
23  the truth of this particular paragraph?
24     A.   Yeah. I'll give you my experience,
25  yes.

Page 134

1    Q.    Oh. Go ahead.
2    A.    It would be brought to my attention
3  from members of the healthcare services and
4  provider services teams -- the provider services
5  team actually did report up through me, so they
6  had provider service reps in the field, a manager
7  and a director and then a vice president that
8  would come to me.
9        And we would get e-mails from -- Randy
10 would usually do it --
11   Q.    Okay.
12   A.    -- and maybe Carol at the time, and my
13 director of provider services saying that General
14 Med, P.C. is telling nursing facilities that they
15 no longer work with Molina, that to try and
16 transition the members to a different managed care
17 organization and that they would -- in one
18 scenario, I think it was Heritage, but I can't
19 remember, there's a lot of skilled nursing
20 facilities -- they hired the physician, the only
21 physician that was working there, on the
22 General Med, P.C. --
23   Q.    General Medicine hired them?
24   A.    Yes, and then said, "You can't see any
25 of the Molina patients."

Page 135

1    Q.    Okay.
2    A.    And then the CEO called me and said,
3  "What am I going to do with your patients?
4  There's no one here now to see them."
5    Q.    Right.
6    A.    And I politely tried to explain that
7  that's -- that is a business issue for him.
8    Q.    Right. Not your problem?
9    A.    Yeah. "Sure, I would love to help you
10 here. I appreciate" -- "I empathize, but" --
11   Q.    "Tell them to move"?
12   A.    Well, you really can't employ a
13 physician that can selectively administer care in
14 that scenario, so...
15   Q.    Right. So, then, did all of this
16 happen after General Medicine terminated?
17   A.    I -- it definitely happened after they
18 terminated. I don't know if it happened in the
19 week or two leading right up to it because, again,
20 there was so much movement. But it was right
21 around that April 1st/April 2nd time frame.
22   Q.    I thought you said that this also
23 involved Carol Rupert, but she was gone in
24 December of 2014, so she could not have received
25 any of this information, is that correct?

Page 136

1    A.    That would be correct if she left --
2  if I was extremely confident that she left in
3  December of '14. I think I keep preceding that
4  comment with "I think" because I didn't interact
5  with Carol Rupert very often --
6    Q.    Okay.
7    A.    -- or Randy. But I would say that
8  Randy was the individual that was responsible for
9  notifying me most frequently.
10       Carol Rupert was located in the
11 Chicago -- pardon me -- the Oak Brook office.
12   Q.    Okay.
13   A.    And Randy was located in the
14 Springfield office --
15   Q.    Right.
16   A.    -- where the majority of this
17 membership -- at that time, we hadn't been in
18 Cook County yet. All of this membership would
19 have been down there so, really, under his
20 purview. So they -- maybe they even overlapped.
21 They were both employed at the same time.
22   Q.    Do you know whether or not any of your
23 members terminated their relationships with Molina
24 as a direct result of what you are -- what you're
25 talking about, this issue with General Medicine

Page 137

1  telling the facilities that they can't see Molina
2  patients?
3    A.    I personally do not have empirical
4  evidence that that exists. Cathy Schilling, our
5  vice president of healthcare services, would have
6  more clear information. I believe she was -- her
7  case managers report up to her, and I believe the
8  case managers were hearing from the members as
9  well, if memory serves me correct, that they would
10 say, "People from General Med, P.C. are telling me
11 to switch."
12   Q.    Okay. For the moment, forget about,
13 you know, whether you had complaints from Molina
14 members.
15   A.    Okay.
16   Q.    So that I don't have to go ahead and
17 depose Cathy Schilling --
18   A.    Okay.
19   Q.    -- the question is: Do you know
20 whether she has specific information of actual
21 patients -- not "patients" -- members that left
22 Molina because of what was said to them?
23   A.    I don't -- I do not know that.
24   Q.    Okay. Because if a member did not
25 leave Molina as a result of this, you would have

Page 138

1 suffered no financial loss, is that -- would that
2 be a fair statement?
3    A.   It's hard to project that. If members
4 were not assigned to a health plan but asking the
5 facility who they should enroll with or what are
6 the options; and if there's only, let's just say,
7 two plans and the facility is now only mentioning
8 one of them, that is a potential loss of revenue
9 for me.
10    Q.   Okay. A potential loss of revenue?
11    A.   That's -- that's fair.
12    Q.   All right. And that lost revenue would
13 be the payment that you should have been receiving
14 from the state of Illinois for that person had
15 they enrolled in your healthcare program?
16    A.   That is correct.
17    Q.   But you've also testified that, sitting
18 here today, you don't know if you've been paid by
19 the state of Illinois --
20    MS. SHERWIN: Objection. You know --
21    MR. ROSENBAUM: No, no, no, no. Seriously,
22 let me ask the question.
23    MS. SHERWIN: Whether they are supposed to be
24 paid or whether they actually were paid under
25 their plan, they were to be paid for whoever was

Page 139

1 in their plan, so I really object to all these
2 questions about the state. He's already told you
3 what he knows about that, and you keep going back
4 to it as if he's got some magical information.
5 He doesn't know what goes on between Molina and
6 the state.
7    MR. ROSENBAUM: I'm entitled to --
8    MS. SHERWIN: He doesn't know whether they
9 were paid. I have let you ask that question now
10 at least 12 times, and I'm not going to let you
11 ask it again.
12    MR. ROSENBAUM: It's relevant to --
13    MS. SHERWIN: Asked and answered.
14    MR. ROSENBAUM: Judy, it's relevant to the
15 counterclaim.
16    MS. SHERWIN: Asked and answered.
17    MR. ROSENBAUM: It's relevant to the
18 counterclaim.
19    MS. SHERWIN: And you have asked it 12 times,
20 all right?
21    MR. ROSENBAUM: It's relevant to the
22 counterclaim.
23    MS. SHERWIN: You have gotten your answer.
24 Move on.
25    MR. ROSENBAUM: It's relevant to the

Page 140

1 counterclaim.
2    MS. SHERWIN: Whether it is or it isn't, you
3 have gotten your answer. Move on.
4    MR. ROSENBAUM: No, I haven't gotten my
5 answer.
6    MS. SHERWIN: Yes, you have.
7    MR. ROSENBAUM: No, I haven't.
8    MS. SHERWIN: He told you he doesn't know.
9    MR. ROSENBAUM: He told me --
10    MS. SHERWIN: That's it.
11    MR. ROSENBAUM: He told me he doesn't know if
12 he's been paid by the state of Illinois.
13    MS. SHERWIN: And you keep asking him that
14 question.
15 BY MR. ROSENBAUM:
16    Q.   Therefore, at this point, you don't
17 know whether or not you've suffered any financial
18 loss as a result of a Molina member either
19 switching or not signing up with Molina? As of
20 today, you do not know?
21    A.   State that one more time for me,
22 please.
23    Q.   As of today, you do not know whether
24 Molina has suffered a financial loss as a result
25 of a member either switching to another health

Page 141

1 plan or not signing up with Molina as a result of
2 the allegations in paragraph 3?
3    A.   I am -- I am -- I do not have empirical
4 evidence.
5    Q.   Okay. And you believe if anybody
6 would, it would be Cathy Schilling?
7    A.   If you're talking about examples that
8 she would have on whether a member did switch?
9    Q.   Yes.
10    A.   I would say that would be her.
11    Q.   Okay.
12    MR. ROSENBAUM: This is No. 5.
13        (WHEREUPON, said document was
14        marked Schoen Exhibit No. 5 for
15        identification as of 04/05/2017.)
16 BY MR. ROSENBAUM:
17    Q.   Mr. Schoen, I'll ask you to take a look
18 at Exhibit 5, which is an e-mail thread.
19        And like all these e-mail threads, they
20 begin on the back page chronologically and work
21 their way forward.
22    A.   Okay.
23    Q.   This one begins on November 17th, 2014
24 and works its way up to December 8th of 2014.
25    MS. SHERWIN: Have you had a chance to look

Page 142

1 through it?
2 BY MR. ROSENBAUM:
3    Q.   Yeah, take a look through it. I'm not
4 going to ask you about every part of this, but --
5    A.   I know this like the back of my hand.
6    Q.   Okay. Good. All right. There is on
7 page --
8    A.   But the majority of this is going to be
9 service-related.
10    MS. SHERWIN: There is no question. Ben, let
11 him ask a question, okay?
12    THE WITNESS: Okay.
13 BY MR. ROSENBAUM:
14    Q.   I will turn your attention to page 4 of
15 the 7 there. It's an e-mail from Kelly Moyer to
16 Sandy -- Kelly Moyer, so it's an internal
17 e-mail --
18    A.   Um-hum.
19    Q.   -- but it's cc'd to some of your Molina
20 employees.
21    A.   Um-hum.
22    Q.   I believe Priti -- Priti Thakkar is a
23 Molina employee?
24    A.   Was.
25    Q.   Was, okay.

Page 143

1        And in it, Kelly Moyer says that --
2 this was with regard to the credentialing issue we
3 talked about earlier.
4        "In regard to the providers still
5     pending credentialing, the first time
6     our credentialing information was sent
7     over was on February 6th, 2014."
8        And then she mentions half a dozen --
9 or five names.
10       "Dr. Magner's information was sent
11    over on May 22nd. Please advise if there
12    is anything I should do differently to
13    expedite the credentialing process."
14       You testified you were aware that there
15 were some delays in the credentialing, is that --
16 issues, is that correct?
17    A.   I testified that there were delays as a
18 result of providers not being registered in the
19 Medicaid Program.
20    Q.   Okay. The very first page of this
21 e-mail --
22    A.   The "first page" meaning the back?
23    Q.   No, page 1 of 7, the very -- the top
24 one, where the --
25    A.   Got it.

Page 144

1    Q.   -- exhibit stamp -- the sticker is --
2    A.   Got it.
3    Q.   -- which would be the last one in the
4 thread. This is Priti Thakkar, who is no longer
5 with Molina, you said, indicates to General
6 Medicine:
7       "...we've had a new COO by name of
8     Benjamin Schoen... He has revamped some
9     policies and processes; effective dates
10     being one of them.
11       "According to new process, effective
12     dates are now based on the providers
13     credentialing complete date. The
14     providers effective date is now always
15     the 1st of the month, and once more is
16     based on when a provider is cred complete."
17       So is this an example of -- would you
18 agree with me that there was a delay of nearly a
19 year on getting some of the General Medicine
20 people properly credentialed?
21    A.   I would agree that there was a delay in
22 getting them registered, which facilitates
23 credentialing.
24    Q.   Okay. If they weren't registered,
25 would they have still been able to input data into

Page 145

1 the CCA, such as care plans?
2    A.   I don't know that answer.
3    Q.   All right. Were you aware that there
4 were certain facilities during the time General
5 Medicine was there that would -- what's the right
6 way to put it? -- have had issues with General
7 Medicine seeing the Molina members in their
8 facilities for any variety of reasons; that they
9 weren't properly notified that General Medicine
10 was to be doing the assessments, for example?
11    A.   Yes.
12    Q.   All right. I mean, was that an issue
13 that had to be addressed by Molina -- between
14 Molina and the facilities?
15    A.   Molina assisted in the instances where
16 that occurred to notify them of the expertise that
17 General Med, P.C. was bringing to the table.
18    Q.   So a facility understood that it had
19 Molina -- it had Molina members in its facility --
20    A.   Yes.
21    Q.   -- but they did not understand that
22 General Medicine was basically your sub- -- your
23 subcontractor for performing required services?
24 Is that a fair statement?
25    A.   They may not have, right.

Page 146

1    Q.   Okay.  And you facilitated getting
2  General Medicine access to your members, then?
3    A.   Correct.
4    Q.   Did that ever result in delays in
5  performing the FCNAs or the care plans?
6    A.   I don't -- I do not know.
7    Q.   You were not -- when Carol Rupert left,
8  I think you testified that Randy Carey-Walden took
9  over as in charge of the SNFist Program, correct?
10   A.   Yes.
11   Q.   He would have been the direct contact
12 between the General Medicine folks and Molina?
13   A.   Yes.
14   Q.   All right.  Did it ever come to your
15 attention that he was instructing the General
16 Medicine clinicians not to do care plans?
17   A.   No.
18   Q.   Okay.  Did you consider care plans to
19 be as equally important as the FCNAs and the ACEs?
20   A.   I consider everything that I'm
21 contractually obligated to perform under the
22 contract with the state of Illinois important.
23   Q.   Okay.  Were those the three items,
24 though, that were audited by the state?
25   A.   Those -- those were the ones that they

Page 147

1  seemed to have the most attention on.
2      MR. ROSENBAUM:  Okay.  This is No. 6.
3      (WHEREUPON, said document was
4      marked Schoen Exhibit No. 6 for
5      identification as of 04/05/2017.)
6  BY MR. ROSENBAUM:
7    Q.   To your knowledge, would Randy
8  Carey-Walden have been aware of those reporting
9  requirements in terms of what the state of
10 Illinois was looking for from --
11   A.   Yes.
12   Q.   All right.  So I have marked this
13 e-mail thread as Exhibit 6.  Have you seen this
14 e-mail exchange before between Randy Carey-Walden
15 and Rebecca Coccia?
16   A.   No.  I don't believe so, no.
17   Q.   The very last e-mail in the thread,
18 Randy Carey-Walden says -- by the way, do you know
19 who Rebecca Coccia is?
20   A.   Not really, but the name does -- the
21 last -- the spelling of the last name, for some
22 reason, looks familiar to me.
23   Q.   Okay.  You understood, though, she was
24 a General Medicine employee?
25   A.   Yeah.  I feel like that's one of the

Page 148

1  individuals that Dr. Prose put on in exchange if
2  we went back and forth, but I don't remember
3  having much to do with her right now.
4    Q.   In this exchange, Randy Carey-Walden
5  says to Rebecca, this has to do with some members
6  that were -- "had FCNA's done by Med XM."  Who was
7  MedXM?
8    A.   A vendor that Molina employed.
9    Q.   Before General Medicine?
10   A.   In addition to.
11   Q.   In addition to?  Okay.  Then what --
12 how were the --
13   A.   Home-based.  So the top here, you'll
14 see:
15        "FCNAs were done by another vendor and
16   member has since transitioned to" a skilled
17   nursing facility.
18   Q.   Okay.  That was the delegation of
19 duties?
20   A.   Meaning they were in their house.
21 MedXM went to do the FCNA.
22        Now that they're in a skilled nursing
23 facility, per our agreement, now you had to worry
24 about these ACE and care plans.
25   Q.   Okay.  So I understand if an FCNA was

Page 149

1  done in-home, then you did not have to do one when
2  that person transitioned to the skilled nursing
3  facility?
4    A.   Right.
5    Q.   Okay.  All right.
6    A.   Unless it needed to be updated.
7  I mean, an initial one wouldn't, right, because we
8  have it in here that every 30 days, they have to
9  be revisited because there might be a change in
10 their condition and, obviously, there was if this
11 individual is transitioning to a skilled nursing
12 facility.
13   Q.   All right.  So Randy answers General
14 Medicine's questions about the folks that had been
15 transitioned and he says:
16        "FCNAs were done by another vendor
17   and member has since transitioned to SNF,"
18   skilled nursing facility.  He says:  "No
19   need to do anything but an ACE on these
20   members."
21        But you just said, though, that he --
22 that they were supposed to do an ACE and a care
23 plan, correct?
24   A.   Correct.
25   Q.   Do you know why Randy did not say, you

Page 150

1 know, they must do an ACE and a care plan?
2    A.   The care plan might have been done as a
3 result of the initial assessment. I don't know.
4 I'm just -- in the absence of not seeing it here,
5 I can only assume.
6      But if they did an FCNA, a face-to-face
7 outward assessment, you have what you need to
8 build the care plan.
9    Q.   Okay.
10    A.   It looks like, in this particular
11 reference, the only thing outstanding was the
12 annual comprehensive exam.
13    Q.   Were care plans done also at home?
14 Is that part of the --
15    A.   Yeah. It's based on a high-risk
16 population. So you can have a high-risk
17 population that's not in a skilled nursing
18 facility setting, too, but they may be homebound.
19    Q.   Gotcha.
20   MR. ROSENBAUM: This is No. 7.
21      (WHEREUPON, said document was
22      marked Schoen Exhibit No. 7 for
23      identification as of 04/05/2017.)
24   MR. ROSENBAUM: We're whipping through this.
25   THE WITNESS: I know. No, sir. I looked --

Page 151

1 my watch was upside down. I haven't had a good
2 jump on the day so far. I have the sniffles, and
3 my watch is upside down.
4   MR. ROSENBAUM: I'm figuring we will be done
5 in maybe another hour.
6   THE WITNESS: And Randy didn't even know what
7 month it is (indicating).
8   MR. ROSENBAUM: You're right. "I don't even
9 know what month it is."
10   THE WITNESS: Per line one.
11   MR. ROSENBAUM: There you go.
12 BY MR. ROSENBAUM:
13    Q.   Exhibit 7. Oh, hold on a second. All
14 right. No. Okay. Look at page 2.
15    A.   Got it.
16    Q.   And let me go back and ask a
17 foundational question again. I apologize if I
18 asked this.
19      This was about -- my questions about
20 references to "corporate" when corporate is
21 requesting something, you felt that -- well, in
22 the context of --
23    A.   This?
24    Q.   -- "this," would this be Long Beach?
25    A.   Yeah.

Page 152

1    Q.   All right. So Randy Carey-Walden
2 writes to General Medicine. He asks whether or
3 not -- he asks: "Do you have any reports" -- this
4 is February 4th of 2015, even if he doesn't know
5 what month it is, all right?
6      "Do you have" -- "Do you have any
7      reports showing how many ACEs and how
8      many FCNAs you've completed since we
9      started the SNFist Program? Corporate
10      is asking."
11      Now, I know you testified that the
12 state of Illinois asks for that. Is that
13 something -- were you familiar with the fact that
14 Long Beach would also be asking for the same
15 information?
16    A.   Um-hum.
17   THE COURT REPORTER: "Yes"?
18 BY MR. ROSENBAUM:
19    Q.   That's a "yes"?
20    A.   Pardon me. Yes.
21    Q.   And was -- did you have to filter --
22 not "filter." "Filter" is not the right word.
23      Did you have to transcend the
24 information through corporate to the state of
25 Illinois, or was it direct from you to the state

Page 153

1 of Illinois?
2    A.   It was direct. However, corporate is
3 much more intimately involved in the MMP Program
4 since it's Medicare/Medicaid.
5    Q.   Right, right.
6    A.   And that can be nationalized.
7    Q.   Do you --
8    A.   And they also have oversight.
9    Q.   Assuming the truth of what Randy
10 Carey-Walden was saying in the last sentence, do
11 you have any idea why corporate would only be
12 asking for the ACEs and the FCNAs and not for the
13 care plans?
14    A.   I don't know if this is an accurate
15 representation of what corporate is actually
16 wanting. I do not know.
17    Q.   Yeah, that's why I prefaced my
18 question, assuming --
19    A.   Yes, sir.
20    Q.   -- assuming he is telling the truth.
21    A.   Understood.
22   MR. ROSENBAUM: Okay. All right. Here is
23 No. 8.
24
25

Page 154

1          (WHEREUPON, said document was
2          marked Schoen Exhibit No. 8 for
3          identification as of 04/05/2017.)
4  BY MR. ROSENBAUM:
5      Q.   You can look at -- yes?  Did you want
6  to ask me something?  I'm giving you a rare
7  opportunity to ask the questioner a question.
8      MS. SHERWIN:  Try to avoid it.
9      THE WITNESS:  I figured I would.
10     MS. SHERWIN:  Do you want to ask something?
11     THE WITNESS:  Am I allowed to do this?  Am
12 I allowed to show her?
13     MR. ROSENBAUM:  You can show her something.
14 She can't give you answers to questions.
15     MS. SHERWIN:  Right.
16     THE WITNESS:  Okay.  All right (indicating).
17     MR. ROSENBAUM:  Okay.
18     THE WITNESS:  Okay, sorry.
19     MS. SHERWIN:  Yeah, that's 7.
20     MR. ROSENBAUM:  That's okay.  All right.
21         Exhibit 8 --
22     MS. SHERWIN:  This (indicating) is 7, right?
23     THE WITNESS:  Yes.
24     MS. SHERWIN:  Here.  Take it back, yeah.
25     MR. ROSENBAUM:  You have your own copy of

Page 155

1  that.
2      MS. SHERWIN:  I do.  I just want to be sure of
3  the record.
4          Okay.  So now we're asking about 8?
5      MR. ROSENBAUM:  Right.
6  BY MR. ROSENBAUM:
7      Q.   This is an e-mail thread that begins on
8  the last page on February 5th.  And this is in
9  response -- I will represent to you, this appears
10 to be in response to Randy Carey-Walden's prior
11 request on Exhibit 7 for the ACEs and the FCNAs.
12 You tell me if I'm right or wrong in making that
13 assumption.
14     A.   Okay.
15     Q.   If you look at the bottom of page 4 of
16 Exhibit 8, on February 5th, Eileen Thompson writes
17 to Randy, and then you can see on the next page
18 what she is sending him.
19     A.   You don't mind if I take just one
20 moment?
21     Q.   No, please, take all the time you need
22 on this one.
23         (Short pause.)
24 BY THE WITNESS:
25     A.   And, I'm sorry, just for clarification,

Page 156

1  the question you want me to validate?  I want to
2  make sure I'm understanding.
3  BY MR. ROSENBAUM:
4      Q.   In Exhibit 7, I showed you Randy's
5  request to General Medicine for the ACEs and the
6  FCNAs.
7      A.   Okay.
8      Q.   That was February the 4th.
9      A.   Yes.
10     Q.   And this e-mail starts on
11 February the 5th from General Medicine back to
12 Randy.  I wanted you to tell me whether I am
13 correct in assuming that this appears to be a
14 response to his request for the FCNAs and ACEs.
15     A.   Yes, it does.
16     Q.   Okay.  If you then look on page 3, you
17 have an e-mail from Mary Jo Coyne, who you have
18 identified -- and it begins at the bottom of
19 page 3 -- an e-mail from Mary Jo Coyne, who you
20 identified as being one of Randy's supervisors, is
21 that correct?  She is in the chain of --
22     A.   Sorry.  Yes.
23     Q.   No, I don't mean to ask you questions
24 when you're reading because that's not fair to
25 you.

Page 157

1      A.   No, sir, no.  You're asking me to stay
2  with you and be here now, and I'm not.
3      Q.   So Mary Jo Coyne, who is director of
4  case management -- and I believe you testified
5  that places her above Randy in the chain of
6  command?
7      A.   Yes, sir.
8      Q.   Okay.  She writes back to Eileen from
9  General Medicine, who provided the FCNAs and ACEs,
10 and she copies Randy and Cathy Schilling, who is
11 Mary Jo Coyne's supervisor.
12     A.   Uh-huh.
13     Q.   Okay.  She says:
14         "Thanks Eileen, Rebecca and Sandy for
15      this very valuable information and for all
16      of your hard work.
17         "Do you have a comprehensive list of
18      ALL of the members referred to Gen Med in
19      2014 and 2015?"
20         So my question to you is:  Why, if you
21 have an opinion, why wasn't Mary Jo Coyne or Randy
22 Carey-Walden interested in the number of care
23 plans that were done and only requested the ACEs
24 and the FCNAs?
25     MS. SHERWIN:  If you know.

Page 158

1 BY MR. ROSENBAUM:
2    Q.   If you know?
3    A.   Well, in Exhibit 7 on page 4, it
4 appears that Sandy Wrona was confirming:
5         "Per our last weeks conference call,
6         you stated that the FCNAs and Care Plans" --
7    Q.   Yes, I saw that.
8    A.   -- "were to be the primary focus."
9    Q.   Um-hum, correct.
10   A.   So it appears that they did relay that,
11 just in a different e-mail.
12   Q.   Well, this is February 4th, 2015.
13   A.   Um-hum.
14   Q.   And if that -- I have no doubt that
15 that's true.
16        So my question, though, is: If that
17 was to be the primary focus, why was it that
18 Mary Jo Coyne and Randy only were interested in
19 the counts for the FCNAs and the ACEs and didn't
20 ask for the care plan counts?
21   A.   That, I don't know.
22   Q.   Okay.
23   A.   I don't know.
24   Q.   All right. Is Mary Jo Coyne still at
25 Molina?

Page 159

1    A.   Yes, she is. She is. We held onto
2 one.
3    Q.   You're proud of that, I can tell.
4    A.   I can tell you, this market is tough.
5    MR. ROSENBAUM: Okay.
6    THE WITNESS: I'm going to grab a Coca-Cola,
7 if that's okay?
8    MR. ROSENBAUM: Sure. Go ahead.
9    THE WITNESS: Can I get anybody anything?
10       (WHEREUPON, discussion was had off
11       the record.)
12 BY MR. ROSENBAUM:
13   Q.   Just with regard to the FCNAs on that
14 Exhibit 8 --
15   A.   Yes.
16   Q.   -- having received the count from
17 General Medicine, do you think that Mary Jo Coyne
18 would have known when she received the count
19 whether or not the total number of FCNAs and ACEs
20 was what it should have been for the members?
21   A.   I don't know. I don't know that.
22   MR. ROSENBAUM: All right. This will be a
23 quickie. It's No. 9.
24
25

Page 160

1         (WHEREUPON, said document was
2         marked Schoen Exhibit No. 9 for
3         identification as of 04/05/2017.)
4 BY MR. ROSENBAUM:
5    Q.   And, Mr. Schoen, you've already
6 testified to this, but I'll -- just to document
7 your testimony --
8    A.   Well, good, because the chronology of
9 events is right in my head.
10   Q.   I thought you would like to see this,
11 yeah. But that does confirm your recollection of
12 the chronology, correct?
13   A.   It -- yes. Yes, it does.
14   Q.   Is it fair to say that this -- would
15 this e-mail have initiated, perhaps, the
16 conversation you ultimately had with Dr. Prose
17 about why the payment wasn't made?
18   A.   I'm -- I'm most certain this would have
19 served as the progenitor for those discussions,
20 yes.
21   MS. SHERWIN: Which Exhibit number is that?
22   MR. ROSENBAUM: 9.
23   THE WITNESS: 9. Yes, my memory is not --
24 it's not going. Good news. I'll tell my dad. He
25 won't believe me, but I'll let him know.

Page 161

1    MR. ROSENBAUM: No. 10.
2         (WHEREUPON, said document was
3         marked Schoen Exhibit No. 10 for
4         identification as of 04/05/2017.)
5    THE WITNESS: Thank you, Miss.
6 BY MR. ROSENBAUM:
7    Q.   All right. This is actually an e-mail
8 that involves you, number one, I'll ask you if
9 you're familiar with this particular e-mail
10 thread.
11   A.   Yes.
12   Q.   Okay. Is this one of the e-mails that
13 you reviewed in preparation for the deposition
14 today?
15   A.   No.
16   Q.   Going to the bottom, let me make sure
17 I've got the timing right here. Yes.
18        Going to the bottom of page -- well,
19 it's page three on here, the second page.
20   A.   In the middle?
21   Q.   Well, no, at the very bottom, where
22 Dr. Prose writes to you on February 18th,
23 "Dear Mr. Schoen."
24   A.   Um-hum.
25   Q.   And then the substance of what he

Page 162

1 writes is on the next page.
2 A. Okay, sure.
3 Q. And he goes through the patient lists
4 that were received. I note that the January -- he
5 makes the statement that the January list was not
6 received until January 22nd, so they were working
7 off of the December list.
8 Do you have a recollection of that
9 being the case, that for whatever reason, the
10 January list was late in getting to General
11 Medicine?
12 A. You don't mind if I catch up here, do
13 you?
14 Q. Not at all.
15 A. I believe you just said that the
16 December list wasn't received? Yes, okay, I see
17 what you are saying now. "January - list received
18 on 1-22."
19 And your question, again, sir?
20 Q. Do you recall that being the case, that
21 because the January list was received so late in
22 the month, General Medicine was working off the
23 December list?
24 A. I have a vague recollection that that
25 is accurate.

Page 163

1 Q. Okay. Two paragraphs down, he says:
2 "...Randy assigned 300 patients for
3 a FCNA, in addition to the February list."
4 Because this is now February 18th and,
5 presumably, they had received the February list at
6 that point.
7 A. Um-hum.
8 Q. "We will complete these within seven
9 days," that is, "by next week. We
10 anticipate FCNA completion for all patients
11 within three weeks, by early March."
12 My question is, you testified earlier
13 that -- well, let me ask a preliminary question.
14 Do you believe this e-mail was
15 subsequent to your telephone conversation with
16 Dr. Prose about where you were concerned about the
17 number of FCNAs and care plans being done?
18 A. I believe it was in parallel to, right
19 around that time. I can't -- that level of the
20 chronology, I can't remember.
21 Q. Exhibit 9 was dated February 17th, and
22 then this is dated February 18th.
23 A. Um-hum.
24 Q. And then at the very bottom of that
25 page 4 there, that e-mail --

Page 164

1 A. Um-hum.
2 Q. -- it says:
3 "Thank-you for raising this concern
4 with me and I welcome the opportunity
5 to address your concerns as they arise."
6 Does that at all refresh your
7 recollection of the chronology of events?
8 A. In what capacity?
9 Q. In that you had a phone conversation
10 with Dr. Prose before that, that resulted in him
11 sending you this e-mail.
12 A. We had a lot of phone conversations
13 with Dr. Prose during this time, so it's hard
14 for -- several a day at some point.
15 Q. Okay.
16 A. So it's hard for me to remember. It
17 does not seem askew, if that helps.
18 Q. Fair enough. That's a fine answer.
19 No, that's a good answer.
20 All right. Going back to this
21 paragraph where it says "Randy assigned 300
22 patients for a FCNA, in addition to the
23 February list," does that at all refer to the
24 names of the members that you testified earlier
25 were sent to General Medicine --

Page 165

1 A. They could be outside of the list.
2 Q. Yeah.
3 A. Yes.
4 Q. To catch up, if you will, that weren't
5 done?
6 A. Could be.
7 Q. All right. And then down later, he
8 says "As regards the delta," which is a term you
9 used before in terms of when you described your
10 conversation with Dr. Prose.
11 A. That's my favorite word. He got it
12 from me, I'm sure.
13 Q. I thought it was more of a current term
14 but, apparently, it dates back to 2015.
15 "As regards the delta, our data appears
16 to show we are on target or at the very
17 least close to target," that is, "90% or
18 more completion. Some of the discrepancy
19 you referenced" -- meaning you, Dr. Schoen --
20 Mr. Schoen -- "may be attributable to the
21 lag in the transfer of the needs assessment
22 to eight page Molina form, and the lag in
23 the input of the needs assessment paperwork
24 into electronic format."
25 Again, does this appear to be a

Page 166

1 response to a conversation that you had about the
2 number of FCNAs and care plans that you were
3 seeing and then what was supposed to be done in
4 the contract?
5    A.   Yes.  This is the impetus to -- we're
6 completing them.
7    Q.   Okay.
8    A.   And my team is going, "uh-uh."
9    Q.   All right.  So my question to you is,
10 if you know, if your conversation was focused on
11 FCNA and care plans, why is there not a mention at
12 all in this long e-mail about care plans?
13       MS. SHERWIN:  Well --
14       MR. ROSENBAUM:  If he knows.
15       MS. SHERWIN:  -- I mean, I would object.  He
16 didn't write the e-mail.  How would he know?
17       MR. ROSENBAUM:  Because he had a phone
18 conversation with Dr. Prose.
19       MS. SHERWIN:  Yeah, but he didn't write the
20 e-mail.
21       MR. ROSENBAUM:  But he had a phone
22 conversation with Dr. Prose.
23       MS. SHERWIN:  Well, if he knows what was going
24 on -- I mean, I object.  He has no way of knowing
25 what's going on -- let me finish.  He has no way

Page 167

1 of knowing what's going on in Dr. Prose's mind.
2 He has no way of knowing why --
3       MR. ROSENBAUM:  Judy, I prefer you just give
4 an objection and not give an answer to this
5 witness.
6       MS. SHERWIN:  I'm not giving an answer --
7       MR. ROSENBAUM:  You are.  You're telling him
8 what to say, and that's totally improper.
9       MS. SHERWIN:  I'm not telling him what to say.
10       MR. ROSENBAUM:  You are.
11       MS. SHERWIN:  I'm telling you why I'm
12 objecting, all right?  So --
13       MR. ROSENBAUM:  I'll ask the question a
14 different way.
15       MS. SHERWIN:  Yes.
16 BY MR. ROSENBAUM:
17    Q.   As a result of your phone conversation
18 with Dr. Prose or many phone conversations with
19 Dr. Prose, do you have any idea why, when he
20 responded to you about your concerns, why he
21 doesn't mention care plans and only refers to the
22 FCNAs that are going to be done?
23    A.   I don't.  But I do know that he wrote
24 that on the 18th and then, in response to him on
25 the 25th, I do mention care plans.

Page 168

1    Q.   Okay.  And we will -- I was going to
2 get to that next.
3    A.   Okay.
4    Q.   But I'm just wondering -- I'm trying to
5 deal with it chronologically.
6    A.   Yeah.  From his perspective, I don't
7 know why he didn't include care plans.
8       But I was sure after -- in the interim,
9 and I don't remember the February 18th, if there
10 was a weekend, where it may be, where I got back
11 to him saying, "We are -- we are only hitting a
12 sliver here."
13    Q.   Okay.
14    A.   "Care plans is a component of this."
15    Q.   You said that the reference to
16 "Randy assigned 300 patients for a FCNA," you said
17 that might have been the additional names that
18 you -- the member names that you provided to
19 General Medicine to do the missing FCNAs, correct?
20    A.   It could have been, yes.
21    Q.   Do you recall instructing Randy to send
22 names to General Medicine?
23    A.   I don't.  And in looking --
24    Q.   In terms of getting General Medicine --
25    A.   We knew that they needed them, you

Page 169

1 mean?
2    Q.   Yes, in terms of getting General
3 Medicine to catch up.
4    A.   I don't remember.  I would -- I would
5 say it would not be out of character for me to say
6 that they -- if we have hired them to do this,
7 they need these names if they haven't otherwise
8 received them.
9    Q.   Would you have expected --
10    A.   But I wouldn't have done it -- I don't
11 think I would have given it to Randy.  I mean --
12    Q.   Somebody higher up?
13    A.   Cathy, yeah.
14    Q.   Would you have expected, then, that
15 Randy would have informed General Medicine that
16 these members need to have both FCNAs and care
17 plans if they were lacking?
18    A.   My expectation is that he should have.
19    Q.   Yes, okay.  All right.  And then, as
20 you've already testified, the February 25th e-mail
21 from you to Dr. Prose is a response to the one
22 from February 18th, correct?
23    A.   Yes.
24    Q.   Okay.  And you say we:
25       "...want to be sure we are aligned

Page 170

1    on expectations."
2        Is it fair to say that your
3    expectations and his expectations are really
4    governed by the contract? Is that a fair
5    statement?
6    A.   Yes.
7    Q.   Okay. You're not talking about some
8    expectations that would be outside the contract?
9    A.   No.
10   Q.   Fair enough.
11       And when you say:
12       "Payment for a PMPM is predicated upon
13   a Face-to-Face assessment and development
14   of a care plan,"
15   you concede that a face-to-face does not have to
16   be done every month? In other words, you can get
17   a PMPM --
18   A.   I do.
19   Q.   -- if an FCNA has already been done?
20   A.   I do.
21   Q.   Okay. All right. And then you say:
22       There are time requirements for the
23   completion of these services and we can
24   work with General Medicine on this."
25       Is it fair to say that you were

Page 171

1    reflecting some flexibility with regard to the
2    time requirements in the contract?
3    A.   That is accurate.
4    Q.   All right. Fair to say that it was
5    more important from your standpoint in dealing
6    with the state of Illinois that it be done, not
7    necessarily that it was done within 72 hours or
8    24 hours or whatever?
9    A.   Correct.
10   Q.   Your sentence is:
11       "I want to make sure that the list
12   of members that we assign or submit is
13   not being construed as those as eligible
14   for a PMPM."
15       What did you mean by that?
16   A.   I don't know.
17   Q.   Is it -- you did not mean that they --
18   that General Medicine was not entitled to a PMPM
19   if it did everything it was supposed to do under
20   the contract for those members, did you?
21   MS. SHERWIN: I don't understand the question.
22   MR. ROSENBAUM: Okay.
23   MS. SHERWIN: Do you understand the question?
24   THE WITNESS: No. And I'm trying to
25   understand what I wrote, too.

Page 172

1    MS. SHERWIN: All right. Well, why don't you
2    focus on his question. Do you understand his
3    question?
4    BY THE WITNESS:
5    A.   Could you ask it again.
6    BY MR. ROSENBAUM:
7    Q.   All right. Or I'll ask it a different
8    way. If it was confusing to Judy, I'll ask it a
9    different way.
10       You make the statement, you:
11       "...want to make sure that the list
12   of members that we assign or submit is
13   not being construed as those as eligible
14   for a PMPM."
15       That's not really an accurate
16   statement. Isn't it true that every member on the
17   list that you gave General Medicine is eligible
18   for a PMPM so long as General Medicine does what
19   the contract requires for those members?
20   A.   That is true as it relates to this
21   contract.
22       If we were sending different lists for
23   different activities, that might -- that might not
24   be -- that might not qualify them. I'm -- I don't
25   know if the individuals -- so I guess the answer

Page 173

1    to that is no. And the reason why is, it goes
2    back to one of these scenarios that we saw before
3    where a member received an initial face-to-face
4    assessment, got a care plan, but then transitioned
5    into a skilled nursing facility. And if they just
6    went to do an ACE or an annual comprehensive exam,
7    that's not what falls into this category. That
8    would be outside. These are just individuals that
9    transitioned in.
10       And then there's also, of course,
11   individuals that they were doing SNFist activities
12   for who may have already had an initial.
13       (WHEREUPON, there was a short
14       interruption.)
15   MR. ROSENBAUM: Ready to go?
16   BY MR. ROSENBAUM:
17   Q.   So I just want to get an understanding
18   on that last sentence about the list of members.
19   When you say "the list of members that we assign,"
20   doesn't that mean the monthly list that General
21   Medicine is required to perform the SNFist
22   services for?
23   A.   I think that's what I was trying to
24   make sure of.
25   Q.   Okay.

Page 174

1    A.    I don't know if there was another list
2  that was going over there if I -- I don't think
3  I had the intimate knowledge that I needed to at
4  this point.
5    Q.    And if, in fact, the list that is
6  assigned is the list for the SNFist services,
7  would you agree that every name on that list is
8  eligible for a PMPM as long as General Medicine
9  does what it's required to do under the contract?
10    A.    Yes.
11    Q.    All right. I'm looking at the first
12  page of Exhibit 10, dated February 25th at 3:11 PM
13  Eastern time. This is an e-mail from Dr. Prose to
14  you. Do you recognize this e-mail?
15    MS. SHERWIN:  You are still on 10, right?
16    MR. ROSENBAUM:  Yes.
17    MS. SHERWIN:  Okay.
18  BY THE WITNESS:
19    A.    Yeah, it looks familiar.
20  BY MR. ROSENBAUM:
21    Q.    Okay. Do you recognize this as being a
22  response to your e-mail that we just discussed of
23  earlier that day?
24    A.    Sorry?
25    Q.    Do you recognize this, the e-mail, the

Page 175

1  last e-mail on the thread to you, as being
2  Dr. Prose's response to your e-mail?
3    A.    Yes. It appears he is asking for the
4  March list.
5    Q.    Okay. All right. And --
6    A.    Because on page 4, it appears that they
7  received the February list.
8    Q.    All right. And when he indicates to
9  you in the last paragraph that "there are issues
10  with CCA," is this something that was new to you,
11  or had you been previously made aware of these
12  issues?
13    A.    To the best of my recollection, this is
14  where I became aware of it.
15    Q.    And as of this date, as of this
16  February 25th date, you had not -- Molina had not
17  paid General Medicine for the January PMPM,
18  correct?
19    A.    Correct.
20    Q.    And you testified you were not in a
21  position to request a corrective action plan yet?
22    A.    Correct, as this intimates to me that
23  I'm still trying to put the pieces together.
24    Q.    All right. And that basically, you're
25  having conversations and e-mails with Dr. Prose

Page 176

1  about your concerns at this point?
2    A.    And there seems to be a CCA issue on
3  the list, and I don't know if it's accurate or
4  not, and how many we should send over. Yeah,
5  I was trying to get my arms around it.
6    MR. ROSENBAUM:  All right. No. 11.
7      (WHEREUPON, said document was
8      marked Schoen Exhibit No. 11 for
9      identification as of 04/05/2017.)
10    THE WITNESS:  Thank You, Miss.
11  BY MR. ROSENBAUM:
12    Q.    This is an e-mail exchange between
13  Rebecca Coccia and Randy Carey-Walden; also,
14  Catherine Schilling and Mary Jo Coyne were
15  included on this, on the first e-mail, the one
16  that's at the bottom of the page.
17      I want to turn your attention to the
18  top part, Randy Carey-Walden writing to Rebecca.
19  "We met our goal" -- this is about the second line
20  of the e-mail.
21      "We met our goal for FCNAs just today.
22      I will prepare a document for your review,
23      Rebecca, on assessment completion time
24      frames. Most of our NF members must have
25      an FCNA done within 60 days of eligibility

Page 177

1      and then annually. ACES can be completed
2      at any time during the year."
3      Were you aware that Molina had met the
4  goals for FCNAs as of February 26th?
5    A.    I'm not certain I know exactly what
6  that goal is referring to. Is that the goal for
7  that month? Is that the goal for when they filled
8  out a compliance? Is that an overall goal
9  relative to the contract? No, I'm -- this sounds
10  familiar in the sense that he said, "We met a
11  goal."
12    Q.    All right.
13    A.    I feel like I've heard that, but I
14  don't know if I knew what he meant by it or if
15  I knew that he was responsible for just the FCNAs
16  and Mary Jo is responsible for the care plans.
17  I don't know how that works.
18    Q.    Fair enough.
19      If you look at the e-mail that's below
20  it, the one that precedes this, Rebecca Coccia
21  who is the director of clinical operations for
22  General Medicine, writes to Randy, Catherine
23  Schilling and Mary Jo Coyne and indicates in the
24  second line:
25      "Knowing that we have all been driven

Page 178

1    to accomplish the completion of FCNAs for
2    members eligible 12/1/14"...
3    **A.    So this looks like the December list.**
4    Q.    Right.  That was the list that jumped
5    from 500 to 1700, was it not?
6    **A.    That would have been that list.**
7    Q.    Okay.  So does it appear to you that
8    there was a drive, if you will, from Molina to
9    say, "Listen, General Medicine.  You know, we've
10    got 1200 new members on here.  We need to get the
11    FCNAs done as quickly as possible"?
12    **A.    It would make sense.**
13    Q.    So when Randy says, "We met our goals
14    for FCNAS just today," is it possible that he's
15    referring to getting all these additional 1200
16    members on the December list up -- you know, done
17    and completed?
18    **A.    That is possible.**
19    Q.    All right.  And, again, do you have any
20    idea why, when he refers to the -- you know, to
21    the "assessment completion time frames," he only
22    refers to FCNAs and ACEs and not care plans?
23    **A.    I don't.  Maybe he thinks FCNAs and**
24    **care plans are the same thing.**
25    Q.    Maybe he told General Medicine that

Page 179

1    they were the same thing.
2        MR. ROSENBAUM:  No. 12.
3        (WHEREUPON, said document was
4        marked Schoen Exhibit No. 12 for
5        identification as of 04/05/2017.)
6    **THE WITNESS:  Thank you.**
7    BY MR. ROSENBAUM:
8    Q.    This is a March e-mail exchange.  It
9    begins on the second page where General Medicine
10    is internally complaining about the fact that
11    their practitioners have not been given log-in
12    info to be able to get into the CCA system.
13        And then it gets forwarded up the chain
14    from Rebecca Coccia to Randy Carey-Walden on
15    March 11th.  March 11th, you're now six and-a-half
16    months into the contract with General Medicine.
17    And Randy writes:
18        "I'm sorry.  I have gone around and
19        around with our IT.  I'm involving our
20        VP today."
21        Again, did you have any knowledge that
22    at this point in time, that you were having
23    problems getting General Medicine credentialed to
24    the point of being able to log in to CCA?
25    **A.    No, because I wasn't -- I'm not aware,**

Page 180

1    **as I said earlier, that the credentialing of the**
2    **provider has impacts or an ability to log in to**
3    **information in the CCA.  I mean, maybe a lower-**
4    **level associate enters the stuff that they do.**
5    **I don't -- I don't know how that process works.**
6    **Again, I wasn't trained on it or I didn't see any**
7    **of the training.  I don't know the process.**
8    Q.    Could there have been other reasons why
9    even credentialed clinicians couldn't log into the
10    CCA?
11    **A.    Could there have been?**
12    Q.    Yes.
13    **A.    There could have been.**
14    Q.    Okay.  So perhaps this particular
15    problem that Randy was dealing with on IT and his
16    VP -- would his VP be Catherine Schilling?
17    **A.    Yes.**
18    Q.    Okay.  Maybe it had nothing to do with
19    credentialing, but it clearly had something to do
20    with General Medicine's clinicians not being able
21    to log in?
22    **A.    This is intimating that there is a**
23    **problem with logging in.**
24    Q.    And was that brought to your attention
25    at the time?

Page 181

1    **A.    Not that I can remember.**
2    Q.    Would -- in your opinion, could that
3    have had -- would that have been a reason for why
4    care plans were not showing up in the CCA?
5    **A.    I don't know.  I don't know enough**
6    **about that process.  Because I think that there's**
7    **a paper form that one could complete if worst came**
8    **to worst.  But, again, I'm not an expert on that**
9    **process.**
10    Q.    If there was a paper form that could be
11    completed --
12    **A.    And they had one person that was able**
13    **to enter it, because it clearly got 188 of them**
14    **in.  Maybe that person got overtime.  I don't**
15    **know.  There was -- they found a way to do it.  So**
16    **why that wasn't echoed for the remainder, I don't**
17    **know, and my lack of intimacy on the process**
18    **precedes me.**
19    Q.    Well, the 188 -- actually, we figured
20    it was 185.
21    **A.    I thought it was something like that,**
22    **yes.**
23    Q.    Close enough.  Those were all in 2014.
24    **A.    Um-hum.**
25    Q.    Yes.  This was in --

Page 182

1    A.   Yes.
2    Q.   This was an issue that was still going
3  on in March of 2015.
4        In other words, you don't know whether
5  this is the same issue that made them -- that may
6  have been going on in 2014?  You don't know how
7  far back this issue goes?
8    A.   I'm not even -- I'm not familiar enough
9  with the issue.
10   Q.   All right.  Didn't the -- maybe this is
11 a dumb question.  Don't the FCNAs have to be
12 entered into the CCA as well?
13   A.   I believe so.
14   Q.   You believe so?
15   A.   I believe so.
16   Q.   Right.  And it appears that, at least
17 to the best of your knowledge, you don't believe
18 there was as big a problem with the FCNAs as there
19 was with the care plans in terms of the number
20 being done?
21   MS. SHERWIN:  I don't think he's testified to
22 that at all.  Why don't you ask him a question.
23 BY MR. ROSENBAUM:
24   Q.   Do you believe -- you referred to the
25 issue as an amalgamation between the FCNAs and the

Page 183

1  care plans.
2    A.   I believe the contract requirements are
3  an amalgamation of the FCNAs, the care plans and
4  ACEs.
5    Q.   And when you conveyed your concerns to
6  General Medicine, you did not have a breakdown as
7  between the FCNAs and the care plans as to whether
8  both were not being done or one was not being done
9  or the other?
10   A.   Not until we started to get into
11 dialogue between Dr. Prose and I, roughly around
12 February 25th or 26th.
13   Q.   I think you testified it's possible
14 that the problem could have all been with care
15 plans and not with FCNAs?
16   A.   Define "problem."
17   Q.   That they weren't being entered into
18 the CCA.
19   A.   And ACEs, or some variations of it.
20   Q.   Okay.  So I guess my question is -- my
21 question is when or not you had -- if there
22 were log-in issues with the CCA, you would think
23 that neither the FCNAs nor the ACEs would have
24 been able to be entered as well, not just care
25 plans?

Page 184

1    A.   I don't know enough about the data
2  entry process for those three components.
3    Q.   Do you recall at the end of March --
4  we're now talking about just a few days before the
5  termination of the contract --
6    A.   Sure.
7    Q.   -- that there was an audit going on,
8  that Molina was being subjected to an audit?
9  I believe it was a state of Illinois audit.
10   A.   Yeah.
11   Q.   Do you have any recollection of that?
12   A.   There have been so many.
13   Q.   Okay.  Wouldn't this have been your
14 first, though, as COO?
15   A.   No.  I think as soon as I got there,
16 I had to go through one.
17   Q.   Okay.
18   A.   I didn't say I was -- I had detailed
19 knowledge at that point.
20   Q.   All right.  Do you know who HSAG is?
21   A.   Yeah.
22   Q.   Okay.  Are they a --
23   A.   An independent.
24   Q.   Contracted by the state to conduct the
25 audit?

Page 185

1    A.   Yes.
2    Q.   Part of the audit required your
3  delegated subcontractors like General Medicine to
4  provide information to you for purposes of
5  submitting to the audit, is that correct?
6    A.   It -- it requires us to gather
7  information that is a provision of the contractor
8  agreement held between Molina and the state of
9  Illinois.  HSAG doesn't care if we get that from
10 Gen Med, P.C., to the best of my knowledge, or
11 MedXM, or if Molina does it itself.
12       They want to know, if you got a hundred
13 individuals that qualified that needed a
14 face-to-face and a care plan, how many of the
15 hundred did you get done.
16   MR. ROSENBAUM:  Let me make sure I've got it
17 right one here.  Yeah.  No. 13.
18       (WHEREUPON, said document was
19       marked Schoen Exhibit No. 13 for
20       identification as of 04/05/2017.)
21 BY MR. ROSENBAUM:
22   Q.   Mr. Schoen, this is another e-mail
23 thread that runs up through March the 27th.
24   A.   Um-hum.
25   Q.   And let's see if I didn't take one out

Page 186

1  of order here. I guess I did not, okay.
2           Were you aware that General Medicine
3  was requested by Molina to provide it with FCNA
4  information to assist Molina in providing what it
5  needed to provide to HSAG for the audit?
6     A.   No.
7     Q.   Did you have any role yourself in the
8  audit?
9     A.   Yes, but I don't believe that this was
10  the result of the audit.
11     Q.   Oh, you don't believe that this --
12     A.   That the information requested in this
13  e-mail corresponds to the audit.
14     Q.   What about with regard to page 3,
15  Dr. Prose writing to you:
16           "Dear Mr. Schoen.
17           "At 1 PM today we received your
18       compliance staff's request for an audit
19       of our services for submission today."
20     A.   Yeah, I believe this is regarding our
21  audit.
22     Q.   All right. Fair enough.
23     A.   This is -- because this is where I'm
24  trying to understand everything still.
25     Q.   Okay. Dr. Prose indicates to you -- he

Page 187

1  tells you what he believes is owed for January,
2  February and March for the PMPM, correct?
3     A.   Correct.
4     Q.   Okay. He also indicates to you some of
5  the reasons why some of the members were not seen
6  in this e-mail.
7     A.   Um-hum.
8     Q.   All right. He also includes the
9  fee-for-service component, which is not at issue
10  in this arbitration.
11     A.   Understood.
12     Q.   Okay. And then you respond by thanking
13  him for his attention to your request.
14           Again, you don't indicate whether or
15  not you're going to pay the PMPM, correct?
16     A.   Correct.
17     Q.   Nor do you at this point require him to
18  do any sort of a corrective action plan --
19     A.   Correct.
20     Q.   -- at this point? You're still
21  investigating, in other words?
22     A.   Correct.
23     MR. ROSENBAUM: 14.
24
25

Page 188

1           (WHEREUPON, said document was
2           marked Schoen Exhibit No. 14 for
3           identification as of 04/05/2017.)
4  THE WITNESS: Thank you.
5  BY MR. ROSENBAUM:
6     Q.   After you have had a chance to review
7  it, I'd turn your attention to page 3.
8     A.   Um-hum.
9     Q.   Okay. The last e-mail there, the one
10  from Dr. Prose to you on the evening of
11  April the 2nd, it starts off: "Ben, As per our
12  conversation this evening." Do you have a
13  recollection of that conversation?
14     A.   Um-hum.
15     Q.   Can you tell me what you recall about
16  the conversation.
17     A.   I indicated that "the CEO would not
18  agree to bring your account with General Medicine
19  current and/or would not provide a partial or any
20  payment on the almost $1 million" that is overdue.
21     Q.   Okay. So he is accurately stating what
22  you told him?
23     A.   I have -- I have no reason to believe
24  otherwise.
25     Q.   Okay. Who is the CEO that's being

Page 189

1  referred to?
2     A.   Cathy Harvey.
3     Q.   And had you had a discussion with Cathy
4  Harvey about paying General Medicine?
5     A.   I had conveyed to her in March-ish,
6  sometime in March that they were escalating some
7  concerns relative to payment, and it was going to
8  take a great deal of investigation to figure out
9  what was -- what accurately needed to be paid.
10           And the fee-for-service component was
11  one of the more perplex- -- perplexing parts of
12  it, even though we've already figured that out,
13  just as a side note.
14     Q.   Was there -- in your discussion with
15  Cathy Harvey, was there ever any -- was there ever
16  any consideration to the fact that you were not
17  receiving payment from the state of Illinois for
18  those same PMPM payments --
19     A.   No.
20     Q.   -- that you owed to General Medicine?
21     A.   No.
22     Q.   That wasn't a consideration at all --
23     A.   No.
24     Q.   -- in your decision not to pay?
25     A.   No, it's like we do with other

Page 190

1 providers we pay.

2 Q. Did Dr. Prose tell you in the phone

3 conversation that he was terminating the

4 agreement?

5 A. His demeanor changed from evening to

6 morning, sometimes much more demanding, is perhaps

7 a good word, too, then much more amiable in the

8 next time I would speak with him.

9 I did tell him -- and I think I even

10 mention it here -- that by 4/7 we're doing these

11 investigations, we have got to run the analysis

12 and the fee-for-service component and the PMPM.

13 I need some time to do that.

14 He noted that they were in need of

15 money and their service area was expanding, and

16 they needed -- they wanted to get paid.

17 Q. Is it fair to say that the

18 fee-for-service component, I mean, that was as

19 equally a concern for you as the PMPM at that

20 time?

21 A. Yes, because it was being intimated

22 that we weren't paying it, but providers weren't

23 eligible, and it's a whole mess on how that works

24 with the state.

25 Q. All right. And I'm not going to --

Page 191

1 A. No, you don't want to.

2 Q. No. But in your response to Dr. Prose

3 on the preceding page, page 2, you indicate -- you

4 say that:

5 "Molina is committed to providing the

6 appropriate payment for medically necessary

7 covered services."

8 Can I assume that you're referring to

9 the fee-for-service there and not the PMPM?

10 A. No, because it goes on to say:

11 "The audit would also lend itself to

12 the determination of any applicable PMPM

13 compensation."

14 What I am -- what I am trying to say is

15 we are committed to providing the appropriate

16 payment for services covered underneath the

17 contract.

18 Q. I think -- I think you're saying the

19 same thing.

20 A. Probably.

21 Q. You may have misunderstood my question.

22 The reference to "medically necessary

23 covered services," I took that to mean a

24 fee-for-service analysis. And then your last

25 line:

Page 192

1 "The audit would also lend itself to

2 the determination of any applicable PMPM

3 compensation."

4 A. We're saying the same thing.

5 Q. I understood you were doing one audit,

6 but it covered both components.

7 A. Both components, yes.

8 Q. But the "medically necessary" was a

9 fee-for-service issue, not a PMPM --

10 A. That's a necessary service type, yes.

11 Q. Gotcha. Okay. Then you say you:

12 "...will convey your notice of

13 termination internally to" the team, your

14 team, "and will work on behalf of Molina

15 and as your direct contact for any further

16 communication."

17 So at that point, you were accepting

18 the fact that General Medicine was terminating the

19 contract?

20 A. Where does it say that? Sorry.

21 Q. I'm sorry. It's the second --

22 A. "I will convey your notice of

23 termination internally to my team."

24 Yes.

25 Q. Okay. Did you take any steps at that

Page 193

1 point to do anything to replace the services that

2 General Medicine was providing under the SNFist

3 Program?

4 A. I contacted my attorney.

5 Q. Okay. I don't want to ask about your

6 conversations with your attorney.

7 But subsequent to contacting your

8 attorney, did you do anything to replace these

9 services?

10 A. Replace?

11 Q. The SNFist services that General

12 Medicine was providing.

13 A. Oh. No.

14 Q. All right. So that's April the 2nd,

15 2015. At some point in time -- now, you still had

16 a contract with the state of Illinois to provide

17 SNFist services, correct?

18 A. Correct.

19 Q. So --

20 A. Well, we had a contract with the state

21 of Illinois. One of the provisions in there is to

22 develop and implement a SNFist Program.

23 Q. Did you -- at some point in time

24 following April 2nd, did you do something to cover

25 the services that General Medicine had been

Page 194

1  providing to you?
2     A.  I believe we had discussions on
3  implementing a Molina SNFist Program and not
4  carving it out.  We were going to attempt to
5  execute it ourselves; to date, which we have not
6  completed.
7     Q.  What do you mean by "not completed"?
8     A.  It's not implemented.
9     Q.  As of today?
10    A.  Um-hum.
11    Q.  "Yes"?
12    A.  Yes.
13    Q.  All right.  So -- how do I frame this
14 question?
15    THE WITNESS:  You might want to pay attention
16 here, Judy.
17    MR. ROSENBAUM:  She's just waiting to object.
18 BY MR. ROSENBAUM:
19    Q.  All right.  So you have not hired a --
20 you have not delegated these services to another
21 subcontractor?
22    A.  No.
23    Q.  Are you doing any of them in-house?
24    A.  No.
25    Q.  Since -- all right.  Well, I saw a --

Page 195

1  Vijay testified yesterday that there were a number
2  of care plans that were being done and FCNAs that
3  were done in the year following General Medicine's
4  termination.  Weren't -- were those being done
5  in-house?
6     A.  I believe those would have been the
7  MedXM homebound.
8     Q.  Okay.
9     A.  And so we used MedXM to do the
10 homebound.
11    Q.  So you believe -- all right.
12    A.  But we --
13    Q.  Are you familiar with the spreadsheet
14 that Vijay prepared and sent to us that, for
15 example, it showed the fact that 185 care plans
16 were done and there needed to be, like, 1655,
17 something like that?
18    A.  I've probably seen it, but I can't --
19 there's just so many spreadsheets.  I -- no.
20    Q.  All right.  I did not ask him -- he did
21 testify that there were a number of FCNAs and care
22 plans done after General Medicine left in the
23 one-year period.
24    A.  Um-hum.
25    Q.  But it's your belief that those all

Page 196

1  would have been done by MedXM for homebound
2  members?
3     A.  Correct.
4     Q.  You don't believe that there have been
5  any FCNAs or care plans done for the SNFist -- I'm
6  sorry -- for the SNFist members that are in
7  skilled nursing facilities?
8     A.  No.
9     Q.  Is that an issue that you would have
10 with the state of Illinois if you have not been
11 doing that since 2015?
12    A.  I don't know.  I don't know how they
13 would take that.
14    Q.  But, of course, they haven't paid you,
15 either, have they, during that time period?
16    MS. SHERWIN:  You know, I object.  How many
17 times are you going to bring that up?  Enough
18 already.  Please move on.
19 BY MR. ROSENBAUM:
20    Q.  Well, I can ask this question.  Does
21 the fact that you are not providing those services
22 to SNFist members, does that have anything to do
23 with the fact that you have not been receiving
24 capitation payments from the state of Illinois?
25    A.  No.

Page 197

1     Q.  Okay.
2     A.  And, again, I don't know to what degree
3  we haven't been paid.  That's my CFO's purview.
4     Q.  Can you tell me why you have not
5  implemented either an in-house or another
6  delegation of those services in the two years
7  since General Medicine terminated?
8     A.  That would be a Cathy Schilling
9  question.
10    Q.  It's not your decision?
11    A.  It's not my -- if it was a vendor or a
12 delegate, that's where I come into play.
13    Q.  Okay.
14    A.  But if we're going to do this in-house,
15 that's on her.
16    Q.  Have you been -- have you received any
17 notification from the state of Illinois that you
18 are in any way deficient --
19    A.  No.
20    Q.  -- under the contract -- let me just
21 finish the question, then you can say "no" -- for
22 not providing those SNFist services?
23    A.  No.
24    Q.  All right.  You haven't been
25 sanctioned, then, by the state for any reason;

Page 198

1 for that reason, not providing SNFist services?

2  **A.  No.**

3  Q.  What about by the federal government?

4  **A.  No.**

5  Q.  Have you been audited by the state of
6 Illinois in the two years since for the services
7 that you provide under the contract with the state
8 of Illinois?

9  **A.  Yes.**

10  Q.  And in that audit, do you provide the
11 information that no --

12  **A.  Sorry, Barry. Go ahead.**

13  Q.  In those audit reports, have you
14 provided the information to the state that you
15 have not been doing SNFist FCNAs or care plans or
16 ACEs in the two years since General Medicine left?

17  **A.  So we have been doing them. We just**
18 **have not been doing them in the skilled nursing**
19 **facilities or able to go into the skilled nursing**
20 **facilities under a traditional SNFist Program.**

21  Q.  Right. But in your --

22  **A.  They just look at aggregate numbers.**

23  Q.  So you have been -- you have been
24 producing the numbers of the ones that have been
25 done in the home setting?

Page 199

1  **A.  Correct.**

2  Q.  You don't have to distinguish between
3 the home setting and the facilities setting?

4  **A.  No.**

5  Q.  How did you inform your staff -- Randy
6 Carey-Walden, Cathy Schilling, Mary Jo Coyne --
7 that General Medicine had terminated its contract
8 with Molina?

9  **A.  It was via e-mail.**

10  Q.  Did you have any sort of a follow-up
11 meeting closely thereafter to discuss the
12 situation as to what you were going to do about
13 it?

14  **A.  I believe that's when we brought our**
15 **legal team in.**

16  Q.  All right. And I don't want to ask you
17 about your legal team.

18  Did you have a meeting in Oak Brook
19 with Mary Jo Coyne, Cathy Schilling, Randy
20 Carey-Walden and Matt Wolf to discuss the General
21 Medicine situation after they terminated?

22  **A.  I believe we did because we were --**
23 **I committed the 4/7, given the response; and it**
24 **wasn't until 4/1 or 4/2 that I believe he**
25 **terminated. We were still using those last six or**

Page 200

1 **seven days to figure it out. They said they did a**
2 **care plan. Did we -- do we have it, that they did**
3 **a care plan? How many ACEs? Okay. This is how**
4 **many ACEs we have.**

5  Q.  Right.

6  **A.  So it was -- we were still meeting on**
7 **what is it, what's the delta.**

8  Q.  Okay. So with regard to my question
9 about a meeting in Oak Brook, do you have a
10 specific recollection of that meeting with those
11 people?

12  **A.  I don't because Matt and -- I have been**
13 **in so many meetings with them, I guess, I don't**
14 **remember a specific one on that. Honestly, I just**
15 **don't remember being in a lot of meetings with**
16 **Randy Carey-Walden.**

17  Q.  Do you remember being in any meetings
18 with Randy Carey-Walden?

19  **A.  I remember being in a meeting -- I have**
20 **been in a meeting with -- "a" or "a few," but not**
21 **many.**

22  Q.  Okay.

23  **A.  I don't remember many.**

24  Q.  All right. So you don't --

25  **A.  He was in Springfield, again --**

Page 201

1  Q.  Right.

2  **A.  -- so we just didn't.**

3  Q.  Would he ever come up to Oak Brook for
4 a meeting?

5  **A.  Rarely.**

6  Q.  Do you recall -- so, then, you don't
7 recall a specific meeting to discuss the General
8 Medicine situation right after it happened in the
9 first week of April which Randy Carey-Walden
10 attended?

11  **A.  I don't recall it.**

12  Q.  Okay. Do you recall telling your
13 people, the people that were involved in the
14 SNFist Program, that General Medicine terminated
15 because they claimed they were owed a million
16 dollars?

17  **A.  I probably sent this e-mail out that**
18 **he said that they sent to us saying that he said**
19 **we're underpaying them.**

20  Q.  Did you ever tell Randy Carey-Walden
21 and Mary Jo Coyne and Matt Wolf and Cathy
22 Schilling that Molina didn't have a million
23 dollars to give to General Medicine?

24  **A.  No.**

25  Q.  Did you ever instruct Randy

Page 202

1  Carey-Walden after the termination to find some
2  reason under the contract to justify not paying
3  General Medicine?
4      **A.  No.  He wouldn't have the authority.**
5      Q.   He wouldn't have the authority to do
6  what?
7      **A.  To not pay them.**
8      Q.   No, no.  Did you ever instruct him to
9  find some reason under the contract --
10     **A.  Oh.**
11     Q.   -- to justify not paying?
12     **A.  No.**
13     MR. ROSENBAUM: Okay.  The last exhibit.
14         (WHEREUPON, said document was
15         marked Schoen Exhibit No. 15 for
16         identification as of 04/05/2017.)
17         (WHEREUPON, discussion was had off
18         the record.)
19     **THE WITNESS:  Thank you very much.**
20     **You don't mind if I read while she**
21 **looks for tissues?**
22     MR. ROSENBAUM: Yes.  That would be great.
23     **THE WITNESS: Okay.**
24 BY MR. ROSENBAUM:
25     Q.   Okay.  Are you familiar with that

Page 203

1  memorandum?
2      **A.  Yeah, it looks familiar.**
3      Q.   All right.  The date on it is May 22nd
4  of 2015, so that's subsequent to the General
5  Medicine --
6      MS. SHERWIN:  This is 15 --
7      MR. ROSENBAUM:  Yeah.
8      MS. SHERWIN:  -- we're doing now?
9  BY MR. ROSENBAUM:
10     Q.   (Continuing) -- to General Medicine's
11 termination, correct?
12     **A.  Um-hum.  Yes.**
13     Q.   In fact, there's a reference to the
14 fact that Molina partnered with General Medicine
15 to complete the face-to-face assessments, right?
16     **A.  Um-hum.**
17     Q.   That's a "yes"?
18     **A.  Yes.**
19     Q.   All right.  It says in bold letters:
20         "Molina has now taken the face to
21     face assessment process in house."
22         Is it your testimony that this was your
23 intention to do this but that you never actually
24 implemented it?
25     **A.  I can't recall if it was actually**

Page 204

1  implemented or not.
2      Q.   All right.  Well, it goes on to say
3  that:
4          "...a Molina Case Manager will visit
5      Members residing in skilled nursing
6      facilities to complete these face to face
7      assessments."
8          First off, were the Molina case
9  managers licensed clinicians to be able to do this
10 themselves?
11     **A.  I'm -- they would have been able to**
12 **meet whatever requirements that was in the**
13 **contract.**
14     Q.   Okay.  All right.  It then goes on to
15 say:
16         "The Case Manager will request a
17     copy of a skilled nursing facility's
18     personalized care plan for each Member."
19         By the way, did you draft this
20 memorandum?
21     **A.  I don't think so.**
22     Q.   Okay.  You say, though, you have seen
23 it before, though?
24     **A.  Yeah.**
25     Q.   All right.  So help me understand it.

Page 205

1  When a case manager was -- is there, in fact, a
2  care plan at the facility?
3      **A.  No.  They would have to go do it.**
4      Q.   Well, it says:
5          "The CM will request a copy of a
6      skilled nursing facility's personalized
7      care plan for each Member."
8          It says "skilled nursing facility's
9  personalized care plan."  Is that different than
10 the care plan that Molina was having done?
11     **A.  I believe it is.  I'm not clinical by**
12 **any nature.  I don't know if, when a member goes**
13 **into a skilled nursing facility, if the skilled**
14 **nursing admitting physician does his own workup on**
15 **them and if that has treatment goals and plans and**
16 **progress notes.  I don't know.**
17     Q.   Okay.  Fair enough.  The last sentence
18 of that paragraph two in bold:
19         "Case managers will not write orders
20     or provide primary care services for
21     Molina Members."
22         Is that because they weren't licensed
23 to do that, or is that just an internal decision
24 not to -- not to do it?
25     **A.  Yeah, I think it was a -- it must have**

Page 206

1 been that they weren't licensed to provide -- to
2 render care as where General Med, P.C. had
3 physician assistants and nurse practitioners.
4    Q.   Okay.
5    A.   And they were able to administer care
6 and bill for it on a fee-for-service.  This was an
7 administrative function.
8    Q.   And then it goes on to say that:
9         "...effective June 1st, 2015, MedXM...
10    will be sending NPs into the skilled
11    nursing facilities to complete an ACE."
12    A.   Um-hum.
13    Q.   Okay.  That's your in-home vendor,
14 right?
15    A.   That's the one that we would use -- we
16 would have used for the in-home, yes.
17    Q.   Okay.  But it was your recollection
18 that you did not use them for facility-based
19 visits, correct?
20    A.   I don't have any recollection of
21 receiving information on them doing that.
22    Q.   All right.  So it's possible that this
23 was never implemented?
24    A.   It is very possible that it was never
25 implemented.

Page 207

1    Q.   Your recollection is that nobody ever
2 did the SNFist programs -- the SNFist services
3 that General Medicine was contracted to do in the
4 facilities after General Medicine --
5    MS. SHERWIN:  I have to object.
6 BY THE WITNESS:
7    A.   SNFist is different than --
8    MS. SHERWIN:  Wait, wait.  I have to object.
9 I think he said he didn't know and that you would
10 have to ask somebody else because it would be
11 somebody else's purview.
12 BY MR. ROSENBAUM:
13    Q.   Okay.  If I'm wrong, you can tell me
14 that.
15    A.   I have SNFist -- the SNFist Program is
16 different.  These are some administrative
17 functions contained in an agreement between us and
18 General Med, P.C.  The SNFist Program goes
19 under -- is identified in Attachment H, 4.7-D.
20    Q.   All right.  Well, I'm confused.
21 I thought in this paragraph three, the reference
22 to "Annual Comprehensive Examination (ACE),"
23 that's the same ACE that's referenced in the
24 General Medicine SNFist contract.  Are you saying
25 that they are different?

Page 208

1    A.   We have a -- well, we have care plans.
2 We have -- but the SNFist Program reviews weekly
3 admission reports from the previous week.  It has
4 admission dates, facility info, diagnostic --
5 diagnosis summaries, date of completions of an
6 annual comprehensive exam, the name of the
7 member's PCP, the name of the assigned SNFist
8 participating provider; monthly admissions
9 reports, total admissions for the month, total
10 discharges, average length of stay, most frequent
11 diagnosis, total number of members needing
12 end-of-life education, treatment plans, additional
13 on-site services.
14         They also render direct med/surg care.
15 That's part of the SNFist Program.
16    Q.   What are you reading from?
17    A.   Attachment H, 4.7-D, "SNFist Reporting
18 Requirements."
19    Q.   Okay.  What about the -- then maybe I'm
20 using the wrong terminology.
21         What about the delegated services that
22 General Medicine was providing under its contract?
23 Did you hire anyone, to your knowledge, to do
24 those services after --
25    A.   No.

Page 209

1    Q.   Okay.  So my question is, did you --
2 this third paragraph here is:
3         "MedXM... will be sending NPs into the
4    skilled nursing facilities to complete an
5    Annual Comprehensive Examination on
6    selected Molina Members."
7         Is that not one of the delegated
8 services?
9    A.   It's one, but that's -- it's a form.
10    Q.   Okay.
11    A.   Like, we could -- we could mail that --
12    Q.   Okay.
13    A.   -- to them and if, by God, the PCP
14 there would do it, that would be great.  The
15 problem is, they don't.  So we have somebody walk
16 out and say...
17    Q.   Then maybe you misunderstood my
18 question.
19    A.   Sorry.
20    Q.   I wasn't suggesting that this memo says
21 that MedXM is going to do all the responsibilities
22 that General Medicine had.  I just wanted to know
23 whether this was one of the responsibilities that
24 they were going to do --
25    A.   According to this memo, yes.

Page 210

1 Q. Okay. But sitting here today, you do
2 not know whether or not this was ever implemented?
3 **A. I don't know if it was ever implemented**
4 **or not for the nursing facility members.**
5 Q. All right. Very good. Sitting here
6 today, do you know how much General Medicine is
7 asking for with regard to the PMPMs for just
8 those -- for the three months of -- for the first
9 three months of 2015?
10 **A. Sitting here right now without looking**
11 **at anything?**
12 Q. Yes.
13 **A. No. I have a ballpark.**
14 Q. All right. Would somebody at Molina be
15 in a position to calculate the PMPM payments that
16 would be due to General Medicine for those first
17 three months assuming -- you know, based on the
18 member lists, assuming that General --
19 **A. The first three months of 2015 --**
20 Q. Yes.
21 **A. -- or the first three months of the**
22 **engagement?**
23 Q. No, the first three months of 2015.
24 **A. If everything was completed?**
25 Q. Yes.

Page 211

1 **A. It would be the member lists, right?**
2 Q. Yes. And somebody at Molina would have
3 that information to be able to do that
4 calculation?
5 **A. Yes.**
6 Q. Who would that be?
7 **A. Dennis or Vijay.**
8 MR. ROSENBAUM: Okay. I don't have anything
9 else.
10 THE WITNESS: Okay.
11 MR. ROSENBAUM: That's only because my voice
12 is going.
13 THE WITNESS: I don't know. You did it
14 quicker than I thought.
15 MR. ROSENBAUM: Yeah, 2:00.
16 MS. SHERWIN: Why don't we take a minute.
17 MR. ROSENBAUM: Go ahead.
18 **THE WITNESS: Me?**
19 MS. SHERWIN: Yeah.
20 (WHEREUPON, a recess was had from
21 2:08 p.m. until 2:16 p.m.)
22
23 EXAMINATION
24 BY MS. SHERWIN:
25 Q. Okay. All right. I just have a couple

Page 212

1 of questions.
2 With respect to the care plans and the
3 ACEs and the FCNAs, where were those documents
4 supposed to be maintained between -- according
5 to -- well, let me rephrase.
6 We have referred to the contract
7 between Molina and Gen Med. Does the contract
8 provide where the FCNAs, the ACEs and the care
9 plans are supposed to be transmitted?
10 **A. The same place that Molina employees**
11 **put them, the CCA.**
12 Q. Okay. So if something is not in the
13 CCA but is maintained in another location, is it
14 your understanding -- what is your understanding
15 about whether or not Gen Med would be -- if
16 General Med comp- -- strike that.
17 If Gen Med completed an ACE or an FCNA
18 or a care plan and did not enter it into the CCA,
19 would that be a fulfillment of the contract?
20 **A. No. We would be unable to have access**
21 **to it pending an audit from the state of Illinois**
22 **or HSAG.**
23 Q. And what's the reason that it has to be
24 in the CCA?
25 **A. So that when we run reports or that**

Page 213

1 **when HSAG comes on-site to do an audit and they**
2 **abstract random charts, we have to be able to pull**
3 **that information.**
4 Q. Now --
5 **A. If it's located in the nursing**
6 **facility, we wouldn't have access to it.**
7 Q. Okay. Now, what was it? Is Exhibit 4
8 the counterclaim?
9 MS. SHERWIN: Is that the counterclaim, do you
10 remember?
11 MR. ROSENBAUM: Oh, I'm sorry. What contract?
12 MS. SHERWIN: No, not the contract, the
13 counterclaim.
14 MR. ROSENBAUM: Oh, the counterclaim, the
15 one-pager?
16 MS. SHERWIN: Yes.
17 MR. ROSENBAUM: It's Exhibit 4.
18 **THE WITNESS: 4, yes.**
19 MR. ROSENBAUM: Yeah.
20 MS. SHERWIN: So mine has writing all over it.
21 Can I use yours for a second?
22 MR. ROSENBAUM: Yes.
23 MS. SHERWIN: It's pristine.
24 MR. ROSENBAUM: He has got a copy in front of
25 him, too.

Page 214

1    MS. SHERWIN: Okay, good.
2    **THE WITNESS: Yeah.**
3    BY MS. SHERWIN:
4    Q.   Okay.  So according to paragraph 2, it
5    indicates that:
6        "Molina pulled healthcare providers
7        off its own staff and required them to
8        perform the FCNAs and care plans that
9        were incomplete."
10       Is that correct?
11   **A.   Correct.**
12   Q.   And was that done after Gen Med
13   terminated their contract?
14   **A.   Correct.**
15   Q.   So that was done in-house by Molina
16   employees, correct?
17   **A.   Correct.  We did these administrative**
18   **functions.**
19   Q.   Okay.  Here you go.
20   **A.   But we're still absent the SNFist**
21   **Program.**
22   Q.   I didn't ask you that yet.
23       Is there a difference between the
24   SNFist Program and the delegated services
25   agreement?

Page 215

1    **A.   Yeah.  The SNFist Program is more in**
2    **the sense of monitoring a patient as they're in**
3    **these skilled nursing facilities to make sure that**
4    **they're not digressing in the acuity of their**
5    **condition and that they are receiving traditional**
6    **med/surg services that they otherwise would have**
7    **to go to the hospital for which costs, obviously,**
8    **more money, which was why we engaged in the**
9    **agreement -- arrangement with Gen Med, P.C.**
10       **Our providers -- or, pardon me -- our**
11   **staff did not have the ability or licensure to**
12   **render those services.  They were only able to go**
13   **in and do the administrative, "Fill out this**
14   **form."**
15   Q.   Okay.  But in addition to the SNFist
16   functions, Gen Med also had to do the -- as it
17   were, fill out these forms, the FCNAs, the ACEs
18   and the care plans, is that correct?
19   **A.   Correct.**
20   Q.   And that was part of the delegated
21   services --
22   **A.   Correct.**
23   Q.   -- which were delegated from Molina to
24   Gen Med, which was also functioning as the SNFist?
25   **A.   Correct.**

Page 216

1    Q.   So just so maybe we have a little
2    clarification, there's a term in medicine these
3    days called a hospitalist, which is a doctor who
4    takes care of somebody in the hospital.
5        Is the SNFist a similar designation for
6    a medical person who takes care of a nursing home
7    resident in the skilled nursing facility?
8    **A.   For all intents and purposes, yes.**
9        MS. SHERWIN: Okay.  I don't have anything
10   else.
11
12       FURTHER EXAMINATION
13   BY MR. ROSENBAUM:
14   Q.   Just a couple of follow-up questions
15   with regard to what Ms. Sherwin asked you.
16       Isn't it true that many Molina members
17   that end up in skilled nursing facilities come
18   from hospitals, complete a hospital stay, and then
19   go into a skilled nursing facility?
20   **A.   That is a way that they can be**
21   **admitted.**
22   Q.   Have you ever heard of the term
23   "post hospitalist"?
24   **A.   Yes.**
25   Q.   All right.  Would that refer to a

Page 217

1    practice that is based primarily or maybe even
2    exclusively in skilled nursing facilities?
3    **A.   I think --**
4    Q.   As an alternative to being in a
5    hospital?
6    **A.   I think it includes but is not limited**
7    **to.**
8    Q.   Okay.  And with regard to the CCA,
9    isn't it true that at any given time, the CCA is
10   able to reproduce a report of all of the FCNAs and
11   the ACEs and care plans that have been input into
12   its -- into the system?
13   **A.   It is able to abstract any information**
14   **that has been entered into the system.**
15   Q.   Right.  So would you agree with me,
16   then, that it was possible for Molina to have
17   determined as early as November of 2014
18   whether or not General Medicine was meeting its
19   goal for FCNAs and care plans?
20   **A.   It is possible.**
21   Q.   All right.  Is it also your
22   understanding, though, that that wasn't done; that
23   Molina did not do an internal audit to determine
24   as early as the end of November 2014?
25   **A.   It is my understanding, I was not aware**

Page 218

1 of whether or not it was done.

2    Q.   All right. So, then, it's fair to say

3 nobody at Molina made you aware of the fact prior

4 to January that they believed that General

5 Medicine was not doing all of the FCNAs and/or

6 care plans they were required to do?

7    A.   I do not recall being made aware of

8 such an occurrence.

9    MR. ROSENBAUM: Okay. I have nothing further.

10   THE WITNESS: Okay.

11   MS. SHERWIN: Neither do I.

12   THE WITNESS: All right.

13   MR. ROSENBAUM: Ben, it was a pleasure.

14   THE WITNESS: Thank you.

15

16      FURTHER DEPONENT SAITH NAUGHT.

17

18      (Time noted: 2:24 p.m.)

19

20

21

22

23

24

25

Page 219

1        REPORTER'S CERTIFICATION

2        I, ROSANNE M. NUZZO, a Notary Public and

3 Certified Shorthand Reporter in and for the State

4 of Illinois, do hereby certify that:

5        The witness, BENJAMIN SCHOEN, was by me

6 duly sworn; the deposition was taken before me at

7 the time and place herein set forth, the testimony

8 and proceedings were reported stenographically by

9 me and later transcribed into typewriting under my

10 direction; the foregoing is a true record of the

11 testimony and proceedings taken at that time.

12    I am not an employee of attorney or counsel for

13 any of the parties hereto, nor interested directly

14 or indirectly in the outcome of this action.

15       IN WITNESS WHEREOF, I have subscribed my

16 name this 16th day of April, 2017.

17

18

19        ROSANNE M. NUZZO, CSR, RMR, CRR

        C.S.R. Certificate No. 84-1388.

20        Notary Public, Will County, Illinois.

        My commission expires May 16, 2017.

21

22

23

24

25

Page 220

1            I N D E X

2   WITNESS - BENJAMIN SCHOEN          PAGE

3        BY MR. ROSENBAUM..................   3

4        BY MS. SHERWIN....................  211

5        BY MR. ROSENBAUM.................. 216

6

7

8            E X H I B I T S

9   SCHOEN EXHIBIT NUMBER          MARKED FOR ID

10   Exhibit No. 1..........................   31

11   Exhibit No. 2..........................   36

12   Exhibit No. 3..........................   80

13   Exhibit No. 4.......................... 118

14   Exhibit No. 5.......................... 141

15   Exhibit No. 6.......................... 147

16   Exhibit No. 7.......................... 150

17   Exhibit No. 8.......................... 154

18   Exhibit No. 9.......................... 160

19   Exhibit No. 10......................... 161

20   Exhibit No. 11......................... 176

21   Exhibit No. 12......................... 179

22   Exhibit No. 13......................... 185

23   Exhibit No. 14......................... 188

24   Exhibit No. 15......................... 202

25