# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

THE UNITED STATES OF AMERICA,  )
and THE STATE OF ILLINOIS *ex rel.*  )
DR. THOMAS PROSE,  )
       )
     Plaintiffs-Relators,  )
       )    Case No. 17-CV-06638
     v.  )
       )    Judge Virginia M. Kendall
MOLINA HEALTHCARE OF ILLINOIS,  )
INC. and MOLINA HEALTHCARE,  )
INC.,  )
       )
     Defendants.  )

## PLAINTIFF-RELATOR'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS

Neil M. Rosenbaum
Damon E. Dunn
Paul Matthew King
FUNKHOUSER VEGOSEN LIEBMAN &
DUNN LTD
55 West Monroe Street, Suite 2300
Chicago, IL 60603
312.701.6824 (Ph)
*nrosenbaum@fvldlaw.com*
*ddunn@fvldlaw.com*
*pking@fvldlaw.com*

Bruce C. Howard
SIPRUT PC
17 N. State Street, Suite 1600
Chicago, IL 60602
312.236.0000 (Ph)
312.878.1342 (Fax)
*bhoward@siprut.com*

***Attorneys for Plaintiff-Relator***

## <u>TABLE OF CONTENTS</u>

INTRODUCTION.................................................................................................. 1

STATEMENT OF FACTS ................................................................................. 1

ARGUMENT ....................................................................................................... 4

I.    MOLINA SUBMITTED FALSE CERTIFICATIONS..................................... 4

        A.   Molina's Express False Certifications ............................................. 4

        B.   Molina's Implied False Certifications............................................. 6

        C.   Relator's Allegations Are Sufficiently Particular.............................. 7

II.   RELATOR HAS SUFFICIENTLY ALLEGED THAT
     MOLINA KNOWINGLY MADE FALSE STATEMENTS
     TO RECEIVE PAYMENTS IT WAS NOT OWED. ...................................... 8

III.  MOLINA'S DUTY TO PROVIDE SNFist SERVICES WAS MATERIAL ......... 9

IV.  THE COMPLAINT STATES A CLAIM AGAINST MOLINA HEALTH........... 14

CONCLUSION ................................................................................................... 15

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Bock v. Computer Assocs. Int'l, Inc.,*
257 F.3d 700 (7th Cir. 2001)............................................................................ 8

*Leveski v. ITT Educ. Servs., Inc.,*
719 F.3d 818 (7th Cir. 2013)............................................................................ 7

*United States ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.,*
764 F.3d 699 (7th Cir. 2014)............................................................................ 4

*United States ex rel. Brown v. Pfizer, Inc.,*
No. CV 05-6795, 2017 WL 1344365 (E.D. Pa. Apr. 12, 2017)........................ 11

*United States ex rel. Escobar v. Universal Health Servs., Inc.,*
842 F.3d 103 (1st Cir. 2016) .......................................................................... 11

*United States ex rel. Fisher v. IASIS Healthcare LLC,*
No. CV-15-00872-PHX-JJT, 2016 WL 6610675 (D. Ariz. 2016) ...................... 5

*United States ex rel. Ling v. City of Los Angeles,*
No. CV 11-974 PSG (JCX), 2018 WL 3814498 (C.D. Cal. July 25, 2018) ........ 13

*United States ex rel. Lisitza v. Par Pharm. Cos.,*
No. 06 C 06131, 2013 WL 870623 (N.D. Ill. 2013) ....................................... 15

*United States ex rel. Lusby v. Rolls–Royce Corp.,*
570 F.3d 849 (7th Cir.2009).............................................................................. 7

*United States ex rel. Prather v. Brookdale Senior Living Comm. Inc.,*
892 F.3d 822 (6th Cir. 2018) .................................................................... 12, 13

*United States ex rel. Rahimi v. Rite Aid Corp.,*
No. 2:11-CV-11940, 2019 WL 1426333 (E.D. Mich. Mar. 30, 2019) .............. 14

*United States ex rel. Scharber v. Golden Gate Nat'l Senior Care LLC,*
135 F. Supp. 3d 944 (D. Minn. 2015) ............................................................ 14

*United States ex rel. Tran v. Computer Scis. Corp.,*
53 F. Supp. 3d 104 (D.D.C. 2014) .................................................................. 15

*United States ex rel. Tyson v. Amerigroup Illinois, Inc.*,
488 F. Supp. 2d 719 (N.D. Ill. 2007) ........................................................... 5, 15

*United States ex rel. Williams v. City of Brockton*,
No. 12-CV-12193-IT, 2016 WL 7429176 (D. Mass. Dec. 23, 2016) ................ 11

*United States ex rel. West v. Ortho-McNeil Pharm., Inc.*,
No. 03 C 8239, 2007 WL 2091185 (N.D. Ill. 2007) ......................................... 15

*United States v. President and Fellows of Harvard College*,
323 F. Supp. 2d 151 (D. Mass. 2004) ............................................................ 14

*Universal Health Services, Inc. v. United States ex rel. Escobar*,
246 S. Ct. 1989 (2016) ........................................................................... *passim*

**Statutes**

31 U.S.C. § 3729 ........................................................................................... 10

305 ILCS 5/5F-15 ............................................................................................. 2

305 ILCS 5/5F-20 ........................................................................................... 12

**Regulations**

42 C.F.R. § 438.604 ......................................................................................... 4

42 C.F.R. § 438.608 ......................................................................................... 4

## INTRODUCTION

Defendants Molina Healthcare of Illinois, Inc. ("Molina"), and its parent company, Molina Healthcare, Inc. ("Molina Health") have moved to dismiss, raising boilerplate arguments commonly asserted in FCA actions, *e.g.,* that Molina's obligations to provide SNFist services were not material to its government contracts, and that it had no obligation to report when it ceased providing them. While imposing upon Relator a far more heightened burden than Rule 9(b) actually requires, however, Defendants ignore the well-pled factual allegations in the Complaint and its exhibits, including the sworn testimony from Molina's leadership admitting to the very FCA elements the Motion claims are missing. When these facts are considered, there is no doubt that Relator states a cognizable cause of action.

## STATEMENT OF FACTS

Molina is a Managed Care Organization ("MCO") that has contracted with the U.S. Dept. of Health and Human Services for Medicare and Medicaid Services and the Illinois Dept. of Healthcare and Family Services (the "Department") to provide health care services to Illinois Medicaid beneficiaries through 2021. Complaint ("Compl.") ¶¶ 2, 26 [Dkt. No. 1]. Like all MCOs, Molina's contracts require it to provide coordinated care for Medicaid beneficiaries living in Skilled Nursing Facilities ("SNFs"), including care from "SNFists." [1] Compl. ¶¶ 33-35, 37-

---

[1] Molina entered into a contract with the U.S. Dept. of Health and Human Services for Medicare and Medicaid Services In Partnership with Department on Nov. 5, 2013 (the "2013 Contract") and another with the Department in 2015 (the "2015 Contract"). Compl. ¶18. Copies of the 2013 Contract and the 2015 Contract (collectively, the "Medicaid Contracts") are attached to the Complaint as Exhibits 2 and 3, respectively.

39, Exs. 2 & 3. SNFists are "medical professional[s] specializing in the care of individuals residing in nursing homes employed by or under contract with a MCO." *See* 305 ILCS 5/5F-15; Compl. ¶ 19. The healthcare community and the Illinois General Assembly recognize that SNFist services provide enhanced post-acute care to Medicaid beneficiaries, which results in reduced unnecessary and expensive hospitalizations by catching problems before they become emergent. Compl. ¶ 19. Illinois recognizes that SNFist services improve the quality of life for Medicaid beneficiaries, while saving taxpayers money.

On April 1, 2014, Molina contracted with General Medicine ("GMed"), a company founded by the Relator, Dr. Prose ("Relator," or "Dr. Prose"), to provide SNFist services at its MCO facilities. Compl. ¶¶ 31, 41, Ex. 12. GMed is a collaborative practice of board-certified physicians and advanced nurse practitioners who specialize in the care of post-acute care patients in long-term care facilities. Compl. ¶¶ 22-23.

In concert with Molina Health and per Defendants' profit motive, Molina stopped paying GMed in January 2015 in an attempt to force GMed to renegotiate their contract. Compl. ¶¶ 31, 43, 58. GMed continued providing SNFist services through April 2015, without remuneration, but ceased services thereafter due to Molina's breach of contract. Compl. ¶ 42. The parties were still arbitrating Molina's breach of contract at the time Relator's Complaint was filed. Compl. ¶ 32. Those proceedings were since resolved in GMed's favor.[2]

---

[2] Molina's contention that Relator "now seeks to air his contractual grievances" with this case (Memo. at 1) is therefore inaccurate. Dr. Prose already aired those grievances and GMed was made substantially whole. The Government's contractual and other

Beginning in May 2015, and continuing for at least the next two years, and likely beyond, Molina provided *absolutely no* SNFist services to any of its 217,000 Medicaid members. Compl. ¶ 48. Molina never informed CMS or the Department that its Medicaid members no longer received *any* SNFist services. Compl. ¶ 51. Nevertheless, Molina continued to receive "capitation" payments, which included amounts for SNFist services.[3]  Compl. ¶ 57.

The Medicaid Contracts obligated Molina to notify the Department within five days of any changes in "key functions for the delivery of care" or to "Contractor's network of Affiliated Providers." Compl. ¶ 36, Ex. 2 at §§ 5.5.5; 1.59 (defining terms); Ex. 3 at § 5.1. Yet Molina never informed the Department that it forced its Affiliated Provider, GMed, to terminate their contract or that it stopped delivering *any* SNFist services to its members. Compl. ¶¶ 48, 51, Ex. 12. Rather, Molina continued reporting to the Government that these particular services were being provided while omitting that they were no longer being provided in accordance with the very specific "Care Delivery Model" prescribed in the Medicaid Contracts. *Id.*

The 2015 Contract also required Molina to submit quarterly reports to the Department certifying that it had disclosed "all instances of suspected Fraud, Abuse and financial misconduct" during the quarter. Compl. ¶¶ 55, 67. For at

---

grievances against Defendants, on the other hand, remain unpaid, and they are significant.

[3] The 2013 Contract defines "Capitation" as "[t]he reimbursement arrangement in which a fixed rate of payment per Enrollee per month is made . . . to the Contractor for the performance of all of the Contractor's duties and responsibilities pursuant to the Contract." Compl. Ex. 2, § 1.16.

least two years, Molina omitted from all of its certified quarterly reports that it stood in violation of its contractual obligation to provide SNFist services but continuing to collect millions of dollars for rendering them anyway.

## ARGUMENT

## I. MOLINA SUBMITTED FALSE CERTIFICATIONS.

FCA liability attaches when a defendant submits a claim for payment containing an explicit lie, *or* when a defendant falsely certifies to the government that is has complied with laws, rules and regulations governing the reimbursement of a claim. *Universal Health Services, Inc. v. United States ex rel. Escobar,* 246 S. Ct. 1989, 1995 (2016). False certification claims can take the form of expressly false certifications or impliedly false certifications. *United States ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.,* 764 F.3d 699, 710-12 (7th Cir. 2014) Molina submitted both.

### A. Molina's Express False Certifications

First, Molina was required by both contract and statute to submit to the Department Encounter Data Reports ("EDRs") recording all Medicaid-covered services rendered by Molina and its Affiliated Providers. Compl. ¶ 62, Ex. 2 at § 2.17.2.1; 42 C.F.R. §§ 438.604 & 438.608. These EDRs included an attestation that the reported data was accurate and truthful and in accordance with applicable laws and contracts pursuant to the Medicaid Contracts and 42 C.F.R. §§ 438.604 & 438.608. Compl. ¶ 63. The EDRs were false because they omitted that Molina ceased providing SNFist services while continuing to receive the same capitation payments. Compl. ¶ 63. As a matter of law, the submission of

false EDRs has been found to constitute false express certifications, sufficient to state a valid FCA claim. *See United States ex rel. Fisher v. IASIS Healthcare LLC*, No. CV-15-00872-PHX-JJT, 2016 WL 6610675, at \*8-9 (D. Ariz. 2016).

Second, in order to receive federal funds, the Department was required to submit quarterly estimates to CMS for estimated costs, including MCO services (Form CMS-37), and quarterly expenditure reports (Form CMS-64). Compl. ¶ 64. In submitting its CMS-37 and -64 reports, the Department utilized the EDRs that had been submitted to it by Molina. Compl. ¶ 65. Moreover, CMS Forms contained certifications that the reported data included only allowable expenditures in accordance with applicable statutes, regulations, policies, and the state plan approved by CMS. Compl. ¶ 64. Because Molina's EDRs omitted its failure to provide the expensive SNFist services compelled by the Medicaid Contracts, the Department's CMS-37 and -64 reports, which were based on Molina's false EDRs, were made false themselves. In *Fisher*, the court found the relator's claim that the State of Illinois' submission of CMS-37s and -64s, which were predicated on false EDRs submitted by the defendants, also constituted express false certification, sufficient to state a valid claim under the FCA. *Fisher*, 2016 WL 6610675, at \*8-9; *see also United States ex rel. Tyson v. Amerigroup Illinois, Inc.*, 488 F. Supp. 2d 719, 728 (N.D. Ill. 2007) (Leinenweber, J.) ("claims submitted [by defendants] to state Medicaid agencies or intermediaries are considered to be claims presented to the federal government"). Accordingly, defendants were held liable for submitting false enrollment forms to the State of Illinois, which in turn, were incorporated in the CMS-37 and CMS-64 reports

submitted by the State to CMS. Thus, Relator has properly alleged that Molina is liable under the FCA for submitting express false certifications, directly through its EDRs, and indirectly when EDR data was included in the Department's CMS-37 and -64 reports.

**B.    Molina's Implied False Certifications**

The FCA not only encompasses claims that make fraudulent misrepresentations, but also claims which include materially misleading omissions. *Escobar,* 136 S. Ct. at 1999. Liability may attach when two conditions are met: "first, the claim . . . makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Id.* at 2001. Such half-truths constitute implied false certifications. *Id.* at 1995.

The Complaint alleges "half-truths," courtesy of Molina's own admissions. First, Molina was required to report to the Government the number of face-to-face exams ("FCNAs") and annual comprehensive exams ("ACEs") completed on all of its members. Compl. ¶ 39. These reports, however, did not distinguish between exams conducted on members residing in their own homes versus those residing in Skilled Nursing Facilities. Compl. ¶¶ 52-53. Molina took advantage by reporting only the "home exam" data to the government while failing to state that members residing its Nursing Facilities did not receive exams. *Id.*

Second, Relator alleges that CMS held monthly conference calls with Molina, during which it regularly asked about the SNFist program. Compl. ¶ 54.

At no time did Molina inform CMS that it had unilaterally discontinued SNFist services for at least two years. Compl. ¶¶ 49-51. Whatever statements Molina made in response to the CMS inquiries constituted specific representations about SNFist services, and Molina's silence in the factual context of such calls represented materially misleading omissions for purposes of alleging Molina's implied false certifications under *Escobar,* 136 S. Ct. at 1995-2001.

### C. Relator's Allegations Are Sufficiently Particular

Defendants argue that Relator's allegations lack sufficient particularity because the claims are alleged "by general category without identifying any specific one that he contends contained a false statement." Memo. at 10. The law, however, does not impose the level of specificity demanded by Defendants.

Notwithstanding the heightened pleading requirements of Rule 9(b), it is well settled that a plaintiff need not present, or even allege, a specific document or bill that defendants submitted to the government, particularly when, as here, a relator does not have access to defendants' internal documents. *See, e.g., Leveski v. ITT Educ. Servs., Inc.,* 719 F.3d 818, 839 (7th Cir. 2013) ("[s]ince a relator is unlikely to have those documents unless he works in the defendant's accounting department," holding otherwise would have "take[n] a big bite out of qui tam litigation.") (quoting *United States ex rel. Lusby v. Rolls–Royce Corp.*, 570 F.3d 849, 854 (7th Cir.2009).) Since Relator alleges that *all* of Molina's EDRs, all of the Department's CMS-37 and CMS-64 reports, and *all* of Molina's FCNA and ACE reports submitted after Molina forced GMed off the job were false, to require

greater specificity is unnecessarily pedantic and not required by the law, especially where Dr. Prose and GMed did not have access to Molina's reports.

## II. RELATOR HAS SUFFICIENTLY ALLEGED THAT MOLINA KNOWINGLY MADE FALSE STATEMENTS TO RECEIVE PAYMENTS IT WAS NOT OWED.

Defendants argue that "Relator has not alleged how Molina knowingly violated the SNFist requirement...." Memo. at 14. Relator's explicit and extensive allegations demonstrate otherwise. Compl. ¶¶ 32, 34-35, 37, 38-41, 48 (alleging that Molina was required to provide a SNFist program, that it had absolutely no SNFist program after GMed, and that Defendants nevertheless continued to claim full payment from the Department).[4]

Defendants also posit that, "while the Complaint alleges that the contracts define an 'SNFist,' it does not include any clear definitions of SNFist services," thereby rendering the Medicaid Contracts ambiguous and relieving Molina from its obligation to comply. Memo. at 14. Defendants' position is disingenuous given that "agreements are generally analyzed in terms of the objective (plain and ordinary) meaning of the terms they contain." *Bock v. Computer Assocs. Int'l, Inc.*, 257 F.3d 700, 707 (7th Cir. 2001). According to Cambridge Dictionary, a

---

[4] For reasons not clear, Defendants point out that "Molina 'contemplated beginning an in-house SNFist program' and in fact did have in-house staff complete some FCNAs to that end." Memo. at 14. Under no principle of civilized law does the contemplation of satisfying a contractual requirement constitute fulfillment of that obligation. Moreover, the completion of FCNA reports in-house is nothing more than an administrative function and hardly equates to providing SNFist services. Compl. ¶ 49.

"service" means the provision of "a particular type of activity." [5] Besides, Defendants understood the meaning of SNFist services enough to append an expansive SNFist Program Statement of Work to GMed's contract delineating all of the SNFist deliverables. Compl., Ex. 12, Attachment D-1.

Finally, Defendants argue that "Relator's factual scienter allegations are consistent with—at most—negligence that would not constitute an FCA violation." Memo. at 15. While Defendants are correct that negligence will not satisfy scienter requirements as a matter of law, the allegations discussed at length above undermine any notion that Molina was simply negligent in failing to provide SNFist services. To the contrary, the Complaint sets forth in detail that Molina—despite knowing its contractual obligations and the health benefits of a SNFist program—willfully discontinued SNFist services and concealed that fact in order to increase Defendants' profits. Compl. ¶¶ 56-57.

## III. MOLINA'S DUTY TO PROVIDE SNFist SERVICES WAS MATERIAL.

Defendants move to dismiss for the "independent reason" that Relator does not sufficiently allege materiality. Memo. at 11-12. They contend that, unless the Government affirmatively characterizes a regulation or contract provision as "material" to its payment decision or has previously withheld payment because of noncompliance with same, a relator cannot satisfy the FCA's rigorous materiality standard. *Id.* The U.S. Supreme Court disagrees. *Escobar,* 136 S. Ct.

---

[5] *service*, CAMBRIDGE DICTIONARY,
https://dictionary.cambridge.org/us/dictionary/english/service (last visited May 14, 2019).

9

at 1996 ("Defendants can be liable for violating requirements even if they were not expressly designated as conditions of payment").

The FCA defines the term "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). And yet, perhaps reacting to the never-ending efforts of defendants like Molina to obscure the statutory definition by attaching novel requirements to it (*see, e.g.*, Memo. at 12), the Supreme Court used its *Escobar* opinion to "clarify how that materiality requirement should be enforced." 136 S. Ct. at 2002. The Complaint easily satisfies the *Escobar* rule, alleging the particular standard of patient care expressly required in the contract to provide medical services for those patients is material to the Government's decision to pay for those medical services. Compl., ¶¶34-36, 50-52, Ex. 2 (2013 Contract) at § 2.5 ("Care Delivery Model"), § 2.5.6 (among other things, the "SNFist program shall provide intensive clinical management of Enrollees in Nursing Facilities").

In *Escobar*, the Supreme Court soundly rejected the defendant's contention that FCA liability arises from the failure to disclose a contractual, statutory or regulatory provision *only* where the Government expressly designates the provision a condition of payment. 136 S. Ct. at 2001-02. At the same time, the Court explained that the Government's express designation of a contractual, statutory or regulatory provision as a condition of payment does not automatically render it "material" for purposes of the FCA either. *Id.* at 2003. Rather, the *Escobar* court borrowed from familiar tort and contract law principles to explain the requisite materiality to state a claim under the FCA. *Id.* at 2002-3

("Under any understanding of the concept, materiality 'look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation.'") (citation omitted); *see also United States ex rel. Brown v. Pfizer, Inc.*, No. CV 05-6795, 2017 WL 1344365, at *11 (E.D. Pa. Apr. 12, 2017).

Here, Relator's allegations track those of the whistleblower in *Escobar* where, following remand, the First Circuit was tasked with *applying* the Supreme Court's materiality standard. The relator in *Escobar* alleged that the "centrality of licensing and supervision requirements in the [healthcare] regulatory program, which go to the 'very essence of the bargain' of [the healthcare regulatory] contractual relationships with various healthcare providers under the Medicaid program, is strong evidence that a failure to comply with the regulations would be 'sufficiently important to influence the behavior' of the government in deciding whether to pay the claims." *United States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 110 (1st Cir. 2016) (internal citations omitted). Those allegations are remarkably similar. *Compare* Compl., ¶¶18-20, 34-37, 50-57, 67-68 ("Molina's failure to provide SNFist services goes to the essence of its bargain with the Department. Had CMS or the Department known the truth, it would have had a material effect on their decision to pay Molina"), *with United States ex rel. Williams v. City of Brockton*, No. 12-CV-12193-IT, 2016 WL 7429176, at *6 (D. Mass. Dec. 23, 2016) ("the First Circuit [in *Escobar*] noted that the expectation that mental health providers are appropriately trained and credentialed lies '[a]t the core' of the regulatory scheme.").

The notion that deviating from a particular model of healthcare required under the parties' contract for healthcare services, *pursuant to applicable law*, would be immaterial to the Government's willingness to pay for said healthcare services is dubious at best. Especially where the Government confirms the healthcare model is "material" elsewhere. For example, the "Network adequacy" section of the IL Medicare-Medicaid Alignment Initiative (MMAI) Nursing Home Residents' Managed Care Rights Law provides that a MCO "may terminate or refuse to renew a contract with a nursing home for a **material breach** of the contract, including, but not limited to, **failure to grant reasonable timely access to the MCO's care coordinators, SNFists and other providers**, termination from the Medicare or Medicaid program, or revocation of license." 305 ILCS 5/5F-20(c) (emphasis added). If a nursing home's failure to grant "reasonable timely access" to Molina's SNFists qualifies as a "material breach" of its subcontract, then Molina's covert elimination of *any* access to SNFists for its eligible members would be a material breach of its Medicaid Contracts.

Courts have little difficulty sustaining a Relator's materiality allegations where, as here, the defendant's statutory or contractual violation thwarts the very purpose of the underlying regulation or agreement. *See*, *e.g.*, *United States ex rel. Prather v. Brookdale Senior Living Comm. Inc.*, 892 F.3d 822, 835-36 (6th Cir. 2018) ("Whether the party on the other side of a transaction complied with the regulations aimed at preventing unnecessary or fraudulent certifications [for Medicare payment] is a fact that a reasonable person would want to know before entering into that transaction."); *United States ex rel. Ling v. City of Los Angeles*,

No. CV 11-974 PSG (JCX), 2018 WL 3814498, at *16 (C.D. Cal. July 25, 2018) ("materiality can be inferred from the fact that the Entitlement Programs sought (at least in part) to provide accessible housing, which Defendants did not do.").

Moreover, Relator went to great lengths to specifically allege the recognized benefits of SNFist care. *See* Compl. ¶19 ("SNFists provide a higher quality of care for post-acute patients because they have a more detailed understanding of the patients' conditions, including personal relationships with the patients ... are on-site, beside the patients, seeing the patients frequently ... [and] SNFists help reduce unnecessary, and expensive, hospitalizations by catching illness and otherwise unforeseen problems before they become emergent."). Plus Relator alleges that the healthcare community in general understands and appreciates the benefits of implementing the SNFist model of care for those who need it. Compl. ¶¶20-21, 24 (citing testimony from AARP Kansas Executive Director that SNFist programs saved Kansas's Medicaid program between $40-77 million annually from reduced readmission rates).

Finally, Defendants' focus on the absence of allegations that the Government complained about Molina's non-performance or withheld payment as a result. *See* Memo at 11-12. This is just a red herring. The law is settled that continued payments from the Government are only germane to the materiality analysis if the Government has actual knowledge of the FCA violations. *See, e.g.*, *Brookdale Senior Living*, 892 F.3d at 834 ("Without actual knowledge of the alleged non-compliance, the Government's response to the claims submitted by the defendants ... has no bearing on the materiality analysis"); *United States ex*

*rel. Rahimi v. Rite Aid Corp.*, No. 2:11-CV-11940, 2019 WL 1426333, at *8 (E.D. Mich. Mar. 30, 2019) ("Rite Aid's argument assumes that the Government *knows* that Rite Aid violated the U&C requirements") (original emphasis).

## IV.   THE COMPLAINT STATES A CLAIM AGAINST MOLINA HEALTH.

Defendants move for Molina Health's dismissal, claiming allegations of its involvement are "premised on a nebulous scheme." Memo. at 15. Relator alleged, however, that Molina Health regularly reviewed Molina's work, including its FCNAs and ACEs, that it took ownership of Molina's execution of its contracts with the Department, and that it imposed its profit motive on its subsidiaries, citing deposition testimony of Molina's executives. Compl. ¶ 58. For example, Monila's COO Schoen testified that Molina Health was "intimately involved in the MMP Program since it's Medicare/Medicaid," which would include Molina as an MCO. Ex. 1, pp. 13, 36-37, 153. Accordingly, Molina Health knew about Molina's patient memberships and even required its subsidiary to keep it appraised of the FCNA and ACE report data. *Id.* Thus, Molina Health was in a position to know that Molina was not performing FCNAs and ACEs on all members in the manner the Medicaid Contracts required. Instead of putting a stop to Molina's deceptive half-truths, Molina Health kept silent in order to further the profit motive at the expense of the members' health and quality of life. Courts have subjected parties to FCA liability for similar inaction. *See United States v. President and Fellows of Harvard College*, 323 F. Supp. 2d 151, 187 (D. Mass. 2004) (Defendant held liable because his "ostrich-like behavior itself [became] a course of conduct" that violated the FCA) (internal quotation omitted).

14

As a matter of law, a parent company will be held liable for the false claims of its subsidiary if the parent knowingly caused such claims to be submitted. *See*, *e.g.*, *United States ex rel. Scharber v. Golden Gate Nat'l Senior Care LLC*, 135 F. Supp. 3d 944, 959 (D. Minn. 2015) (sustaining allegations that "[parent] effectively directed the [subsidiary's] employees to order unnecessary therapy and treatment for the purpose of driving up revenue" and "that this strategy came from the parent company"); *Tyson*, 488 F. Supp. 2d at 737. Molina Health cannot avoid liability where Molina's false claims were in furtherance of the parent's scheme. *See*, e.g., *United States ex rel. Tran v. Computer Scis. Corp.*, 53 F. Supp. 3d 104, 127 (D.D.C. 2014) (Claim against non-submitting party allowed because "the non-submitter was the driving force behind an allegedly fraudulent scheme."); *Tyson*, 488 F. Supp. 2d at 737 (parent company caused subsidiary to violate the FCA because its' financial incentives program encouraged its subsidiary to avoid late pregnancy patients, which was a violation of subsidiary's contract with the government). [6] Relator's allegations are likewise sufficient.

## CONCLUSION

Defendants' motion to dismiss should be denied and they should be held accountable for their fraudulent conduct which has cost taxpayers millions of dollars while diminishing the quality of care provided to Medicaid beneficiaries.

---

[6] The cases on which Molina relies, on the other hand, alleged "nothing about the fraudulent scheme or the companies' participation in it." *United States ex rel. Lisitza v. Par Pharm. Cos.*, No. 06 C 06131, 2013 WL 870623, at *4 (N.D. Ill. 2013); *United States ex rel. West v. Ortho-McNeil Pharm., Inc.*, No. 03 C 8239, 2007 WL 2091185, at *5 (N.D. Ill. July 20, 2007) (N.D. Ill. 2007); *see also* Memo. at 15. They are therefore inapposite.

Dated:  May 14, 2019                              Respectfully submitted,

                                                 */s/ Bruce C. Howard*
                                                 Bruce C. Howard
                                                 SIPRUT PC
                                                 17 N. State Street
                                                 Suite 1600
                                                 Chicago, IL 60602
                                                 312.236.0000 (Ph)
                                                 312.878.1342 (Fax)
                                                 *bhoward@siprut.com*

                                                 */s/ Neil M. Rosenbaum*

                                                 Neil M. Rosenbaum
                                                 FUNKHOUSER VEGOSEN LIEBMAN
                                                 & DUNN  LTD
                                                 55 West Monroe Street
                                                 Suite 2300
                                                 Chicago, IL 60603
                                                 312.701.6824 (Ph)
                                                 *nrosenbaum@fvldlaw.com*
                                                 *ddunn@fvldlaw.com*
                                                 *pking@fvldlaw.com*

                                                 *Attorneys for Plaintiff-Relator*
                                                 *Dr. Thomas Prose*

## **CERTIFICATE OF SERVICE**

The undersigned, an attorney, certifies that the foregoing **Plaintiff-Relator's Response to Defendants' Motion to Dismiss** was filed electronically with the Clerk of the Court using the CM/ECF system on this 14th day of May 2019, and served electronically on all counsel of record

*/s/ Bruce C. Howard*