IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, and THE STATE OF ILLINOIS *ex rel.* THOMAS PROSE,<br><br>*Plaintiffs,*<br><br>v.<br><br>MOLINA HEALTHCARE OF ILLINOIS, INC. and MOLINA HEALTHCARE, INC.,<br><br>*Defendants.* | No. 17 C 6638<br><br>Judge Virginia M. Kendall |

### MEMORANDUM OPINION AND ORDER

Plaintiff Dr. Thomas Prose brings this qui tam lawsuit against Defendants Molina Healthcare of Illinois, Inc. ("Molina"), and Molina Healthcare, Inc. ("Molina Health"), pursuant to the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* (the "FCA"), and the Illinois False Claims Act, 740 ILCS 175/1, *et seq.* (the "IFCA"). Prose alleges that Molina falsely represented and/or misrepresented that it was providing services that it was not actually providing. Defendants have moved to dismiss Prose's First Amended Complaint on the grounds that he has failed to sufficiently allege a false claim, materiality, causation, or scienter. (Dkts. 54, 55). For the following reasons, Defendants' motion is granted.

## BACKGROUND

The following factual allegations are taken from Prose's First Amended Complaint and are assumed true for purposes of this motion. *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016).

Molina is a managed care organization that has contracted with the Illinois Department of Healthcare and Family Services ("IDHFS" or "the Department") and the United States Centers for Medicare and Medicaid Services ("CMS") to provide healthcare services to Illinois Medicaid beneficiaries. (Dkt. 53 ¶ 2; Dkt. 53-1). Prose alleges that, despite requirements and promises to do so, Molina failed to provide an SNFist program for eligible members. (Dkt. 53 ¶ 2). An SNFist is "a medical professional specializing in the care of individuals residing in nursing homes employed by or under contract with a" managed care organization. 305 ILCS 5/5F-15. Prose claims that Molina continued to receive payments even though it was failing to provide SNFist services. (Dkt. 53 ¶ 2). The United States of America and the State of Illinois have declined to intervene. (Dkt. 9).

Prose founded a company called General Medicine, P.C. ("GenMed"). (Dkt. 53 ¶ 27). Molina contracted with GenMed to delegate to GenMed oversight and operation of its SNFist program. (*Id.* at ¶¶ 46–48). After a payment dispute, GenMed ceased providing services to Molina as of April 2, 2015. (*Id.* at ¶¶ 60–63).

Prose alleges that from April 2, 2015 through "at least April 5, 2017, and probably beyond," Molina failed to provide SNFist services to its enrollees. Prose alleges that Molina made various false claims regarding its failure to provide SNFist

services, which are described in more detail below. His allegations include that Molina failed to reveal its lack of a SNFist program, continued to receive payments improperly, and failed to report its ongoing fraud.

Prose alleges that several high-level Molina managers knew that providing SNFist services was a material part of Molina's contract with CMS and IDHFS. (*Id.* at ¶ 118). Prose also alleges that Molina Health, as the parent of Molina, reviewed Molina's information, took ownership of Molina's contracts with IDHFS, and forced a profit motive on its subsidiaries which caused Molina to cut corners. (*Id.* at ¶¶ 135–140).

The Court previously dismissed Prose's complaint upon a 12(b)(6) motion by the Defendants. (Dkt. 49). Prose, with leave of this Court, filed their Amended Complaint. (Dkt. 53). Defendants have again moved to dismiss. (Dkt. 54).

## **LEGAL STANDARD**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Olson v. Champaign Cty., Ill.*, 784 F.3d 1093, 1099 (7th Cir. 2015) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "Threadbare recitals of the elements of a cause of action, supported

by mere conclusory statements, do not suffice." *Toulon v. Cont'l Cas. Co.*, 877 F.3d 725, 734 (7th Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678.).

Complaints sounding in fraud have an elevated pleading standard: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The FCA, as an anti-fraud statute, is subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 775 (7th Cir. 2016). To meet the particularity standard, a plaintiff must assert in his complaint the "who, what, when, where, and how" of the alleged fraud. *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009); *see also U.S. ex rel. Grenadyor v. Ukrainian Vill. Pharmacy, Inc.*, 772 F.3d 1102, 1106 (7th Cir. 2014) ("The complaint must state the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." (internal quotation marks omitted)).

Private individuals, as "relators," can prosecute *qui tam* actions on behalf of the United States government for fraud. 31 U.S.C. § 3730; *see State Farm Fire & Cas. Co. v. United States ex rel. Rigsby*, 137 S. Ct. 436, 440, (2016). A relator who successfully prosecutes a qui tam action is entitled to receive a portion of the recovery. 31 U.S.C. § 3730(d); *see United States ex rel. Conner v. Mahajan*, 877 F.3d 264, 267 (7th Cir. 2017).

## DISCUSSION

"The False Claims Act makes it unlawful to knowingly (1) present or cause to be presented to the United States a false or fraudulent claim for payment or approval, 31 U.S.C. § 3729(a)(1)" or to "(2) make or use a false record or statement material to a false or fraudulent claim, § 3729(a)(1)(B)." *U.S. ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 822 (7th Cir. 2011). "Thus, to establish civil liability under the False Claims Act, a relator generally must prove [at this stage of the case, allege] (1) that the defendant made a statement in order to receive money from the government; (2) that the statement was false; and (3) that the defendant knew the statement was false." *Thulin v. Shopko Stores Operating Co., LLC*, 771 F.3d 994, 998 (7th Cir. 2014) (internal quotation marks omitted). The falsehood must be "the proximate cause of the Government's harm." *United States v. Luce*, 873 F.3d 999, 1014 (7th Cir. 2017). Because the IFCA mirrors the FCA, the same standard applies in analyzing both of Prose's claims. *See Bellevue v. Universal Health Servs. of Hartgrove, Inc.*, 867 F.3d 712, 716 n.2 (7th Cir. 2017) ("The IFCA closely mirrors the FCA, and to date we have not found any difference between the statutes that is material to a jurisdictional or merits analysis." (internal quotation marks omitted)). As such, any references to Prose's FCA claim in this Opinion apply to both his federal and state-law claims.

Prose points to Molina's 2013 contract with IDHFS and CMS, which mandated that Molina provide SNFist services. (Dkt. 53 ¶¶ 44–51). And he alleges that IDHFS paid a higher capitation rate to Molina for members in nursing facilities, which he

attributes to expensive SNFist services. (*Id.* at ¶¶ 52–58). He claims that Molina continued to receive capitation payments despite no longer providing these expensive services. (*Id.* at ¶ 68).

Prose explains his theory of Defendants' liability in his response to the motion to dismiss. He points to various false reports, certifications, and omissions alleged in his complaint. He states that "Molina's false reports and certifications to the government that it was 'doing the work' required by the 2013 Contract were tantamount to presenting claims for payment because material noncompliance with Molina's reporting obligations would cause the Department to delay or discontinue making the PMPM payments." (Dkt. 60 at 4).

### I. Direct False Claims

Prose alleges that Molina "directly submitted false claims" by submitting enrollment forms for each enrollee which Molina knew would result in capitation payments while knowing that no SNFist services would be provided. (Dkt. 60 at 5). The State, in turn, submitted Molina's requests for payments to the United States. (Dkt. 53 ¶¶ 121–127). Prose, however, points to no express falsehoods in the enrollment forms, in fact, he pleads almost no information about the content of the forms. He, therefore, fails to plead this theory with particularity, as is required by Rule 9(b). Moreover, he appears to base his argument on the fact that Molina submitted the data while omitting "its violations of statutory, regulatory, or contractual requirements" and misrepresenting the services it was providing. *Universal Health Servs., Inc. v. United States ex. rel. Escobar*, 136 S. Ct. 1989, 1999

(2016). Such claims are more appropriately classified as implied false certifications and are addressed as such below.

## II. False Certifications

Prose also advances a theory of express and implied false certification. "Under an express false certification theory, a relator must allege that defendants affirmatively certified they had 'complied with particular statutes or regulations that were conditions of, or prerequisites to, government payment.'" *United States v. Pfizer Inc.*, No. 16-CV-7142, 2019 WL 1200753, at *8 (N.D. Ill. Mar. 14, 2019) (quoting *United States ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*, 764 F.3d 699, 710–711 (7th Cir. 2014)). "[T]he implied certification theory can be a basis for liability, at least where two conditions are satisfied: first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Escobar*, 136 S. Ct. at 2001.

"The materiality standard is demanding" and the FCA "is not an all-purpose antifraud statute or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Id.* at 2003 (citations and internal quotation marks omitted). "[N]ot every undisclosed violation of an express condition of payment automatically triggers liability. Whether a provision is labeled a condition of payment is relevant to but not dispositive of the materiality inquiry." *Id.* "[S]tatutory, regulatory, and contractual requirements are not automatically material, even if they are labeled

conditions of payment." *Id*. "Materiality, in addition, cannot be found where noncompliance is minor or insubstantial." *Id*. at 2003. "[I]f the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material." *Id*. at 2003–04.

**Response to Request for Proposal**:

Prose points to Molina's response to IDHFS's request for a proposal, in which, he says, Molina made several representations about its SNFist program, for example that its "SNFist program, will be available 24 hours a day, 7 days a week with an on-site presence maintained Monday thru Friday, as well as weekend, if needed." (Dkt. 53 ¶¶ 37–42). The SNFist program with GenMed was allegedly terminated in 2015, long after the response to the RFP was submitted. Prose has failed to allege why, in 2013, representations about the SNFist program were false. *See U.S. ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 917 (7th Cir. 2005) ("But fraud requires more than breach of promise: fraud entails making a false representation, such as a statement that the speaker will do something it plans not to do."). Molina stated it would have such a service and did so for at least two years—the alleged facts do not support that the statements were false when made or that Molina did not, at the time, intend to

follow through on them. These allegations, therefore, cannot be the basis for FCA liability.

**Encounter Data Reports**:

Prose states that Molina was required to provide monthly Encounter Data Reports, which were used to calculate capitation rates. Molina submitted these reports without revealing it was not providing SNFist services thereby inflating rates for future years. (Dkt. 53 ¶¶ 105–108). These allegations are not pleaded with the required particularity. It is unclear what these reports are, why they would touch on SNFist services (if at all), or why anything in them was misleading or false. These allegations, therefore, cannot be the basis for FCA liability.

**Failure to Document/Notify**:

Prose states that Molina failed to document that there had been a change to its SNFist services despite a contractual obligation to do so. (Dkt. 53 ¶¶ 86–87). Molina also failed to notify CMS and the Department within 5 days of this change. (*Id.* at ¶¶ 90–92). Prose also states that Molina made false demonstrations that its provider network had SNFist service providers. (*Id.* at ¶¶ 88–89).

Prose points first to §2.3.1.12 of Molina's contract with CMS and IDHFS, which provides that IDHFS and CMS will review documentation provided by Molina in certain circumstances, including upon a change in covered services. (*Id.* at ¶ 87; Dkt. 53-1 at 37). This section discusses review of documentation and not any obligation to provide documentation. Further, Prose's allegation is that Molina failed to provide documentation, not that it provided documentation to be reviewed and that

documentation was false in any way. Prose points to no falsity, misrepresentation, or omission associated with any documentation provided, as he points to no documentation. These allegations, therefore, cannot be the basis for FCA liability.

The allegations about "demonstrations" are also lacking in required particularity. Prose alleges only that "Upon information and belief, between April 2015, and at least April 2017, Molina attempted to demonstrate on an annual basis that it had an adequate network of providers. Such demonstrations were false and fraudulent in that Molina had no providers in its networks providing mandatory SNFist services." (Dkt. 53 ¶ 89). Prose does not explain what these demonstrations were or how they were made. *See U.S. ex rel. Bogina v. Medline Indus., Inc.*, 809 F.3d 365, 370 (7th Cir. 2016) ("Allegations based on 'information and belief' thus won't do in a fraud case-for 'on information and belief' can mean as little as 'rumor has it that. . . .'"); *see also United States ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 841 (7th Cir. 2018) (noting that, although in some cases fraud allegations can be based upon information and belief, "the relator must still describe the predicate acts with some specificity to inject precision and some measure of substantiation into his allegations of fraud" (internal quotation marks omitted)). These allegations, therefore, cannot be the basis for FCA liability.

Prose does point to a contract provision that requires Molina to notify the contract managers of a change in its provider network that renders it unable to provide a covered service—and alleges that it should have provided notice that it no longer had an SNFist provider. (Dkt. 53 ¶¶ 90–92). But the failure to state something

does not create FCA liability unless it is tied to some other statement or misstatement—there can be no false claim if no claim is made. Therefore, this failure alone cannot suffice for FCA liability. To the extent Prose's argument is that this failure to notify made later statements or certifications false, as described in this Opinion, no such statements or certifications are sufficiently pleaded.

**<u>Compliance Officer</u>**:

Prose states that Molina was contractually required to employ a qualified Compliance Officer, yet that officer was derelict in his or her responsibilities by failing to ensure SNFist services were provided and failing to report this noncompliance. (Dkt. 53 ¶¶ 83–84). As with other above allegations, this failure alone cannot suffice for FCA liability as no false statement or misrepresentation is alleged. To the extent Prose's argument is that this failure made later statements or certifications false, as described in this Opinion, no such statements or certifications are sufficiently pleaded.

**<u>Quality Assurance Plans and Results</u>**:

Prose states that "Molina submitted Quality Assurance Plans to CMS and the Department, which failed to disclose that it was not providing Enrollees quality, appropriate and timely access to SNFist services." (Dkt. 53 ¶¶ 93–99). Molina also submitted reports detailing the effectiveness of its Quality Assurance Plans but concealed its failure to identify and address the need to provide SNFist services. (*Id.* at ¶¶ 100–101). Prose further states that "Molina submitted quarterly Quality

Assurance results to CMS and the Department that failed to disclose that GenMed ceased to be an Affiliated Provider or Subcontractor as of April 2015." (*Id.* at ¶ 104).

While Prose details what Molina was required to provide, he provides almost no information on what Molina did, in fact, provide. His allegations are vague, broad, and based on information and belief. (*Id.* at ¶¶ 97, 99, 101). Prose does not point to any false statement or certification Molina made in any such reports, nor does he explain what specific representations Molina made that could have been impliedly false. He has failed to allege his claims with the required particularity. And, while Prose alleges that the contract required Molina to notify CMS and IDHFS of termination of a provider contract for a quality of care issue, Prose does not allege that there was any such issue here. (*Id.* at ¶ 104). These allegations, therefore, cannot be the basis for FCA liability.

**<u>2016 & 2017 Contract Readiness Reviews</u>**:

Prose alleges that prior to renewal of Molina's contracts in 2016 and 2017, CMS and IDHFS were to conduct a comprehensive readiness review. (*Id.* at ¶¶ 78–82). Before these reviews, Molina was required to provide assurances that it was ready and able to meet its contractual obligations. (*Id.* at ¶¶ 78–82). He alleges that any such assurances were false due to Molina's inability to provide SNFist services and its failure to report its own fraud. (*Id.* at ¶¶ 78–82).

These allegations, like some of his others, read as though Prose looked through Molina's 2013 contract and thought that because it provides for such reviews in future, they must have happened. Other than this assumption, he provides no

information on whether such reviews did happen. He does not provide any detail on whether Molina provided assurances in advance or what such assurances entailed. His only bases are the 2013 contract and "information and belief." Prose's allegations are almost entirely lacking in particularity. *See, e.g., Grenadyor*, 772 F.3d at 1108 (discussing that relator must be able to explain how he knows of the alleged fraud). These allegations, therefore, cannot be the basis for FCA liability.

**FCNAs & ACEs**:

Prose alleges that "Molina was obligated to report certain SNFist deliverables to the Department for auditing purposes on a monthly basis," including the number of initial face-to-face comprehensive assessments ("FCNAs") and annual comprehensive exams ("ACEs") performed on Molina's members. (Dkt. 53 ¶ 110). Prose further alleges that "Molina unilaterally extracted the FCNAs and ACEs from its SNFist Program in order to direct its own care coordinators to conduct these medical assessments on members residing in Nursing Facilities. As such, Molina was able to continue reporting these deliverables to CMS and the Department without tipping them off to the material change in its Provider Network." (*Id.* at ¶ 113). The problem with this, Prose says, is that Molina knew that its own providers could not adequately provide such care. (*Id.* at ¶ 113).

This, in theory, is similar to the allegations which might have stated a claim in *Escobar*, that the facility submitted implied false certifications that certain care was being provided while knowing the services that were in fact provided were grossly deficient. 136 S. Ct. at 1998. The problem here, as Defendants point out, is that the

Page 13 of 19

source that Prose relies on to show such knowledge does not support his allegation. He points to, and attaches to his complaint, a deposition from Molina's COO which he states shows that Molina "fully recognized that its own personnel were inadequate substitutes for licensed SNFist providers like GenMed." (Dkt. 53 ¶ 113). But the COO's testimony describes GenMed as conducting FCNAs and ACEs "in addition to SNFist functions." (Dkt 53-3 at 336). In other words, although his testimony supports that GenMed had been providing these services, it suggests that they were additional and separate from SNFist services and were something that Molina's own staff could provide. The deposition, therefore, fails to provide the necessary detail.

What is left is an allegation that Molina was reporting FCNAs and ACEs which it really did provide. And absent his mischaracterization of the COO's testimony, Prose has not alleged any basis upon which to infer that these services were being improperly provided or provided by inadequate personnel. Nor does he allege any other falsity tied to the reporting of FCNAs and ACEs; he does not, for example, allege that Molina certified that these services were being provided by specific types of healthcare professionals. In sum, his allegations are lacking falsity—implied or otherwise. These allegations, therefore, cannot be the basis for FCA liability.

**Enrollment Forms**:

Prose alleges that Molina submitted enrollment forms for each enrollee which essentially served as requests for payment. Molina knew submission of these forms would result in capitation payments. Yet Molina submitted them while knowing that

no SNFist services would be provided. The State, in turn, submitted Molina's requests for payments to the United States. (Dkt. 53 ¶¶ 121–127).

Each enrollment form was a specific request for payment for that enrollee.[1] And each was impliedly false because it requested payment of the capitation rate, implying that all services that justified that rate could or might be provided. That capitation rate was allegedly as high as it was because of the expense of providing SNFist services. Yet Molina did not disclose that it had ceased providing these SNFist services that drove the rates up. Prose alleges that the enrollment forms were the proximate cause of the (over)payment to Molina—the forms served as a request for payment and caused the government to remit payment for these enrollees, a foreseeable consequence. (*See, e.g.*, Dkt. 53 ¶ 121). *See Luce*, 873 F.3d at 1012.

Prose argues that various alleged facts support materiality.[2] He points to an Illinois statute, 305 ILCS 5/5F-20, but that statute discusses the relationship between a managed care organization and a nursing home and has little relevance here. He also points to the fact that the government's request for proposal asked questions about SNFist services, but this is insufficient to meet the rigorous

---

[1] To the extent the representations in *Escobar* were more specific, *Escobar* did not foreclose liability for less specific representations. 136 S. Ct. at 2000 ("We need not resolve whether all claims for payment implicitly represent that the billing party is legally entitled to payment.").

[2] There is some suggestion in the complaint and the briefing that the State and the U.S. continued to contract with Molina despite the filing of this complaint and the knowledge that Molina is not providing SNFist services while under a requirement to do so. Were this supported by something more concrete, it would be a strong indication that the requirement to provide SNFist services was not material. *See Escobar*, 136 S. Ct. at 2003 ("Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material."). But given the lack of specificity around these allegations, the Court will not find a lack of materiality on this basis.

materiality requirements set forth in *Escobar*. At most, it suggests that the SNFist program was important, but does not support the inferential leap that the lack of SNFist services would be material to the government's decision to pay under the contract. By that logic, anything referenced in a contract or RFP would automatically be material, which contravenes the directives of *Escobar*. Prose's allegations about the capitation rate, however, support an inference of materiality. Making reasonable inferences in Prose's favor, it is reasonable to infer that IDHFS and CMS would have refused payment of the higher capitation rates in this scenario—particularly because Prose has alleged that the provision of SNFist services played a central role in these rates. *See, e.g., U.S. ex rel. Upton v. Family Health Network, Inc.*, No. 09 C 6022, 2013 WL 791441, at *7 (N.D. Ill. Mar. 4, 2013) (noting that contractual provisions may be material when they form "the actuarial basis upon which capitation rates were calculated"); *U.S. ex rel. Tyson v. Amerigroup Illinois, Inc.*, 488 F. Supp. 2d 719, 726 (N.D. Ill. 2007) (same).

There is a problem, though, when it comes to knowledge. Molina must have known of this materiality. *See Escobar*, 136 S. Ct. at 1996 ("What matters is not the label the Government attaches to a requirement, but whether the defendant knowingly violated a requirement that the defendant knows is material to the Government's payment decision."). Per Rule 9(b), "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Prose argues that "Molina's senior managers knew that providing SNFist services was a material requirement of the 2013 Contract." (Dkt. 60 at 14; *see also* Dkt. 53 ¶ 118 ("Senior

managers for Molina knew that providing SNFist services was a material requirement of its Contract.")). But these allegations are conclusory, and Prose has failed to allege facts that support Molina's knowledge of the reason for materiality here—that SNFist services factored heavily into the capitation rate. Prose alleges that such services played a central role in the calculation of these rates, but to do so, he points to a contract between IDHFS and the actuarial consultants. He does not allege that Molina had anything to do with these calculations or knew of the supposed weight given to SNFist services in calculating the capitation rates. (Dkt. 53 ¶¶ 52–58). Because he has failed to allege facts supporting Molina's knowledge of materiality, even under lesser pleading standards, Prose has failed to state an FCA claim based on submission of the enrollment forms.

**<u>Fraud Reporting</u>**:

Prose points to various obligations that Molina had to report fraud, waste, and abuse. He states that Molina "was required to disclose or certify on a quarterly basis that it has no knowledge of conduct constituting fraud or abuse of the Medicaid Program" and that such certifications are an express condition of payment. (*Id.* at ¶¶ 69–71). To renew its contract in 2016 and 2017, Molina was required provide assurances that it was preventing, detecting, and correcting fraud. (*Id.* at ¶¶ 70–72). Molina was also required "to submit annual reports to CMS and the Department regarding its fraud monitoring." (*Id.* at ¶ 74). And Molina was required to "report suspected Fraud and Abuse in the HFS Medical Program to the Department's Office of Inspector General" and include such information "in reports filed on a quarterly

basis." (*Id.* at ¶ 75). Despite all these obligations, Prose says, "Molina failed to report the fraudulent scheme identified herein, and falsely certified to CMS and that Department that it had identified no instances of any fraud, waste or abuse." (*Id.* at ¶ 76).

Prose has failed to sufficiently allege that the failure to report fraud was material. He notes that fraud-related certifications are an express condition of payment or contract renewal, but under *Escobar*, this is not enough. He might have been able to tie the materiality of the fraud reporting to the materiality of the impact of SNFist services on the capitation rate. For the reasons described above, however, he failed to sufficiently allege Molina's knowledge under this theory. These allegations, therefore, cannot be the basis for FCA liability.

### III. Fraudulent Inducement

Prose also advances a fraudulent inducement theory. Prose alleges that Molina fraudulently induced CMS and IDHFS to renew Molina's contracts in 2016 and 2017 by saying it would provide SNFist services when it did not intend to do so, by failing to report its intentions, and by certifying past compliance. (*Id.* at ¶¶ 116–117). This theory fails for a lack of required particularity. It would appear, from these allegations, that Prose does not have any details of the contract renewals in 2016 and 2017, aside from a general understanding that the contracts were renewed. He does not point to any specific statement or misrepresentation made by Molina; he only alleges very generally that the contracts were renewed, and Molina again promised to provide SNFist services. His basis for these allegations is unexplained.

*See Grenadyor*, 772 F.3d at 1108 (discussing that relator must be able to explain how he knows of the alleged fraud). These allegations, therefore, cannot be the basis for FCA liability.

## CONCLUSION

As described above, Prose has failed to allege with particularity the majority of his bases for liability under the FCA and has otherwise failed to sufficiently allege materiality and/or scienter. The Court therefore grants Defendants' motion to dismiss. Because Prose was previously given leave to amend his complaint, yet failed to sufficiently to do so, his claims are dismissed with prejudice.

_____
Virginia M. Kendall
United States District Judge

Date: June 8, 2020