**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA, | ) | |
| and THE STATE OF ILLINOIS *ex rel*. | ) | |
| DR. THOMAS PROSE, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 1:17-cv-06638 |
| | ) | |
| v. | ) | |
| | ) | |
| MOLINA HEALTHCARE OF ILLINOIS, | ) | |
| INC. and MOLINA HEALTHCARE, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>DEFENDANTS MOLINA HEALTHCARE OF ILLINOIS, INC. AND MOLINA HEALTHCARE INC.'S AMENDED ANSWER AND AFFIRMATIVE DEFENSES TO FIRST AMENDED COMPLAINT</u>

Defendants Molina Healthcare of Illinois, Inc. and Molina Healthcare, Inc., by and through their attorneys, hereby state and allege as follows for their Answer and Affirmatives Defenses to the First Amended Complaint ("Complaint") filed by Thomas Prose ("Relator"). This Answer is based upon the information currently available to Defendants, and Defendants reserve the right to amend their Answer to the extent permitted by the Federal Rules of Civil Procedure.  The Complaint contains numerous headings, which are not allegations and do not require a response from Defendants.  The headings are included herein only to aid the Court and the parties in their review of Defendants' Answer.  To the extent any headings are construed as allegations, they are denied.

## <u>NATURE OF ACTION</u>

1.      This *qui tam* lawsuit is for damages and civil penalties in an action under the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq*. (the "FCA"), and the Illinois False Claims

1

Act, 740 ILCS 175/1, *et seq*. (the "IFCA," and together with the FCA, the "FCAs"), based on Defendants' knowing submission of false claims for payment to the Illinois Medicaid program.

 **ANSWER**: Paragraph 1 is a legal characterization of the Complaint and contains no factual allegations that Defendants are required to admit or deny.  To the extent paragraph 1 contains factual allegations or otherwise requires a response, Defendants deny paragraph 1.

 2. Molina is a Managed Care Organization ("MCO") that has contracted with the Illinois Department of Healthcare and Family Services (the "Department") to provide health care services to Illinois Medicaid beneficiaries. Molina promised the Department that it would provide a SNFist Program for eligible members: coordinated care for Medicaid beneficiaries living in Skilled Nursing Facilities ("SNFs") using licensed medical professionals. The Department and the Centers for Medicare & Medicaid Services ("CMS") have made clear that the requisite SNFist services are mandatory services under the Illinois Medicaid program. Yet, despite full knowledge of its obligation to provide a SNFist program, Molina discontinued its SNFist program in April 2015. For at least the next two years, Molina continued to accept payments from the Department for the expensive and medically necessary SNFist services that it had ceased providing to its members, and took affirmative steps to conceal its material breach of contract from the Department.

 **ANSWER**: Defendants admit that Molina is a Managed Care Organization ("MCO") that has contracted with the Illinois Department of Healthcare and Family Services (the "Department") to provide health care services to Illinois Medicaid beneficiaries.  Defendants otherwise deny the allegations in paragraph 2.

 3. Dr. Prose has first-hand knowledge of Molina's scheme, but non-public, sworn testimony confirms his allegations, including that:

- Molina executives knew Molina was obligated to provide a SNFist program;

- Molina executives knew Molina stopped providing any SNFist services in April 2015 and did nothing to remedy Molina's failure; and

- Molina failed to inform the Department that it was not providing the SNFist services as required (despite Molina's express contractual obligation to notify CMS and the Department within five days of any significant changes to its Provider Network).

**ANSWER**: Defendants deny the allegations in paragraph 3.

4.      This is not merely a matter of breach of contract. Molina's top executives knew full well that abandoning the SNFist Program meant breaching Molina's government contracts and defying the Illinois legislature, but they chose to conceal the violation from CMS and the Department. Molina's concealment allowed them to continue receiving capitated payments specifically calculated to cover the cost of the expensive clinical services required by members that Molina was no longer rendering. Through dozens of false certifications and even more misleading reports and disclosures, Molina continued to get paid for work it never performed for no less than two years and effectively suckered the Department into renewing Molina's contract for additional terms.

**ANSWER**: Defendants deny the allegations in paragraph 4.

5.      Molina's actions are unfair to competitors who do pay, as they must, to offer SNFist services; unfair to the taxpayers who are funding Molina's scheme, and the increased costs that result from the failure to provide SNFist services; and, most importantly, unfair to the vulnerable Medicaid beneficiaries in nursing facilities who deserve but are denied the important quality care provided by the SNFist. The FCAs were designed to remedy precisely this type of scheme.

**ANSWER**: Defendants deny the allegations in paragraph 5.

## **PARTIES**

6.      Dr. Thomas Prose is a Michigan resident and United States Citizen.

3

**ANSWER**: Defendants lack sufficient knowledge to form a belief as to the truth of the allegations in paragraph 6 and therefore deny them.

7.      Molina Healthcare of Illinois, Inc. is a corporation organized under the laws of the State of Illinois, with its principal place of business in Oak Brook, Illinois.

**ANSWER**: Defendants admit the allegations in paragraph 7.

8.      Molina Healthcare, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business in Long Beach, California.

**ANSWER**: Defendants admit the allegations in paragraph 8.

<u>**JURISDICTION AND VENUE**</u>

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1345 because it arises under the laws of the United States—in particular, the False Claims Act—and because it is commenced on behalf of the United States. Further, 31 U.S.C. § 3732 specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3730.

**ANSWER**: Defendants state that the allegations of paragraph 9 set forth legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations.

10.     This Court has supplemental jurisdiction over the subject matter of the claims brought under state laws pursuant to 28 U.S.C. § 1367 because the claims are so related to the claims within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Further, 31 U.S.C. § 3732(b) specifically confers jurisdiction on this Court for actions brought under state laws arising from the same transaction or occurrence as an action brought under 31 U.S.C. § 3730.

**ANSWER**: Defendants state that the allegations of paragraph 10 set forth legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations.

11. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because 31 U.S.C. § 3732(a) authorizes nationwide service of process, and Defendants have sufficient minimum contacts with the United States of America.

**ANSWER**: Defendants state that the allegations of paragraph 11 set forth legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations.

12. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), and 28 U.S.C. § 1391(b) and (c), because at least one of the Defendants transacts business in this District, and because some of the acts and omissions of which Relator complains occurred in this District.

**ANSWER**: Defendants state that the allegations of paragraph 12 set forth legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations.

## THE FALSE CLAIMS ACTS

13. The FCA, as amended by the Fraud Enforcement and Recovery Act of 2009, and the IFCA, impose liability on anyone who: "(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . . or (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or

property to the Government." 31 U.S.C. § 3729(a)(1); *see also* 740 ILCS 175/3 (substantively identical).

**ANSWER**: Defendants state that the allegations of paragraph 13 set forth legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations.

14. Any person who violates the FCAs is liable for civil penalties for each violation, plus three times the amount of the damages sustained by the Government.

**ANSWER**: Defendants state that the allegations of paragraph 14 set forth legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations.

15. The FCAs allow any person having information about false or fraudulent claims to bring an action on behalf of the Government, and to share in any recovery.

**ANSWER**: Defendants state that the allegations of paragraph 15 set forth legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations.

16. All allegations in this First Amended Complaint ("FAC") are based on evidence obtained directly by Dr. Prose independently, through his own labor and efforts. As required by the FCAs, Relator has provided to the United States Attorney General, the United States Attorney for the Northern District of Illinois, and the Attorney General of Illinois, a statement of material evidence and information that Dr. Prose possesses regarding his pleading. Because that statement includes attorney-client communications and work product of Relator's counsel, and was submitted to the Attorneys General and the United States Attorney in their capacity as potential co-counsel in this litigation, that statement is confidential.

**ANSWER**: Defendants lack sufficient knowledge to form a belief as to the truth of the allegations in paragraph 16 and therefore deny them.

17.     In accordance with 31 U.S.C. § 3730(b)(2), and 740 ILCS 175/4(b)(2), Relator filed his original complaint *in camera*, where it remained under seal for at least 60 days. On November 19, 2018, the Court entered an order advising that the United States and the State of Illinois had declined to intervene in this action and directing the Clerk of the Court to unseal Relator's original complaint. Defendants were served shortly thereafter.

**ANSWER**: Defendants admit the allegations in paragraph 17.

18.     On July 31, 2019, this Court entered its Memorandum Opinion and Order granting Defendants' motion to dismiss Relator's original complaint pursuant to Fed. R. Civ. P. 12(b)(6) while granting Relator leave to amend.

**ANSWER**: Defendants admit the allegations in paragraph 18.

<u>**BACKGROUND FACTS**</u>

I.     **SNFIST SERVICES**

19.     A "SNFist" is defined by Illinois statute as a "medical professional specializing in the care of individuals residing in nursing homes employed by or under contract with a MCO." 305 ILCS 5/5F-15 (IL Public Aid Code).

**ANSWER**: Defendants state that the allegations of paragraph 19 set forth legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations.

20.     Molina's contracts with the Department define a SNFist as:

A Physician or APN licensed under the Illinois Nurse Practice Act who is part of an organized system of care, meaning a coordinated group working together, whose entire professional focus is the general medical care of individuals residing in a Nursing Facility and whose activities include Enrollee care oversight,

7

communication with families, significant others, PCPs, and Nursing Facility administration.

(Contract Between United States Department of Health and Human Services Centers for Medicare and Medicaid Services In Partnership with State of Illinois Department of Healthcare and Family Services and Molina Healthcare of Illinois, Inc., dated November 5, 2013 ("2013 Contract"), § 1.142 (**Ex. 1**); *see also* State of Illinois Contract between the Department of Healthcare and Family Services and Molina Healthcare of Illinois, Inc. ("2015 Contract"), § 1.142 (**Ex. 2**)).

**ANSWER**: Defendants admit that paragraph 20 quotes from Contract Between United States Department of Health and Human Services Centers for Medicare and Medicaid Services In Partnership with State of Illinois Department of Healthcare and Family Services and Molina Healthcare of Illinois, Inc., dated November 5, 2013 ("2013 Contract"), an unexecuted version of which is attached as Exhibit 1 to the Complaint. Defendants refer the Court to the full Contract for a complete and accurate depiction of its contents and context for the partial quotation found in paragraph 20.

21.      A skilled nursing facility (SNF) is an institution designed to provide long-term care for sick, disabled, or geriatric patients who require medical or nursing care, but do not need hospitalization. *See* 42 U.S.C.A. § 1395i-3(a) (West 2019). Facilities are set up across the United States, including in Illinois, to provide skilled nursing facility services. *See* 210 ILCS 45/1-113 (Illinois Nursing Home Care Act, defining a "long-term care facility").

**ANSWER**: Defendants state that the first sentence of paragraph 21 sets forth legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations. Defendants lack sufficient knowledge to form a belief as to the truth of the second sentence of paragraph 21 and therefore deny it.

22.     Taxpayers fund billions of dollars in SNF services. "According to the 2015 Annual Report of the Medicare Trustees, payments for SNF services from Medicare Part A were $29.92 billion for fiscal year 2015." Medicare and Medicaid Programs; Reform of Requirements for Long-Term Care Facilities, 81 Fed. Reg. 68688-01 (Oct. 4, 2016) (codified at 42 C.F.R. pt. 483). Medicare Part A provides limited coverage for SNF stays for up to 100 days. *See* 42 U.S.C.A. § 1395d.

**ANSWER**: Defendants lack sufficient knowledge to form a belief as to the truth of the first sentence of paragraph 22 and therefore deny it.  The remainder of the allegations of paragraph 22 set forth legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations.

23.     Congress considers these Medicare expenditures critically important. "Medicare specifies that payment for skilled nursing facility (SNF) care can be made only if a physician certifies (and recertifies where care is provided over a period of time) that an individual needs, on a daily basis, skilled nursing care or other skilled rehabilitation services *that can only be provided in a SNF*." H.R. CONF. REP. 101-386, at 732–33, *reprinted in* 1989 U.S.C.C.A.N. 3018, 3335–36 (emph. added).

**ANSWER**: Defendants state that the allegations of paragraph 23 set forth legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations.

24.     SNFist programs are critical to the provision of quality and cost-effective medical care for many reasons. They result "in fewer medications being administered, fewer patient and family complaints, and improved patient outcomes, especially when these clinicians have experience and training in the principles of geriatric medicine." William C. Wilson, *The Role of*

*the 'SNFologist' in Today's Transitional Care*, 16 CARING FOR THE AGES 14, 14 (Nov.

2015), https://doi.org/10.1016/j.carage.2015.10.012. In addition, facilities that implement SNFist

programs drive down acute care facility readmission rates by providing higher quality care,

greater skilled continuity of care, and a coordinated healthcare approach that reduces negligence

and other avoidable complications. *Id*. (describing case studies of definitively improved

healthcare outcomes).

**ANSWER**: Defendants admit that paragraph 24 quotes in part from an article published

in Caring for the Ages.  Defendants refer the Court to the article for a complete and accurate

depiction of its contents and the context of the partial quotation found in paragraph 24.

Defendants otherwise deny the allegations in paragraph 24.

24.     As the "nursing home population is becoming increasingly older, sicker, and more

disabled" and the number of chronic and acute conditions in elderly populations increase,

residents of nursing homes increasingly require "ongoing, competent medical attention."

Marshall B. Kapp, *The Liability Environment for Physicians Providing Nursing Home Medical

Care: Does It Make A Difference for Residents?*, 16 ELDER L.J. 249, 250–51 (2009) (collecting

citations). SNFist services fill this critical gap.

**ANSWER**: Defendants admit that paragraph 25 quotes in part from an article published

in Elder Law Journal.  Defendants refer the Court to the article for a complete and accurate

depiction of its contents and the context of the partial quotation found in paragraph 25.

Defendants otherwise deny the allegations in paragraph 25.

26.     Unsurprisingly, the healthcare community has increasingly recognized the value

of a robust SNFist program in recent years.[1] By way of example, the American Association of

---

[1]     *See*, *e.g.*, "SNFists at Work,"
http://www.modernhealthcare.com/article/20120324/MAGAZINE/303249939. (**Ex. 3**.)

Retired Persons ("AARP") has endorsed the value of SNFist programs. AARP Kansas'

Executive Director, Dr. Maren Turner, testified before the Kansas House Health and Human

Services Committee that SNFist programs help reduce readmission rates, and that the savings to

the Kansas Medicaid program from reduced readmission rates range from $40-77 million

annually.[2]

ANSWER: Defendants admit that paragraph 26 cites to an article on

modernhealthcare.com and an article published by the AARP. Defendants refer the Court to

these articles for a complete and accurate depiction of their contents and the context of the

propositions for which Relator cites them. Defendants otherwise deny the allegations in

paragraph 26.

## II. DR. THOMAS PROSE AND GENERAL MEDICINE, P.C.

27. Dr. Prose, a Medical Doctor, also has a MPH and an MBA—all from the

University of Michigan. He has more than 30 years' experience in internal medicine, geriatrics

and health care administration. In 1983, Dr. Prose founded a company called General Medicine,

P.C. ("GenMed") that has grown consistently since. Prior to creating GenMed, Dr. Prose was the

medical director for Cigna Insurance Co.; he also has served as a medical consultant for the

boards of directors for many federal and state agencies, insurance carriers and health care

systems. Dr. Prose has authored a collection of articles on the healthcare industry and has

presented before the U.S. Senate, CHFA, CMS, the National Cancer Institute, and the

Association of Community Cancer Centers. He is a featured speaker of the National Geriatric

Society, and several other national, state and local healthcare organizations. A copy of Dr.

Prose's CV is attached as **Ex. 5**.

---

[2]     *See* "CARE Act Testimony for Kansas House Health and Human Services Committee," available at
http://states.aarp.org/care-act-testimony-for-kansas-house-health-and-human-services-committee/. (**Ex. 4**.)

**ANSWER**: Defendants lack sufficient knowledge to form a belief as to the truth of the allegations in paragraph 27 and therefore deny them.

28.     GenMed, also known as the "Post-Hospitalist Company," is a collaborative practice of board-certified physicians and advanced nurse practitioners who specialize in the care of post-acute care patients in long-term care facilities. These Post-Hospitalists, sometimes referred to as SNFists, practice exclusively in these post-acute facilities rather than in addition to outpatient clinics and hospitals.

**ANSWER**: Defendants lack sufficient knowledge to form a belief as to the truth of the allegations in paragraph 28 and therefore deny them.

29.     GenMed is engaged in the business of providing SNFist services to many MCOs, Accountable Care Organizations ("ACOs"), and state health plans, and has an extremely successful track record: among other accolades, its SNFists have achieved a nation-wide leading hospital readmission rate—a key measure of success—that is 67% lower than the national average, in addition to quality metrics in the top 10%.[3] GenMed is recognized as the leading physician care model for post-acute care patients, including by the Illinois Health Care Association ("IHCA").[4]

**ANSWER**: Defendants lack sufficient knowledge to form a belief as to the truth of the allegations in paragraph 29 and therefore deny them.

## III.     MOLINA AND MOLINA HEALTH

30.     Molina is one of several MCOs operating in Illinois pursuant to agreements with

---

[3]     *See*, *e.g.*, "General Medicine, P.C. achieves performance in the top 10 percent for audited HEDIS Rate results for 2013," Healthcare Finance, Jan. 9, 2014, available at http://www.healthcarefinancenews.com/press-release/general-medicine-pc-achieves-performance-top-10-percent-audited-hedis-rate-results. (**Ex. 6**.)
[4]     *See* IHCA Regulatory Beat, Aug. 9, 2016, available at http://www.ihca.com/rc_files/149/Regulatory%20Beat%20-%20August%209,%202016.pdf. (**Ex. 7**.)

the Department. Molina claims "Contracted providers (such as GenMed) are an essential part of delivering quality care to our members," and that "Molina Healthcare of Illinois values our provider partnerships and supports the doctor-patient relationship our members share with you." Molina also claims to oppose efforts to underutilize services.[5]

**ANSWER**: Defendants admit that Molina is an MCO operating in Illinois pursuant to an agreement with the Department.  Defendants admit that paragraph 30 quotes from a page on Molina's website.  Defendants refer the Court to the website for a complete and accurate depiction of its contents and the context of the partial quotation found in paragraph 30. Defendants lack sufficient knowledge to form a belief as to the truth of the remaining allegations in paragraph 30 and therefore deny them.

31.     Molina's contract with the Department has been extended through 2021. (*See* Award Announcement (**Ex. 9**)).

**ANSWER**: Defendants admit the allegations in paragraph 31.

32.     As of December 2018, Molina served approximately 224,000 members, and recognized premium revenue of approximately $793 million for the year ended December 31, 2018.

**ANSWER**: Defendants admit the allegations in paragraph 32.

33.     Molina is owned and controlled by Molina Health, a FORTUNE 500 company that provides "managed health care services under the Medicaid and Medicare programs and through the state insurance marketplaces. Through its locally operated health plans, Molina

---

[5]     *See* http://www.molinahealthcare.com/providers/il/medicaid/Pages/home.aspx. (**Ex. 8**.)

Healthcare served approximately 3.4 million members as of June 30, 2019."[6] Molina Health

generated $4.029 billion in revenue in 2016, and $4.740 billion in 2017.

 **ANSWER**: Defendants admit that paragraph 33 quotes from a page on Molina's website.

Defendants refer the Court to the website for a complete and accurate depiction of its contents

and the context of the partial quotation found in paragraph 33. Defendants deny the allegations

in the last sentence of paragraph 33.

## IV. MOLINA'S APPLICATIONS TO THE DEPARTMENT TO PROVIDE HEALTHCARE SERVICES TO ILLINOIS MEDICAID BENEFICIARIES REQUIRED MOLINA TO DISCLOSE ITS SNFIST PROGRAM

 34. In order to even be considered to contract with CMS and the Department in the

first place, Molina was required to submit a detailed response to the Department's Medicare-

Medicaid Alignment Initiative RFP on or about March 24, 2013 (Resp. to RFP). A copy of

relevant portions of Molina's Resp. to RFP is attached as **Ex. 11A & 11B**.

 **ANSWER**: Defendants admit that they submitted a response to the Department's RFP, a

portion of which is attached to the Complaint. Defendants otherwise deny the allegations in

paragraph 34.

 35. Among other things, the RFP afforded CMS and the Department with an

opportunity to assess whether Molina's service model, capacity and network of affiliate

providers were sufficiently comprehensive to comply with the contract requirements and

applicable law. *See*, *e.g.*, 42 CFR 438.206 ("Availability of Services").

 **ANSWER**: Defendants state that the allegations of paragraph 35 set forth legal

conclusions to which no response is required. To the extent a response is required, Defendants

---

[6] *See* http://www.molinahealthcare.com/members/common/en-US/abtmolina/compinfo/Pages/compinfo.aspx. (**Ex. 10**.)

lack sufficient knowledge to form a belief as to the truth of the allegations in paragraph 35 and therefore deny them.

36.     As a general matter, Molina's Resp. to RFP touted Molina's Integrated Care Management Program as predicated upon Molina's "person-centered model of care." Elaborating further, Molina assured the Department and CMS that its care delivery model would be "…anchored in a medical home and supported by care teams that are tailored and personalized to meet individual care needs and focused on providing a multidisciplinary approach to care delivery, care coordination, and care management for those with complex needs." **Ex. 11A**, at §3.2.1.1.1.

**ANSWER**: Defendants admit that paragraph 36 quotes in part from their RFP response, a portion of which is attached to the Complaint.  Defendants refer the Court to their full RFP response for a complete and accurate depiction of its contents and the context of the partial quotations found in paragraph 36. Defendants otherwise deny the allegations in paragraph 36.

37.     To ensure the eventual MCO would be able to perform its material obligations under the contract (and Illinois law) with respect to delivering to the members of all healthcare services deemed necessary by the State, the RFP allocated a number of questions to due diligence on the applicant's SNFist program in particular.

**ANSWER**: Defendants admit that the RFP asked questions about the applicant's SNFist program.  Defendants otherwise deny the allegations in paragraph 37.

38.     For example, Molina and the other applicants were required to describe, *inter alia*, "the components and operation of the SNFist program *you are required to operate*, including: Types of providers; Targeted caseloads of these Providers; Hours of availability in the Nursing Facility; [and] Employment relationship with these providers." *See* **Ex. 11B** (Resp. to

RFP at §§3.2.2.3.1 – 3.2.2.3.4) (emph. added). *See also id*. at 3.2.2.3.6 (Asking applicant, "In which facilities in your network you will operate a SNFist program"). Molina was also asked "[h]ow the SNFist program will communicate with the interdisciplinary care team to provide continual updates to the Individualized Care Plan?" *Id*. at §3.2.2.3.5.

    **ANSWER**: Defendants admit that paragraph 38 quotes in part from their RFP response, a portion of which is attached to the Complaint. Defendants refer the Court to their full RFP response for a complete and accurate depiction of its contents and the context of the partial quotations found in paragraph 38. Defendants otherwise deny the allegations in paragraph 38.

    39.     Responding to the RFP, Molina assured that its "SNFist program, will be available 24 hours a day, 7 days a week with an on-site presence maintained Monday thru Friday, as well as weekend, if needed." *Id*. In terms overseeing affiliated SNFist providers, Molina responded that its "Care Management team will work closely with these providers to ensure member care includes returning members to the community as soon as is safely possible or to provide oversight for members requiring ongoing residential care. SNFists will provide continual updates to the Individualized Care Plan. SNFist providers are available to meet on a regularly scheduled basis with team members in person or via conference calls. Providers are available to participate in Care Plan meetings, grand round meetings and family conferences." *Id*.

    **ANSWER**: Defendants admit that paragraph 39 quotes in part from their RFP response, a portion of which is attached to the Complaint. Defendants refer the Court to their full RFP response for a complete and accurate depiction of its contents and the context of the partial quotations found in paragraph 39. Defendants otherwise deny the allegations in paragraph 39.

    40.     Assuring CMS and the Department of its commitment to "significant credentialing standards," Molina promised, "Providers of nursing care must, at a minimum, meet

state licensure and certification requirements for providing nursing services." **Ex. 11B** at §3.2.2.10. To ensure performance of this material obligation, Molina indicated that aside from "conduct[ing] initial quality assessments at the time of applying for Network participation," Molina's "Credentialing Committee" conducts reassessments every 36 months. **Ex. 11B** at §3.2.2.10. Elsewhere, Molina confirms that "Skilled nursing facilities/nursing homes" are among the health delivery organizations subject to Molina's quality assessments and reassessments. *Id*. at 3.2.2.19.

ANSWER: Defendants admit that paragraph 40 quotes in part from their RFP response, a portion of which is attached to the Complaint. Defendants refer the Court to their full RFP response for a complete and accurate depiction of its contents and the context of the partial quotations found in paragraph 40. Defendants otherwise deny the allegations in paragraph 40.

41. In the context of the RFP's questions regarding "Communication with Providers," Molina confirms it "is aware of the critical impact quality nursing care has on positive health outcomes for its members and therefore Molina requires that Care Managers are directly involved with monitoring nursing services provided to its members, especially those residing in care facilities." **Ex. 11B**, at §3.2.2.10. More substantively, Molina adds: "Members receiving nursing care are closely monitored. Molina's Care Managers stay in direct communication with the nursing staff providing service to its members. Changes in level of care, declining health status and all quality of care issues are immediately investigated and handled appropriately." *Id*.

ANSWER: Defendants admit that paragraph 41 quotes in part from their RFP response, a portion of which is attached to the Complaint. Defendants refer the Court to their full RFP response for a complete and accurate depiction of its contents and the context of the partial quotations found in paragraph 41. Defendants otherwise deny the allegations in paragraph 41.

42.     Beyond its representations regarding the features of its SNFist program, Molina made clear in responding to the RFP that it understood the significance of engaging SNFist practitioners to care for the State's most vulnerable members (**Ex. 11B**, at §3.2.2.10):

> For members residing in a Nursing Home Facility or ICF/DD facility, Molina is planning to contract with hospitalists and SNFists to provide comprehensive coordination of services. These providers will ensure members receive quality care to avoid complications that result in hospital admission, re-admission and emergency department visits. Molina believes the use of hospitalists and SNFists to care for Nursing Facility or ICF/DD facility members will increase their quality of life and could potentially allow members to return to the community."

**ANSWER**: Defendants admit that paragraph 42 quotes in part from their RFP response, a portion of which is attached to the Complaint. Defendants refer the Court to their full RFP response for a complete and accurate depiction of its contents and the context of the partial quotations found in paragraph 42. Defendants otherwise deny the allegations in paragraph 42.

## V.     MOLINA'S GOVERNMENT CONTRACTS REQUIRED THAT IT PROVIDE SNFIST SERVICES

43.     In reliance on the representations set forth in Molina's Resp. to RFP, including with respect to Molina's SNFist Program, the Department and CMS proceeded to enter into the 2013 Contract (the "Contract") with Molina.

**ANSWER**: Defendants admit that the Department and CMS entered into a contract with Molina dated November 5, 2013 (the "2013 Contract"). Defendants otherwise deny the allegation in paragraph 43.

44.     In unambiguous language, the Contract mandated that Molina provide "Covered Services" to its Illinois Medicaid beneficiaries. More specifically (*see* **Ex. 1** (emph. added)):

(a) Paragraph 1.35 defines "Covered Services" as: "The Set of services *required* to be provided by the Contractor."

(b) Section 2 defines "Contractor Responsibilities" and states in relevant part: "The Contractor *will* deliver and coordinate all components of Medicare and Medicaid Covered Services for Enrollees."

(c) Section 2.3.1.7, which pertains to "Contract Management," provides: "The Contractor *will* be responsible for providing Covered Services to Enrollees from the effective date of enrollment in Contractor's health plan."

(d) Section 2.4.1 states in relevant part: "The Contractor *must* authorize, arrange, integrate, and coordinate the provision of all Covered Services for its Enrollees. * * * Covered Services *must* be available to all Enrollees twenty-four (24) hours a day, seven (7) days a week, as authorized by the Contractor."

(e) Subsection 2.4.2 states in pertinent part: "The Contractor *must* provide the full range of Covered Services."

(f) Section 2.7 concerns Molina's obligation to maintain an adequate Provider Network, with subsection 2.7.1.4 providing, in relevant part: "The Contractor *shall* establish, maintain and monitor a network that is sufficient to provide adequate access to all Covered Services under the Contract…."

(g) Section 2.9.1 of the Contract requires that Molina "*must* provide services to Enrollees as follows: 2.9.1.1 Authorize, arrange, coordinate and ensure the provision of *all* Medically Necessary Covered Services to Enrollees…."

**ANSWER**: Defendants admit that paragraph 44 quotes in part from the 2013 Contract, an unexecuted version of which is attached to the Complaint. Defendants refer the Court to the full Contract for a complete and accurate depiction of its contents and the context of the partial quotations found in paragraph 44. Defendants otherwise deny the allegations in paragraph 44.

45. Consistent with the scope of inquiry for the Department's RFP, SNFist services are among the "Covered Services" that Molina was explicitly required to provide under the Contract. *See* §2.5.6, **Ex. 1**, p. 50 (emph. added):

The Contractor *shall* provide SNFist services, either through direct employment or a sub-contractual relationship. The SNFist program *shall* provide intensive clinical management of Enrollees in Nursing Facilities.

**ANSWER**: Defendants admit that paragraph 45 quotes in part from Section 2.5.6 of the 2013 Contract, an unexecuted version of which is attached to the Complaint. Defendants refer the Court to the full Contract for a complete and accurate depiction of its contents and the context of the partial quotations found in paragraph 45. Defendants otherwise deny the

19

allegations in paragraph 45, including that Defendants deny that SNFist services are among the "Covered Services" that Molina was required to provide under the Contract.

46. Lacking the credentials, experience or licensure needed to offer the mandatory SNFist services on its own, Molina chose to subcontract with GenMed in order to comply with the law (or to at least convince the Department that it would do so). In April 2014, Molina entered into a Provider Services Agreement ("PSA") with GenMed pursuant to which GenMed agreed to provide specialized healthcare services to government healthcare program beneficiaries who were Members of Molina's Health Plan. A copy of the PSA is attached as **Ex. 12**.

**ANSWER**: Defendants admit that in April 2014, they entered into a Provider Services Agreement ("PSA") with GenMed, a copy of which is attached to the Complaint as Exhibit 12. Defendants refer the Court to the full PSA for a complete and accurate depiction of its contents and the obligations it imposed on the parties. Defendants otherwise deny the allegations in paragraph 46.

47. Upon executing the PSA, GenMed became an "Affiliated Provider" and a "First Tier, Downstream and Related Entity" to Molina, as those terms are defined in the Contract. (*See* §§ 1.11 & 1.59, **Ex. 1** at pp. 6, 12).

**ANSWER**: Defendants admit that the 2013 Contract defines "Affiliated" at section 1.11 and "First Tier, Downstream and Related Entity" at section 1.59. Defendants refer the Court to the Contract for a complete and accurate depiction of these definitions. Defendants otherwise deny the allegations in paragraph 47.

48. Through the PSA, Molina delegated the oversight and operation of its "SNFist Program" to GenMed. *See* **Ex. 12**, Attachment D-1, pp. 4-6 ("SNFist Program Contract SOW"). The PSA summarizes Molina's SNFist Program as follows:

20

The SNFist Program is a component of Molina Healthcare of Illinois' (MI IIL) care management program that targets members receiving residential or custodial care in a nursing facility. Members identified for the SNFist program have multiple chronic conditions with associated functional or cognitive issues; psychosocial complications; and an array of co-morbidities that may result in high risk for unscheduled admissions and emergency room care.

The program's objectives are to provide timely medical oversight by Provider's contracted practitioners. Practitioner includes medical doctors (MD), doctors of osteopathy (DO) and/or mid-level staff such as nurse practitioners (NP). The Provider's practitioners fill the primary care gap by providing onsite care to members receiving care in a nursing facility.

SNFist Program outcomes will include:
- Improvement of quality of life,
- Patient/family satisfaction,
- Reduction of inappropriate and unnecessary hospital admissions, readmissions and emergency room care, [and]
- Transitioning members to the least restrictive environment possible.

**ANSWER**: Defendants admit that paragraph 48 quotes in part from Attachment D-1 to the PSA. Defendants refer the Court to the full PSA for a complete and accurate depiction of its contents and the obligations it imposes. Defendants otherwise deny the allegations in paragraph 48.

49. Besides defining the SNFist Program's mission and objectives, the PSA assigned to GenMed a list of 28 specific deliverables to be performed on a day-to-day basis (hereafter, the "SNFist Services"). For example, the PSA tasked GenMed with performing initial face-to-face comprehensive assessments upon new members within 24 hours of referral by Molina. Also known as FCNAs, these comprehensive assessments included, without limitation, a physical exam, depression screening, medication review and reconciliation, and assessment for potential repatriation of the member to the community. *Id*. at p. 4.

**ANSWER**: Defendants admit that the PSA defines a "Scope of Work" that includes 28 subsections and that item number 6 requires GenMed to perform comprehensive assessments that include numerous components listed in the PSA. Defendants refer the Court to the full PSA for a

complete and accurate depiction of its contents and the obligations it imposes.  Defendants otherwise deny the allegations in paragraph 49.

50.     Other SNFist Services assigned to GenMed included, without limitation, annual comprehensive exams (ACEs) performed annually for each member, monthly visits with members, and development of 30-day treatment plans customized for the Members' risk levels and particular needs. *Id*. at p. 5.

**ANSWER**: Defendants admit that the "Scope of Work" portion of the PSA includes "Development of 30-day treatment plan targeting unique interventions that are designed specifically for the Members' risk level and unique needs" (item 7),  "An annual comprehensive assessment will be performed within 30 days of the anniversary date of the initial comprehensive assessment" (item 9), and "Members will receive monthly (every 30 days) onsite visits by Provider to proactively identify conditions that merit medical intervention that would otherwise result in significant morbidity or transfer to acute hospital. Medication review and reconciliation will be included during each visit" (item 11).  Defendants refer the Court to the full PSA for a complete and accurate depiction of its contents and the obligations it imposes.  Defendants otherwise deny the allegations in paragraph 50.

51.     Ensuring access to SNFist providers is a material contractual obligation as a matter of law. *See* 305 ILCS 5/5F-20(c) ("A managed care organization may terminate or refuse to renew a contract with a nursing home for a material breach of the contract, including, but not limited to, failure to grant reasonable and timely access to the MCO's care coordinators, SNFists and other providers …").

**ANSWER**: Defendants state that the allegations of paragraph 51 set forth legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations.

## VI.   MOLINA'S CONSIDERATION FOR PROVIDING MANAGED CARE SERVICES UNDER THE CONTRACT

52.      Molina is a MCO that has entered into risk contracts with the Department to provide managed care to Illinois Medicaid members in return for a per-member, per-month (PMPM) or capitated payment. *See* 2013 Contract (**Ex. 1**) and 2015 Contract (**Ex. 2**); *see also* 42 U.S.C. § 1396b(m) (defining MCOs); 42 C.F.R. § 438.1 (rules regarding MCOs and state contracts); 42 C.F.R. § 438.2 (defining risk contract).

**ANSWER**: Defendants admit that Molina entered into a Contract with CMS and the Department dated November 5, 2013, an unexecuted version of which is attached to the Complaint as Exhibit 1. Defendants further admit that Molina entered into a Contract with CMS and the Department with an Effective Date of July 1, 2014, an unexecuted version of which is attached to the Complaint as Exhibit 2. Defendants refer the Court to the full Contracts for a complete and accurate depiction of their contents and the obligations they impose. Defendants otherwise deny the allegations in paragraph 52.

53.      To ensure an "actuarially sound" capitation rate to compensate Molina for its services, the Department contracted with third party consultant Milliman, Inc. to document and provide "actuarial certification for the Medicaid component of the program." *See* Milliman Client Report, Medicare-Medicaid Alignment Initiative- Medicaid Rate Component V2 (Apr. 11, 2014) (**Ex. 13** at p. 1).

**ANSWER**: Defendants admit that paragraph 53 quotes in part from a report titled Medicare-Medicaid Alignment Initiative - Medicaid Rate Component V2 prepared by Milliman,

Inc. for the Department and attached to the Complaint as Exhibit 13 (the "Milliman Report"). Defendants refer the Court to the full report for a complete and accurate depiction of its contents and the context of the partial quotation found in paragraph 53. Defendants otherwise deny the allegations in paragraph 53.

54. The Milliman report explains that at least initially, "[t]he capitation rates were developed using state fiscal year (SFY 2010 and 2011) historical fee-for-service (FFS) claims and enrollment experience limited to the targeted population. The historical experience was converted to a per member per month (PMPM) basis and stratified by population rate cell and category of service." *Id*. at p. 3. Through a complicated process more thoroughly detailed in the Milliman report attached, the Department was able to calculate "annual utilization rates per 1,000 average cost per service, and per member per month (PMPM) claims cost developed using FFS data" for services incurred during SFY 2010 and 2011 and paid through March 2013. *Id*. at p. 6. In other words, the Department went to a great deal of trouble and expense to base the CY2014 capitation rate to be paid to Molina in exchange for the services contracted for, including the SNFist program, on the actuarially-determined anticipated expenses needed to care for the targeted population in real life.

**ANSWER**: Defendants admit that paragraph 54 quotes in part from the Milliman Report. Defendants refer the Court to the full report for a complete and accurate depiction of its contents and the context of the partial quotation found in paragraph 54. Defendants otherwise deny the allegations in paragraph 54.

55. As the Department and CMS necessarily learned from Milliman's findings, the requisite SNFist services are expensive. In order to furnish the citizens of Illinois with the standard of health care required by our legislature, the Department paid a materially higher

capitation rate to Molina for the care of members residing in Nursing Facilities than any other population rate cell. *See* **Ex. 13**, Appx. A (MMAI – Medicaid Component, February through December 2014 Contract Period).

      **ANSWER**: Defendants admit that Appendix A to the Milliman Report displays rates to be paid for groups divided by age group, rate cell, and region.  Defendants refer the Court to the full report for a complete and accurate depiction of its contents and findings.  Defendants otherwise deny the allegations in paragraph 55.

      56.    For example, among members age 65+ in the Central Illinois Composite, the PMPM demonstration rate of $2,737.42 for Nursing Facility members was materially higher than the demonstration rate of the next highest rate cell, "Other Waiver Plus" ($2,142.37), and dwarfed the most populous rate cell, "Community," which had a demonstration PMPM of $59.45. *Id*. As far as the *total expenditures* for the Central Illinois Composite, which factored in the number of enrollees, the Milliman report determined that the State would pay $38,860,000 for Nursing Facility members between February and December 2014, compared to $310,000 for the "Other Waiver Plus" members and $1,260,000.00 for the "Community" members, respectively. The capitation rates for the Nursing Facility population cells were also highest among all others in the "age 21-64" calculations and the Greater Chicago Composite. *Id*.

      **ANSWER**: Defendants admit that Appendix A to the Milliman Report shows that the Demonstration Capitation Rate for the age 65+ category, Nursing Facility - Central Illinois is $2,7374.42.  Defendants admit that Appendix A to the Milliman Report shows that the Demonstration Capitation Rate for the age 65+ category, Other Waiver Plus - Central Illinois is $2,142.37.  Defendants admit that Appendix A to the Milliman Report shows that the Demonstration Capitation Rate for the age 65+ category, Community - Central Illinois is $59.45.

Defendants admit that Appendix A to the Milliman Report shows that the Demonstration Expenditures for the age 65+ category, Nursing Facility - Central Illinois is $38,860,000. Defendants admit that Appendix A to the Milliman Report shows that the Demonstration Expenditures for the age 65+ category, Other Waiver Plus - Central Illinois is $310,000. Defendants admit that Appendix A to the Milliman Report shows that the Demonstration Expenditures for the age 65+ category, Community - Central Illinois is $1,260,000. Defendants admit that Appendix A to the Milliman Report shows a Demonstration Capitation Rate that is relatively higher compared to other categories for the age 21-64 category, Nursing Facility - Greater Chicago and Nursing Facility - Central Illinois, and for the age category 65+, Nursing Facility - Greater Chicago. Defendants refer the Court to the full report for a complete and accurate depiction of its contents and findings. Defendants otherwise deny the allegations in paragraph 56.

57. The capitation rates payable to Molina in exchange for providing managed care services were subject to change during the course of a fiscal year in accordance with legislative directives and new underlying data and assumptions. Changes in applicable capitation rates would be reflected in follow-up reports completed by Milliman at the Department's direction.

**ANSWER**: Defendants lack sufficient knowledge to form a belief as to the truth of the allegations in paragraph 57 and therefore deny them.

58. For example, on or about July 7, 2014, Milliman published the *July 2014 to December 2015 Capitation Rate Development: ACA Adult Data Book*, a copy of which is attached hereto as **Ex. 14**. In explaining the underlying "Base Data" for its report, Milliman notes the reason for expressly including "Long-term care member services" in the calculations for the PMPM payment: "While short-term services for FHP members were included in other service

26

categories listed above, this category adds an explicit amount to represent additional cost incurred to MCOs for enrolling these higher-cost members." **Ex. 14**, at p. 7.

      **ANSWER**: Defendants admit that paragraph 58 quotes in part from a report titled "July 2014 to December 2015 Capitation Rate Development: ACA Adult Data" prepared by Milliman, Inc. for the Department and attached to the Complaint as Exhibit 14. Defendants refer the Court to the full report for a complete and accurate depiction of its contents and the context of the partial quotation found in paragraph 58. Defendants otherwise deny the allegations in paragraph 58.

## VII.    MOLINA TERMINATES THE PSA WITH GENMED

      59.    The 2013 Contract obligates Molina to pay GenMed under the terms of the PSA. (**Ex. 1**, App. C, para. H, pp. 244-45.)

      **ANSWER**: Defendants admit that Exhibit 1, which is an unexecuted version of the 2013 Contract, states at Appendix C, paragraph H, in part: "The Contractor shall ensure that all contracts or arrangements with First Tier Downstream and Related Entities for medical Providers including additional provisions" and identifies 20 provisions to be included. Defendants refer the Court to the full Contract for a complete and accurate depiction of its contents and the obligations it imposes. Defendants otherwise deny the allegations in paragraph 59.

      60.    Molina paid GenMed in full, without issue, for SNFist services GenMed provided for Molina's members in September, October, November and December 2014. In January 2015, however, Molina attempted to force GenMed to renegotiate the PSA at a lower rate of compensation and stopped paying GenMed altogether.

      **ANSWER**: Defendants admit that Molina paid GenMed pursuant to its obligations under the PSA in September, October, November, and December 2014. Defendants admit that Molina

did not pay GenMed in January, February, and March 2015 because GenMed had committed a breach of contract under the PSA.   GenMed and Molina resolved these claims via arbitration. Defendants otherwise deny the allegations in paragraph 60.

61.     GenMed continued to honor the PSA by providing SNFist services through March 2015 despite Molina's nonpayment.

**ANSWER**: Defendants admit that GenMed provided services under the PSA in January, February, and March of 2015.  Defendants otherwise deny the allegations in paragraph 61.

62.     Molina's refusal to pay GenMed for services rendered constituted a material breach of the PSA.

**ANSWER**: Defendants admit that in 2017 an Arbitrator found that Molina's withholding of payment for January, February, and March 2015 was a breach of the PSA and ordered Molina to make payment for those three months, which it did. Defendants otherwise deny the allegations in paragraph 62.

63.     Due to Molina's material breach of the PSA in refusing to pay GenMed for services rendered, GenMed had no choice but to terminate the PSA and ceased providing delegated services for Molina's members – including SNFist services -- as of April 2, 2015.

**ANSWER**: Defendants admit that on April 2, 2015, GenMed notified Molina that it was terminating the PSA and stopped providing services under the agreement.  Defendants otherwise deny the allegations in paragraph 63.

64.     Even though Molina entered into a subcontract with GenMed, Molina remained responsible for ensuring that the mandatory SNFist services were actually provided. Section 2.7.2.2.1 of the Contract provides in pertinent part:

> The Contractor remains fully responsible for meeting all of the terms and requirements of the Contract regardless of whether the Contractor subcontracts for

performance of any Contract responsibility. * * * No subcontract will operate to relieve the Contractor of its legal responsibilities under the Contract. (**Ex. 1**, p. 66)

**ANSWER**: Defendants admit that paragraph 64 quotes in part from the 2013 Contract. Defendants refer the Court to the full Contract for a complete and accurate depiction of its contents and the context of the partial quotation found in paragraph 64. Defendants otherwise deny the allegations in paragraph 64.

65. In the event that Molina's network providers were unable to provide necessary services, Molina was required to cover such services out of network. Section 2.9.1.7 provides:

2.9.1.7 If the Contractor's network is unable to provide necessary medical services covered under the Contract to a particular Enrollee, the Contractor must adequately and timely cover these services out of network for the Enrollee, for as long as the Contractor is unable to provide them. The Contractor must ensure that cost to the Enrollee is no greater than it would be if the services were furnished within the network; (**Ex. 1**, p. 82)

**ANSWER**: Defendants admit that paragraph 65 quotes in part from the 2013 Contract. Defendants refer the Court to the full Contract for a complete and accurate depiction of its contents and the context of the partial quotation found in paragraph 65. Defendants otherwise deny the allegations in paragraph 65.

66. From April 2, 2015, the date on which GenMed ceased providing SNFist services, through at least April 5, 2017, and probably beyond, Molina failed to make any arrangements to fulfill its obligation to provide SNFist services to its Enrollees and ceased providing SNFist services altogether.

**ANSWER**: Defendants deny the allegations in paragraph 66.

67. Molina did not disclose to CMS and the Department that from April 2, 2015, through at least April 5, 2017, it was not providing SNFist services to its Enrollees, whether via subcontract with GenMed or any other arrangement described in the Contract.

**ANSWER**: Defendants deny the allegations in paragraph 67.

68.     Between April 2, 2015, through at least April 5, 2017, Molina continued to receive capitation payments, which were specifically calculated to cover the cost of providing expensive SNFist services to members in need, even though such services were not being provided.

**ANSWER**: Defendants admit that they received capitation payments pursuant to its contracts with the Department between April 2, 2015 and April 5, 2017.  Defendants otherwise deny the allegations in paragraph 68.

## VIII.   MOLINA FRAUDULENTLY SUBMITTED REPORTS TO CMS AND THE DEPARTMENT CONCEALING ITS FAILURE TO PROVIDE SNFIST SERVICES

### A.     Molina Falsely Certified That It Was In Compliance With Disclosure Requirements Regarding Fraud, Waste And Abuse

69.     As an MCO, Molina was required to disclose or certify on a quarterly basis that it has no knowledge of conduct constituting fraud or abuse of the Medicaid Program. Such certifications are made express conditions of payment by 42 C.F.R. § 438.602, which provides in pertinent part that "[a]s a condition for receiving payment under the Medicaid managed care program, an MCO . . . must comply with the applicable certification, program integrity and prohibited affiliation requirements of this subpart."

**ANSWER**: Defendants state that the allegations of paragraph 69 set forth legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations.

70.     The Contract also required that Molina monitor and report fraud, waste and abuse.

**ANSWER**: Defendants state that the allegations of paragraph 70 set forth legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations.

71.     For example, the Contract's provisions regarding Program Integrity dictate that "[t]he Contractor shall adopt and implement an effective compliance program to prevent, detect and correct Fraud, Waste, and Abuse consistent with 42 C.F.R. Part 420, *et seq*., 42 C.F.R. § 422.503, and 42 C.F.R. §§ 438.600-610, 42 C.F.R. Part 455." (§2.1.7, **Ex. 1**, p. 27).

**ANSWER**: Defendants admit that paragraph 71 quotes in part from the 2013 Contract. Defendants refer the Court to the full Contract for a complete and accurate depiction of its contents and the context of the partial quotations found in paragraph 71.

72.     As part of its Contract Readiness Review Requirements for renewal of its contract in 2016 and 2017, Molina was required to provide assurances that it was compliant with "Fraud and Abuse and program integrity" requirements. (§2.2.1.2.2.8, **Ex. 1**, p. 29).

**ANSWER**: Defendants admit that paragraph 72 quotes in part from the 2013 Contract. Defendants refer the Court to the full Contract for a complete and accurate depiction of its contents and the context of the partial quotations found in paragraph 72.  Defendants otherwise deny the allegations in paragraph 72.

73.     Molina's Quality Assurance obligations under the Contract also required that it "[i]ncludes fraud control provisions … ." (§2.13.1.6, **Ex. 1**, p. 116).

**ANSWER**: Defendants admit that paragraph 73 quotes in part from the 2013 Contract. Defendants refer the Court to the full Contract for a complete and accurate depiction of its contents and the context of the partial quotations found in paragraph 73.  Defendants otherwise deny the allegations in paragraph 73.

74.     The Contract also required Molina to submit annual reports to CMS and the Department regarding its fraud monitoring. Pursuant to § 2.13.2.7.2:

> At the end of each year, a written report on the QAP shall be prepared by the Contractor and submitted to CMS and the Department as a component part of the

QA/UR/PR Annual Report. The report shall include an Executive Summary that provides a high-level discussion/analysis of each of the area of the Annual Report of findings, accomplishments, barriers and continued need for quality improvement. The report shall, at a minimum, provide detailed analyses of each of the following … 2.13.2.7.2.6 Fraud and Abuse Monitoring. (**Ex. 1**, p. 130)

**ANSWER**: Defendants admit that paragraph 74 quotes in part from the 2013 Contract. Defendants refer the Court to the full Contract for a complete and accurate depiction of its contents and the context of the partial quotations found in paragraph 74. Defendants otherwise deny the allegations in paragraph 74.

75. The Contract also required that Molina "shall have a utilization review … to … report suspected Fraud and Abuse in the HFS Medical Program to the Department's Office of Inspector General." (Appendix D, **Ex. 1**, p. 249). Such information was to be included in reports filed on a quarterly basis.

**ANSWER**: Defendants admit that paragraph 75 quotes in part from the 2013 Contract. Defendants refer the Court to the full Contract for a complete and accurate depiction of its contents and the context of the partial quotations found in paragraph 75. Defendants otherwise deny the allegations in paragraph 75.

76. Despite the foregoing regulatory and contractual obligations, Molina failed to report the fraudulent scheme identified herein, and falsely certified to CMS and that Department that it had identified no instances of any fraud, waste or abuse.

**ANSWER**: Defendants deny the allegations in paragraph 76.

**B.  Molina Circumvented Supervisory Readiness Reviews With False Assurances And Material Omissions**

77. The 2013 Contract directed that CMS and the Department subject Molina to a comprehensive Readiness Review "prior to the Contract Operational Start Date." (§ 2.2.1, **Ex. 1**, p. 28)

**ANSWER**: Defendants admit that paragraph 77 quotes in part from the 2013 Contract. Defendants refer the Court to the full Contract for a complete and accurate depiction of its contents and the context of the partial quotations found in paragraph 77. Defendants otherwise deny the allegations in paragraph 77.

78. On information and belief, Readiness Reviews were performed upon Molina prior to the renewal of its Contract in 2016 and 2017.

**ANSWER**: Defendants admit that they responded to a Readiness Review in October 2017. Defendants otherwise deny the allegations in paragraph 78.

79. The Readiness Reviews included, but were not limited to, review of (i) Molina's Network Provider composition and access; (ii) capabilities of Molina's First Tier, Downstream and Related Entities; (iii) comprehensiveness of Molina's quality management/quality improvement and Utilization Management strategies; (iv) Fraud and Abuse and program integrity; and (v) Molina's Information systems, including claims payment system performance, interfacing and reporting capabilities and validity testing of Encounter Data.

**ANSWER**: Defendants admit that section 2.2.1.2.2 of the 2013 Contract sets out the scope of Readiness Reviews, which includes, among other items, "Network Provider composition and access," "Capabilities of First Tier, Downstream, and Related Entities," "Comprehensiveness of quality management/quality improvement and Utilization Management strategies," "Fraud and Abuse and program integrity," and "Information systems, including claims payment system performance, interfacing and reporting capabilities and validity testing of Encounter Data." Defendants refer the Court to the full Contract for a complete and accurate depiction of its contents. Defendants otherwise deny the allegations in paragraph 79.

80.     Before CMS and Department performed the Readiness Reviews, Molina was required to provide "assurances that [it] is ready and able to meet its obligations" under the Contract. (§2.2.1.2.1, **Ex. 1**, p. 28)

**ANSWER**: Defendants admit that paragraph 80 quotes in part from the 2013 Contract. Defendants refer the Court to the full Contract for a complete and accurate depiction of its contents and the context of the partial quotations found in paragraph 80. Defendants otherwise deny the allegations in paragraph 80.

81.     Upon information and belief, Molina provided assurances to CMS and the Department in the course of at least two Readiness Reviews in connection with the renewal of Molina's contract in 2016 and 2017 that it was ready and able to meet its obligations under the Contract.

**ANSWER**: Defendants admit that they participated in and responded to a Readiness Review conducted by the Department in 2017. Defendants otherwise deny the allegations in paragraph 81.

82.     These assurances provided by Molina to CMS and the Department were false because:

(a)     Molina was not ready and able to meet its obligations to provide SNFist services to its Enrollees. It had failed to obtain an alternate provider and lacked the requisite licensure and personnel to provide the SNFist services itself;

(b)     Molina's Network Provider composition and access at the time of such assurances was incapable of providing SNFist services;

(c)     Molina's First Tier, Downstream and Related Entities at the time of such assurances all lacked the capability of providing SNFist services;

34

(d)     Molina's quality management/quality improvement and Utilization Management strategies were not comprehensive in that no measures were in place or being realistically considered for the provision of SNFist services; and

(e)     Molina either lacked adequate measures for reporting fraud and abuse and program integrity or purposefully bypassed them.

**ANSWER**: Defendants deny the allegations in paragraph 82.

### C.     Molina's Compliance Officer Was Ineffective

83.     The 2013 Contract required Molina to employ a qualified Compliance Officer. Pursuant to Section 2.2.1, "[t]he Compliance Officer must act as liaison between Contractor, CMS and the Department," and have responsibilities that include, without limitation, the following (**Ex. 1**, pp. 31-32):

2.2.2.1.1 Ensure the Contractor's compliance with the terms of the Contract, including securing and coordinating resources necessary for such compliance;
* * *
2.2.2.1.3 Oversee all activities by the Contractor and its First Tier, Downstream and Related Entities, including but not limited to coordinating with the Contractor's quality management director, medical director, and behavioral health clinician;
* * *
2.2.2.1.4 Ensure that Enrollees receive written notice of any significant change in the manner in which Covered Services are rendered to Enrollees at least 30 days before the intended effective date of the change;
* * *
2.2.2.1.6 Meet with representatives of CMS or the Department, or both, on a periodic or as needed basis and resolve issues that arise.

**ANSWER**: Defendants admit that paragraph 83 quotes in part from the 2013 Contract. Defendants refer the Court to the full Contract for a complete and accurate depiction of its contents and the context of the partial quotations found in paragraph 83.  Defendants otherwise deny the allegations in paragraph 83.

84.     Molina's Compliance Officer was derelict in his/her responsibilities in failing to ensure that SNFist services were being provided as prescribed from April 2015, through at least

April 2017. Molina's Compliance Officer failed to report such Contract noncompliance to CMS

and the Department, and never gave Enrollees any notice, let alone written notice in a timely

fashion, that there had been a significant change in the manner in which Covered Services were

being provided.

**ANSWER**: Defendants deny the allegations in paragraph 84.

### D. Molina Failed To Document Changes In The Provision of Covered Services As Required

85.     The 2013 Contract reiterates Molina's obligation to provide Covered Services to

Enrollees under the section entitled Enrollment Activities, which provides in part: "The

Contractor will be responsible for providing Covered Services to Enrollees from the effective

date of enrollment in Contractor's health plan." (§2.3.1.7, **Ex. 1**, p. 35)

**ANSWER**: Defendants admit that paragraph 85 quotes in part from the 2013 Contract.

Defendants refer the Court to the full Contract for a complete and accurate depiction of its

contents and the context of the partial quotations found in paragraph 85.  Defendants otherwise

deny the allegations in paragraph 85.

86.     The Enrollment Activities section of the Contract obligated Molina to document

changes in the provision of Covered Services and the adequacy of its network of Affiliated

Providers. Section 2.3.1.12 states in pertinent part:

> The Department and CMS . . . will review documentation provided by contractor
> that sets forth Contractor's physical and professional capacity: * * * (iii) when there
> is a change in Covered Services, categories of Potential Enrollees, Service Area or
> Capitation that can reasonably be expected to impact Contractor's capacity. * * *
> Such documentation must demonstrate that Contractor offers an appropriate range
> of preventive, primary care and specialty services that is adequate for the
> anticipated number of Enrollees in the Service Area and that Contractor maintains
> a network of Affiliated Providers that is sufficient in number, mix and geographic
> distribution to meet the needs of the anticipated number of Enrollees in the Service
> Area. (**Ex. 1**, pp. 35-36)

**ANSWER**: Defendants admit that paragraph 86 quotes in part from the 2013 Contract. Defendants refer the Court to the full Contract for a complete and accurate depiction of its contents and the context of the partial quotations found in paragraph 86.  Defendants otherwise deny the allegations in paragraph 86.

87.     Contrary to its obligations under §2.3.1.12, Molina failed to provide documentation to CMS and the Department that there had been a change in Covered Services – specifically SNFist services -- when GenMed terminated the PSA. Likewise, Molina failed to provide documentation to CMS and the Department that Molina had failed to offer an appropriate range of services; and that it had failed to maintain a network of Affiliated Providers sufficient to meet the needs of Enrollees and program requirements.

**ANSWER**: Defendants deny the allegations in paragraph 87.

88.     Section 2.7.1 of the Contract states in pertinent part:

The Contractor must demonstrate annually that it has an adequate network, as approved by CMS and the Department, to ensure adequate access to medical, behavioral health, pharmacy, community-based services, and long-term services and supports Providers that are appropriate for and proficient in addressing the needs of the enrolled population, including physical, communication, and geographic access. The Contractor must maintain a Provider Network sufficient to provide all Enrollees with access to the full range of Covered Services, including behavioral health services, other specialty services, and all other services required in 42 C.F.R. §§422.112, 423.120, and 438.206 and under this Contract. (**Ex. 1**, pp. 61-62)

**ANSWER**: Defendants admit that paragraph 88 quotes in part from the 2013 Contract. Defendants refer the Court to the full Contract for a complete and accurate depiction of its contents and the context of the partial quotations found in paragraph 88.

89.     Upon information and belief, between April 2015, and at least April 2017, Molina attempted to demonstrate on an annual basis that it had an adequate network of providers. Such

demonstrations were false and fraudulent in that Molina had no providers in its networks

providing mandatory SNFist services.

**ANSWER**: Defendants deny the allegations in paragraph 89.

90.     The Contract further required that Molina notify CMS and the Department within

at least five (5) days of any significant changes in its Provider Network:

> The Contractor must notify [CMS and the Department] of any significant Provider
> Network changes immediately, but no later than five (5) days after becoming aware
> or should become aware of an issue, including a change in the Contractor's network
> of Affiliated Providers that renders the Contractor unable to provide one (1) or more
> Covered Services…. (§2.7.1.1, **Ex. 1**, pp. 61-62)

**ANSWER**: Defendants admit that paragraph 89 quotes in part from the 2013 Contract.

Defendants refer the Court to the full Contract for a complete and accurate depiction of its

contents and the context of the partial quotations found in paragraph 89.  Defendants otherwise

deny the allegations in paragraph 90.

91.     A significant change in Molina's Provider Network occurred upon GenMed's

termination of the PSA for cause on April 2, 2015.

**ANSWER**: Defendants deny the allegations in paragraph 91.

92.     Molina failed to notify CMS and the Department that it no longer had a SNFist

provider under contract within five (5) days of GenMed's termination of the PSA, and it

persisted in failing to notify the government each day thereafter for at least two years.

**ANSWER**: Defendants deny the allegations in paragraph 92.

**E.     Molina's Quality Assurance Program Required Molina To Disclose The
Cessation Of Its SNFist Program**

93.     Like all MCOs, Molina was required to implement a Quality Assessment and

Performance Improvement (QAPI) program. Pursuant to§ 1.123 of the Contract (**Ex. 1**, pp. 20):

> Quality Assessment and Performance Improvement (QAPI) - The program required
> by 42 C.F.R. § 438.240, in which MCOs are required to have an ongoing quality

assessment and performance improvement program for the services furnished to Enrollees, that: (i) assesses the quality of care and identifies potential areas for improvement, ideally based on solid data and focused on high volume/high risk procedures or other services that promise to substantially improve quality of care, using current practice guidelines and professional practice standards when comparing to the care provided; and (ii) corrects or improves processes of care and clinic operations in a way that is expected to improve overall quality.

**ANSWER**: Defendants admit that paragraph 93 quotes in part from the 2013 Contract. Defendants refer the Court to the full Contract for a complete and accurate depiction of its contents and the context of the partial quotations found in paragraph 93. Defendants otherwise deny the allegations in paragraph 93.

94.     The Contract also required that Molina have an ongoing fully implemented Quality Assurance Program for health services that:

(a)     Monitors the health care services the Contract provides, including assessing the appropriateness and quality of care (§2.13.1.2, **Ex. 1**, p. 116);

(b)     Includes fraud control provisions (§2.13.1.6. *Id*.); and

(c)     Includes written procedures for taking appropriate remedial action and developing corrective action and quality improvement whenever, as determined under the Quality Assurance Program, inappropriate or substandard services have been furnished or there was a delay in providing, or a failure to provide, Covered Services that should have been provided (§2.13.1.9. **Ex. 1**, p. 117).

**ANSWER**: Defendants admit that paragraph 94 quotes in part from the 2013 Contract. Defendants refer the Court to the full Contract for a complete and accurate depiction of its contents and the context of the partial quotations found in paragraph 94. Defendants otherwise deny the allegations in paragraph 94.

95.     As part of its Quality Assurance Program, the Contract stated Molina "shall provide to CMS and the Department a written description of its Quality Assurance Plan (QAP) for the provision of clinical services (e.g., medical, medically related services, care coordination,

Care Management, Disease Management and behavioral health services.)" (§2.13.2.1, **Ex. 1**, pp. 118-19)

ANSWER: Defendants admit that paragraph 95 quotes in part from the 2013 Contract. Defendants refer the Court to the full Contract for a complete and accurate depiction of its contents and the context of the partial quotations found in paragraph 95. Defendants otherwise deny the allegations in paragraph 95.

96.     Molina's Quality Assurance Plan ("QAP") was required to monitor the quality of care and service to Enrollees and submit the results of its review to the government. Section 2.13.2.1.7 required that Molina's QAP include:

> Systematic process of quality assessment and improvement - The QAP shall objectively and systematically monitor and evaluate the quality, appropriateness of, and timely access to, care and service to Enrollees, and pursue opportunities for improvement on an ongoing basis. Documentation of the monitoring activities and evaluation plan shall be provided to CMS and the Department. (**Ex. 1**, p. 120)

ANSWER: Defendants admit that paragraph 96 quotes in part from the 2013 Contract. Defendants refer the Court to the full Contract for a complete and accurate depiction of its contents and the context of the partial quotations found in paragraph 96. Defendants otherwise deny the allegations in paragraph 96.

97.     Upon information and belief, between April 2015, and at least April 2017, Molina submitted Quality Assurance Plans to CMS and the Department, which failed to disclose that it was not providing Enrollees quality, appropriate and timely access to SNFist services.

ANSWER: Defendants admit that they submitted Quality Assurance Plans as requested by CMS and the Department. Defendants otherwise deny the allegations in paragraph 97.

98.     Once Molina identified an area that needed quality improvement, it was required to implement corrective actions and provide documentation of such actions to CMS and the Department. Pursuant to § 2.13.2.5 of the Contract:

The QAP shall include written procedures for taking appropriate remedial action whenever, as determined under the QAP, inappropriate or substandard services are furnished, including . . . services that should have been furnished [but] were not. Quality Assurance actions that result in remedial or corrective actions shall be forwarded by the Contractor to CMS and the Department on a timely basis. (**Ex. 1**, p. 129)

**ANSWER**: Defendants admit that paragraph 98 quotes in part from the 2013 Contract. Defendants refer the Court to the full Contract for a complete and accurate depiction of its contents and the context of the partial quotations found in paragraph 98. Defendants otherwise deny the allegations in paragraph 98.

99. Upon information and belief, between April 2015, and at least April 2017, Molina submitted Quality Assurance Plans or corrective actions to CMS and the Department, which concealed that it was failing to furnish SNFist services, and failed to document remedial actions to provide such services.

**ANSWER**: Defendants admit that they submitted Quality Assurance Plans as requested by CMS and the Department. Defendants otherwise deny the allegations in paragraph 99.

100. Molina was required to submit annual reports to CMS and the Department containing an evaluation of continuity and effectiveness of its QAP. The Contract states:

(a) At least annually, the Contractor shall conduct a regular examination of the scope and content of the QAP (42 C.F.R. § 438.240 (l)(i)(ii)) to ensure that it covers all types of services, including behavioral health services, in all settings, through an Executive Summary and Overview of the Quality Improvement Program, including QA, Utilization Review (UR) and Peer Review (PR). (§2.13.2.7.1, **Ex. 1**, p. 130)

(b) At the end of each year, a written report on the QAP shall be prepared by the Contractor and submitted to CMS and the Department as a component part of the QA/UR/PR Annual Report. The report shall include an Executive Summary that provides a high-level discussion/ analysis of each area of the Annual Report of findings, accomplishments, barriers and continued need for quality improvement. The report shall, at a minimum, provide detailed analysis of … 2.13.2.7.2.6 Fraud and Abuse Monitoring. (§2.13.2.7.2, *Id*.)

41

**ANSWER**: Defendants admit that paragraph 100 quotes in part from the 2013 Contract. Defendants refer the Court to the full Contract for a complete and accurate depiction of its contents and the context of the partial quotations found in paragraph 100. Defendants otherwise deny the allegations in paragraph 100.

101.    Upon information and belief, between April 2015, and at least April 2017, Molina submitted annual reports to CMS and the Department purporting to evaluate the continuity and effectiveness of its QAP, but concealed that its QAP was failing to identify the need to provide SNFist services and was failing to provide corrective action plans for providing such services.

**ANSWER**: Defendants admit that they submitted annual reports as requested by CMS and the Department. Defendants otherwise deny the allegations in paragraph 101.

102.    The Contract also provides that "QA information shall be used in recredentialing, recontracting and annual performance evaluations." (§2.13.9, **Ex. 1**, p. 137)

**ANSWER**: Defendants admit that paragraph 102 quotes in part from the 2013 Contract. Defendants refer the Court to the full Contract for a complete and accurate depiction of its contents and the context of the partial quotations found in paragraph 102.

**F.    Molina's Quality Assurance Results Reporting Omitted That GenMed Ceased Rendering Care**

103.    Further compliance requirements in the Contract obligated Molina to report at least every quarter its Quality Assurance results to CMS and the Department. Among other things, Molina was required to report when any Provider or Subcontractor ceased providing care. Section 2.13.10.1 states:

> [A]ll Quality Assurance findings, conclusions, recommendations, actions taken, results or other documentation relative to QA shall be reported to CMS and the Department on a quarterly basis or as requested by CMS and the Department. CMS and the Department shall be notified of any Provider or Subcontractor who ceases to be an Affiliated Provider or Subcontractor for a quality of care issue. (**Ex. 1**, at 138)

**ANSWER**: Defendants admit that paragraph 103 quotes in part from the 2013 Contract. Defendants refer the Court to the full Contract for a complete and accurate depiction of its contents and the context of the partial quotations found in paragraph 103. Defendants otherwise deny the allegations in paragraph 103.

104. Upon information and belief, between April 2015, and April 2017, Molina submitted quarterly Quality Assurance results to CMS and the Department that failed to disclose that GenMed ceased to be an Affiliated Provider or Subcontractor as of April 2015.

**ANSWER**: Defendants admit that they submitted Quality Assurance results as requested by CMS and the Department. Defendants otherwise deny the allegations in paragraph 104.

**G.** **Molina Submitted False And Misleading Encounter Data Reports ("EDRs")**

105. The Contract required that Molina "[p]rovide Encounter Data to CMS and the Department on a monthly basis," or as otherwise specified by CMS and the Department. (§2.17.2.5, **Ex. 1**, p. 166)

**ANSWER**: Defendants admit that paragraph 105 quotes in part from the 2013 Contract. Defendants refer the Court to the full Contract for a complete and accurate depiction of its contents and the context of the partial quotations found in paragraph 105.

106. The Contract further provided that the Encounter Data submitted be "at a minimum standard for completeness and accuracy as defined by CMS." (§2.17.2.6, *Id.*)

**ANSWER**: Defendants admit that paragraph 106 quotes in part from the 2013 Contract. Defendants refer the Court to the full Contract for a complete and accurate depiction of its contents and the context of the partial quotations found in paragraph 106. Defendants otherwise deny the allegations in paragraph 106.

107.     Molina's monthly EDRs from April 2015 through at least April 2017 were incomplete and inaccurate in that they failed to reveal the Molina was failing to provide SNFist encounters.

**ANSWER**: Defendants deny the allegations in paragraph 107.

108.     By submitting inaccurate EDRs, Molina not only concealed its material breach of contract from CMS and the Department, but it falsely and artificially inflated PMPM rates for future contract years. Upon information and belief, the EDRs submitted to the government are considered by the professional consultants engaged by the Department to calculate "actuarially sound" capitation rates for future years.

**ANSWER**: Defendants deny the allegations in paragraph 108.

**H.     Molina Extracted Reportable Deliverables From The SNFist Program In Order To Conceal it's Material Breach**

109.     As alleged hereinabove, the PSA delegated to GenMed the obligation to perform a variety of defined "SNFist Services" for those Enrollees assigned to GenMed's care. The SNFist Services are fully set forth in Attachment D-1 to the PSA (SNFist Program Contract SOW).

**ANSWER**: Defendants admit that the PSA sets forth GenMed's obligations and refer the Court to the full PSA for a complete and accurate depiction of its contents and the obligations it imposes.  Defendants otherwise deny the allegations in paragraph 109.

110.     Molina was obligated to report certain SNFist deliverables to the Department for auditing purposes on a monthly basis. These included, for example, the number of FCNAs and ACEs performed on Molina's members. Pursuant to the PSA, FCNAs and ACEs were comprehensive assessments involving clinical examination to be performed by properly credentialed and/or accredited providers at particular times.

44

**ANSWER**: Defendants admit that Attachment D-1 of the PSA required GenMed to provide comprehensive assessments and refer the Court to the full PSA for a complete and accurate depiction of its contents. Defendants otherwise deny the allegations in paragraph 110.

111. Following GenMed's termination of the PSA on April 2, 2015, Molina could no longer delegate the obligation to administer FCNAs and ACEs to members residing in Nursing Facilities to properly credentialed SNFist Providers.

**ANSWER**: Defendants deny the allegations in paragraph 111.

112. Yet Molina did not notify CMS and the Department of the material change to its Provider Network as the Contract required. Nor did Molina engage a new SNFist provider to take over for GenMed. Nor did Molina simply refrain from performing the specialized SNFist services that its case managers were not qualified to undertake.

**ANSWER**: Defendants deny the allegations in paragraph 112.

113. Instead, Molina unilaterally extracted the FCNAs and ACEs from its SNFist Program in order to direct its own care coordinators to conduct these medical assessments on members residing in Nursing Facilities. As such, Molina was able to continue reporting these deliverables to CMS and the Department without tipping them off to the material change in its Provider Network.

**ANSWER**: Defendants deny the allegations in paragraph 113.

114. Molina fully recognized that its own personnel were inadequate substitutes for licensed SNFist providers like GenMed. As Benjamin Schoen, Molina's COO, testified during a 2017 deposition:

> The SNFist Program is more in the sense of monitoring a patient as they're in these skilled nursing facilities to make sure that they're not digressing in the acuity of their condition and that they are receiving traditional med/surg services that they otherwise would have to go to the hospital for which costs, obviously, more money,

which was why we engaged in the agreement—arrangement with Gen Med, P.C. Our providers – or, pardon me—our staff did not have the ability or licensure to render those services. They were only able to go in and do the administrative, 'Fill out this form.'" *See* Transcript of Deposition of Benjamin Schoen, April 5, 2017, at p. 215 (**Ex. 15**).

**ANSWER**: Defendants admit that paragraph 114 quotes in part from the April 5, 2017 deposition of Benjamin Schoen, taken in the arbitration between GenMed and Molina and attached to the Complaint as Exhibit 15. Defendants refer the Court to the full deposition transcript for a complete and accurate depiction of its contents and the context of the partial quotation found in paragraph 114. Defendants otherwise deny the allegations in paragraph 114.

115. By Molina's own admission, its concealment of GenMed's termination of the PSA, adversely affected the quality of healthcare provided to its members.

**ANSWER**: Defendants deny the allegations in paragraph 115.

## IX. MOLINA FRAUDULENTLY INDUCED THE DEPARTMENT TO RENEW ITS CONTRACT IN AT LEAST 2016 AND 2017

116. The Department renewed Molina's Contract in 2016 and 2017.

**ANSWER**: Defendants admit the allegations in paragraph 116.

117. Molina, as detailed above, fraudulently induced CMS and the Department to renew its contract with Molina by doing one, or more or all of the following:

(a) On information and belief, falsely representing to CMS and the Department that it would provide SNFist services, when it did not intend to do so;

(b) Submitting or causing to be submitted contract renewals for 2016 and 2017 to CMS and the Department, promising that Molina would provide SNFist services to Enrollees, when it did not intend to do so;

(c) Submitting or causing to be submitted contracts to CMS and the Department, promising that Molina would provide SNFist services to Enrollees

when it was currently failing to provide such services under existing/prior contracts and had no intention of providing such services;

(d)     Submitting false certifications of compliance with current contracts, which had they been truthful concerning Molina's failure to provide SNFist services to Enrollees, would have precluded the government from offering or entering into later contracts with Molina;

(e)     Making fraudulent material omissions, specifically, failing to report its practices and intended practices of not providing SNFist services to Enrollees in connection with the negotiation, submission and execution of each contract.

**ANSWER**: Defendants deny the allegations in paragraph 117.

118.     Senior managers for Molina knew that providing SNFist services was a material requirement of its Contract, including but not limited to:

(a)     Catherine Harvey: Molina's President, who signed the agreement with GenMed and made the decision to stop paying them;

(b)     Ben Schoen: Molina's Chief Financial Officer since 2014, whose responsibilities included network development, provider services, physician engagement, program management and oversight;

(c)     Cathy Schilling: Molina's Vice President of Health Care Services;

(d)     Ross Randolph Carey-Walden: Molina's Director of Health Care from June 2014 through December 2015. Mr. Carey-Walden supervised the contract between Molina and GenMed;

47

(e)      Vijay Parthasarathy: Molina's Director of Finance and Analytics. Mr.

Parthasarathy is responsible for overseeing all governmental reporting and cost control;

and

(f)      Kimberly Beckman: Molina's former Director of Finance and Analytics. Ms.

Beckman was responsible for overseeing all governmental reporting and cost control.

**ANSWER**: Defendants admit that Catherine Harvey was the President of Molina

Healthcare of Illinois from 2014 through April 2017 and that she signed the PSA with GenMed.

Defendants admit that Ben Schoen was the Chief Operating Officer of Molina Healthcare of

Illinois from August 2014 through April 2017.  Defendants admit that Cathy Schilling was

Molina's Vice President of Healthcare Services until October 2017.  Defendants admit that Ross

Randolph Carey-Walden was Molina's Director of Case Management from June 2014 through

December 2015 and had oversight duties for Case Management functions related to the contract

between Molina and GenMed.  Defendants admit that Vijay Parthasarathy is currently Molina's

Market CFO - IL & WI and that prior to his current position he has held various positions in

Finance and Analytics since 2016, including Director of Finance & Analytics from 2016 through

October 2017.  Defendants admit that Kimberly Beckman was the Manager of Healthcare

Analysis at Molina from May 2013 through May 2017 and a Manager of Provider Information

Management at Molina from May 2017 through October 2017.  Defendants otherwise deny the

allegations in paragraph 118.

119.    Each of these senior managers knew that Molina ceased providing SNFist

services beginning in April 2015 upon GenMed's termination of the PSA, but failed to report this

material breach of MCO Contract to CMS and the Department.

**ANSWER**: Defendants deny the allegations in paragraph 119.

48

120.    Had CMS and the Department been aware of the above acts, or any of them, neither would or could have approved Molina for participation in the program, or entered into a MCO contract with Molina for the provision of Medicaid services.

**ANSWER**: Defendants deny the allegations in paragraph 120.

## X.    MOLINA SUBMITTED AND CAUSED THE SUBMISSION OF FALSE CLAIMS

121.    Molina submitted requests for payment to the governments. Each enrollment form/enrollee submitted was a request for payment of the monthly capitation rate for that person. Each enrollee accepted by the Stated caused Illinois and the United States to expend funds in the form of their respective shares of the capitation payment. Defendants knew and intended that the submission of enrollment forms and enrollees would result in payment of the capitation rate by Illinois and the United States. Relator estimates that defendants submitted thousands of such requests in the relevant time period.

**ANSWER**: Defendants admit that they submitted enrollment forms to CMS and the Department and that CMS and the Department provided capitation payments.  Defendants otherwise deny the allegations in paragraph 121.

122.    Operating under a comprehensive risk contract in exchange for a capitation payment, Molina receives its monthly PMPM payment from the Department regardless of the particular healthcare services rendered during the period covered by the payment. C.F.R. §438.2. Molina therefore does not invoice the Department in the traditional sense in order to receive payment.

**ANSWER**: To the extent that paragraph 122 purports to characterize C.F.R. § 438.2, no response is required.  Defendants refer the Court to C.F.R. § 438.2 for a complete and accurate depiction of its contents.  To the extent that the description of the regulation in paragraph 122 is

inconsistent with the regulation itself, Defendants deny those allegations. Answering the last sentence of paragraph 122, Defendants admit that Molina does not receive payment from the Department on a fee-for-service basis. Defendants otherwise deny the allegations in the last sentence of paragraph 122.

123. Instead, the Department determines Enrollee eligibility and electronically sends an "834 file" to Molina identifying which members have been assigned to Molina's care and the corresponding rates that Molina will be paid.

**ANSWER**: Defendants admit that the Department sends Molina an "834" file identifying which members have been assigned to Molina's care and the corresponding rates that Molina will be paid.

124. At no time following the termination of the PSA did Molina notify the Department, upon receiving an 834 file, that no SNFist Services would be provided to those Members otherwise qualified to receive them.

**ANSWER**: Defendants deny that no SNFist Services were provided to its Members, and thus admit that Defendants did not notify the Department that no SNFist Services would be provided to its Members. Defendants otherwise deny the allegations in paragraph 124.

125. Because the only the only prerequisite that Molina must satisfy in order to receive the PMPM payments is to perform the healthcare services, the extensive reporting obligations set forth in the Contract are critical. Absent Molina's submission of accurate EDR and required disclosures, the Government would have no way of knowing whether Molina is actually performing the services in the manner required.

**ANSWER**: Defendants admit that the Contract sets forth certain reporting requirements. Defendants lack sufficient knowledge to form a belief about the truth of the remaining allegations contained in paragraph 125 and therefore deny them.

126. Accordingly, Molina's submission of the various information it is required to disclose to the Department is tantamount to presenting claims for payment. If Molina does not comply with its reporting obligations in material respects, the Department would delay or the discontinue capitation payments.

**ANSWER**: The first sentence of paragraph 126 is a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations. Defendants lack sufficient knowledge to form a belief about the truth of the remaining allegations contained in paragraph 126 and therefore deny them.

127. In addition, Molina caused the State to submit its forms CMS-37 and CMS-64, which presented Defendants' requests for payment in summary form to the United States and were certified by the State to be allowable costs. As a result of Defendants' fraud, this was false.

**ANSWER**: Defendants deny the allegations in paragraph 127.

128. As detailed above, each and every one of Molina's requests for payment was false or fraudulent for one, several, or all of the following reasons:

(a) Each such request was submitted in connection with a fraudulently induced contract;

(b) Each such request was submitted while Molina was in knowing violation of program eligibility requirements and a condition of payment, specifically, the requirement that Molina provide SNFist services to Enrollees;

(c)    Each such request was submitted after Defendants had knowingly and falsely certified or caused the certification of the absence of any knowledge of fraud, waste or abuse, and a truthful certification was an express condition payment pursuant to 42 C.F.R. §438.602;

(d)    Each such request was submitted while Molina was in knowing material breach of its contract, but nevertheless maintain a false and fraudulent pretense of compliance through false certifications and material omissions, and the absence of material breach is a condition of payment as a matter of law.

**ANSWER**: Defendants deny the allegations in paragraph 128.

129.    Had the state and federal governments known the truth, it would have materially affected their decision to pay Molina and the continuance or renewal of its contracts. Federal regulations authorized the termination of a MCO for substantial breach of contract contained in 42 U.S.C. § 1396b(m) [Social Security Act § 1903], 42 C.F.R. § 438/708. Furthermore, the Government would not – and in fact could not – have paid Molina if they knew that Defendants' certifications were false, or that critical information was being omitted, or that the contracts were induced by fraud.

**ANSWER**: Defendants deny the allegations in paragraph 129.

130.    By submitting false certifications, by omitting critical information, or by fraudulently inducing the Department to sign contract renewals for 2016 and 2017, the Defendants knowingly made, used, or caused to be made a false record in order get false or fraudulent claims paid by the Governments.

**ANSWER**: Defendants deny the allegations in paragraph 130.

131.    Defendants' submission of false claims have damaged the Governments.

52

**ANSWER**: Defendants deny the allegations in paragraph 131.

## XI.  DEFENDANTS' INTENTIONAL FAILURES GIVE RISE TO FCA LIABILITY

132.     Molina's failure to provide SNFist services goes to the essence of its bargain with the Department. Had CMS or the Department known the truth, it would have had a material effect on their decision to pay Molina and the continuance or renewal of its contracts. The Department has the authority to terminate Molina's contract if the Department determines that Molina failed to "[c]arry out the substantive terms of its contract." 42 C.F.R. § 438.708.

**ANSWER**: Defendants deny the allegations in paragraph 132.

133.     Molina's silence, despite its obligation to report its deficiencies and its knowledge that it had no plan to address its deficiencies, was designed to keep the funding spigot open.

**ANSWER**: Defendants deny the allegations in paragraph 133.

134.     The federal Government and state Governments, including Illinois, have long used the FCAs to hold MCOs responsible for failing to provide the services they promised to provide, and courts have long held that such conduct violates the FCA. *See, generally, United States ex rel. Tyson v. Amerigroup Illinois, Inc.*, 488 F. Supp. 2d. 719 (N.D. Ill. 2007) (failure to comply with MCO contract obligations violates FCAs); *see also, e.g., United States ex rel. Fisher v. Iasis*, 2016 WL 6610675 (D. Ariz. Nov. 9, 2016) (MCO's failure to provide contracted-for services in violation of FCAs); *United States ex rel. Upton v. Family Health Network, Inc.*, 2013 WL 791441 (N.D. Ill. Mar. 4, 2013).

**ANSWER**: Defendants state that the allegations of paragraph 134 set forth legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations.

## XII. MOLINA HEALTH'S LIABILITY FOR MOLINA'S ACTS AND OMISSIONS

135. Molina Health, as the parent of Molina, is responsible in all senses for the conduct of Molina, actively overseeing Molina's work for the Department.

**ANSWER**: Paragraph 135 contains a legal conclusion to which no response is required. To the extent a response is required, Defendants admit that Molina Healthcare, Inc. is the parent company of Molina Healthcare of Illinois, Inc. Defendants otherwise deny the allegations in paragraph 135.

136. Molina Health requires Molina to regularly send information regarding its work to Molina Health's Long Beach, California offices for review, including the FCNAs and ACEs that Molina is required to provide to both the Department and to CMS.

**ANSWER**: Defendants deny the allegations in paragraph 136.

137. Accordingly, Molina Health took ownership of Molina's execution of its contracts with the Department, and with the "profit motive" that Molina Health imposed on its subsidiaries. Molina Health knowingly caused Molina to cut corners for short-term gain by eliminating the SNFist program in violation of Molina's contracts with the Department.

**ANSWER**: Defendants state that the first sentence of paragraph 137 set forth legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations. Defendants also deny the remaining allegations in paragraph 137.

138. Molina relies heavily on resources and contributions from Molina Health in order to perform its contractual obligations.

**ANSWER**: Defendants deny the allegations in paragraph 138.

139.    In responding to the Department's RFP, the footer of each page of the Resp. to RFP is marked with the following disclaimer: "[t]he term 'Molina' encompasses the bidder, Molina Healthcare of Illinois, Inc., and its parent organization Molina Healthcare, Inc."

**ANSWER**: Defendants admit that paragraph 139 quotes in part from their RFP response, a portion of which is attached to the Complaint.  Defendants refer the Court to their full RFP response for a complete and accurate depiction of its contents and the context of the partial quotations found in paragraph 139.  Defendants otherwise deny the allegations in paragraph 139.

140.    Accordingly, Molina established from the outset that it is unable to perform as an MCO without material assistance from Molina Health.

**ANSWER**: Defendants deny the allegations in paragraph 140.

## COUNT I
## VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729, *ET SEQ.*

141.    Plaintiff-Relator Dr. Thomas Prose realleges and incorporates by reference the allegations made in each of the preceding Paragraphs of this Amended Complaint as though fully set forth herein.

**ANSWER**: Defendants incorporate by reference, as if set forth fully verbatim herein, its answers to the allegations contained in the foregoing paragraphs of the Complaints, as its answer to paragraph 141 of the Complaint.

142.    As set forth above, the FCA provides, in relevant part, that any person who:

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . .

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . plus 3 times the amount of damages which the Government sustains because of the act of that person. 31 U.S.C. § 3729(a)(1).

**ANSWER**: Defendants state that paragraph 142 sets for legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations.

143. The term "knowingly" means that a person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require[s] no proof of specific intent to defraud." 31 U.S.C. § 3729(b)(1).

**ANSWER**: Defendants state that paragraph 143 sets for legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations.

144. Through the acts described above, Defendants and their agents and employees knowingly presented, or caused to be presented, to officers, employees, or agents of the United States Government false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

**ANSWER**: Defendants deny the allegations in paragraph 144.

145.     Through the acts described above, Defendants and their agents and employees knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, and to get false or fraudulent claims paid or approved by the United States Government in violation of 31 U.S.C. § 3729(a)(1)(B).

**ANSWER**: Defendants deny the allegations in paragraph 145.

146.     Through the acts described above, Defendants and their agents and employees knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the United States Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the United States Government in violation of 31 U.S.C. § 3729(a)(1)(G).

**ANSWER**: Defendants deny the allegations in paragraph 146.

147.     The United States Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay claims that would not have been paid but for the acts and/or conduct of Defendants as alleged herein.

**ANSWER**: Defendants deny the allegations in paragraph 147.

148.     The United States has been damaged by Defendants' acts, and continues to be damaged, in a substantial amount to be determined at trial.

**ANSWER**: Defendants deny the allegations in paragraph 148.

## <u>COUNT II</u>
## VIOLATIONS OF THE ILLINOIS FALSE CLAIMS ACT, 740 ILCS 175/1, *ET SEQ.*

149.     Plaintiff-Relator Dr. Thomas Prose realleges and incorporates by reference the allegations made in each of the preceding Paragraphs of this Amended Complaint as though fully set forth herein.

**ANSWER**: Defendants incorporate by reference, as if set forth fully verbatim herein, its answers to the allegations contained in the foregoing paragraphs of the Complaints, as its answer to paragraph 149 of the Complaint.

150.    As set forth above, the IFCA provides, in relevant part, that any person who:

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . .

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the State for a civil penalty of not less than $5,000 and not more than $11,000, plus 3 times the amount of damages which the State sustains because of the act of that person. 740 ILCS 175/3(a)(1).

**ANSWER**: Defendants state that paragraph 150 sets for legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations.

151.    The term "knowingly" means that a person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require[s] no proof of specific intent to defraud." 740 ILCS 175/3(b)(1).

**ANSWER**: Defendants state that paragraph 151 sets for legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations.

152.     Through the acts described above, Defendants and their agents and employees knowingly presented, or caused to be presented, to officers, employees, or agents of the State of Illinois false or fraudulent claims for payment or approval in violation of 740 ILCS 175/3(a)(1)(A).

**ANSWER**: Defendants deny the allegations in paragraph 152.

153.     Through the acts described above, Defendants and their agents and employees knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, and to get false or fraudulent claims paid or approved by the State of Illinois in violation of 740 ILCS 175/3(a)(1)(B).

**ANSWER**: Defendants deny the allegations in paragraph 153.

154.     Through the acts described above, Defendants and their agents and employees knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State of Illinois, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State of Illinois in violation of 740 ILCS 175/3(a)(1)(G).

**ANSWER**: Defendants deny the allegations in paragraph 154.

155.     The State of Illinois, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay claims that would not have been paid but for the acts and/or conduct of Defendants as alleged herein.

**ANSWER**: Defendants deny the allegations in paragraph 155.

156.    The State of Illinois has been damaged by Defendants' acts, and continues to be damaged, in a substantial amount to be determined at trial.

**ANSWER**: Defendants deny the allegations in paragraph 156.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff-Relator Dr. Thomas Prose requests that judgment be entered against Defendants Molina Healthcare of Illinois, Inc. and Molina Healthcare, Inc., ordering that:

(a)    Defendants cease and desist from violating the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq*. and the Illinois False Claims Act, 740 ILCS 175/1, *et seq*.;

(b)    Defendants pay an amount equal to three (3) times the amount of damages the United States and the State of Illinois have sustained because of Defendants' actions, plus a civil penalty against Defendants for each violation of 31 U.S.C. § 3729 and 740 ILCS 175/3;

(c)    Plaintiff-Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) and 740 ILCS 175/4(d)(1);

(d)    Plaintiff-Relator be awarded all costs of this action, including attorneys' fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d) and 740 ILCS 175/4(d)(1); and

(e)    The United States, the State of Illinois, and Plaintiff-Relator be granted all such other relief as the Court deems just and proper.

**ANSWER**: The unnumbered "Wherefore" Prayer for Relief does not contain allegations of fact and therefore no response is required.  To the extent a response is required, Defendants the allegations in this paragraph, including all separate subparts, and deny that Relator is entitled to any of the relief requested.

## AFFIRMATIVE DEFENSES

Defendants set forth their affirmative defenses without assuming the burden of proving any fact, issue, or element of a cause of a cause where such burden properly belongs to Relator. Moreover, nothing stated herein is intended or shall be construed as an admission that any particular issue or subject matter is relevant to the allegations of the Complaint. Unless otherwise stated, capitalized terms have the same definitions provided by Relator in the Complaint. Defendants reserve the right to amend or supplement their affirmative defenses as additional facts concerning their defenses become known.

## FIRST DEFENSE

1.      This Court lacks subject matter jurisdiction over some or all of Relator's claims under the False Claims Act's public disclosure bar, 31 U.S.C. §§ 3729 *et seq.*

2.      Courts lack subject matter jurisdiction over any False Claims Act claim where the qui tam complaint is based on information previously disclosed to the public. The purpose is to dissuade the filing of parasitic lawsuits.

3.      Relator is not an original source of the material allegations in his complaint. To the contrary, Relator repeatedly relies on government contracts as the source of his allegations, including all alleged requirements of and representations made pursuant to the 2013 Contract, Quality Assurance Plans, and Readiness Review, which are all publicly available documents for which Relator is not the original source of information.

4.      The Court thus lacks subject matter jurisdiction to hear Relator's claims.

**SECOND DEFENSE**

5.     Relator's claims are barred in whole or in part due to the False Claims Act's public disclosure bar, 31 U.S.C. §§ 3729 *et seq*.

6.     The public disclosure bar prevents a relator from filing a qui tam complaint based on information previously disclosed to the public.  The purpose is to dissuade the filing of parasitic lawsuits.

7.     Relator is not an original source of the material allegations in his complaint.  To the contrary, Relator repeatedly relies on government contracts as the source of his allegations, including all alleged requirements of and representations made pursuant to the 2013 Contract, Quality Assurance Plans, and Readiness Review, which are all publicly available documents and for which Relator is not the original source of information.

8.     Relator's claims are thus barred by the public disclosure bar.

**THIRD DEFENSE**

9.     Any recovery by Relator is subject to reduction under the False Claims Act, which permits the Court to reduce the amount of recovery for any relator where that individual "planned and initiated the violation of section 3729 upon which the action was brought."  31 U.S.C. § 3730(d)(3).

10.     The Government filed a complaint against Relator alleging, *inter alia*, that Relator and eighteen of his companies, including General Medicine, P.C. ("GenMed"), violated the False Claims Act by "engag[ing] in a years-long, wideranging health care fraud scheme that involved billing Medicare for thousands of false claims for visits with nursing home and assisted living facility residents. These claims were false because the associated patient visits were either not performed, not medically necessary, or insufficient to meet the requirements of the billing code

for which reimbursement was received. Defendants' unlawful scheme netted tens of millions of dollars in payments, with American taxpayers footing the bill." *United States v. General Medicine, P.C., et al.*, No. 3:22-cv-00651 (S.D. Ill. Mar. 30, 2022).

11.     On information and belief, the allegations in *General Medicine* pertain to and include Relator's provision of SNFist services on behalf of Molina pursuant to GenMed's contract with Molina.  Moreover, it is GenMed's contract with Molina (and the termination of that contract) that purportedly gives rise to Relator's original knowledge of his allegations against Molina in this action.

12.     To the extent there is any overlap between, on the one hand, Relator's conduct that is subject to government prosecution in *General Medicine*, and, on the other hand, any of Relator's allegations or claims that he asserts in this action, then any recovery that Relator may receive through this action should be reduced pursuant to 31 U.S.C. § 3730(d)(3).

## FOURTH DEFENSE

13.     Relator's claims are barred by the equitable doctrines of waiver, ratification, consent, and estoppel.

14.     Defendants incorporate Paragraphs 72, 77-81, and 116 from Relator's Complaint by reference.

15.     The alleged violations have been subjected to CMS and Department audit or other administrative review or determination, including but not limited to audits and readiness reviews performed by the Department from April 2015 through September 2017.

16.     Theses audits, reviews, and determinations provided CMS and the Department knowledge of Molina's actual provision of SNFist services to Illinois Medicaid plan participants.

CMS and the Department continued to make payments to Molina and renewed its contracts with Molina with this knowledge.

17.     The Government also became aware of Relator's allegations at the time he filed the instant action.

18.     The Government continued to make payments to Molina and renewed its contracts with Molina after having actual knowledge of Relator's allegations.

19.     The alleged violations are, therefore, barred by the equitable doctrines of waiver, ratification, consent, and estoppel.

**FIFTH DEFENSE**

20.     The alleged violations have been subjected to audit or other administrative review or determination and are, therefore, barred by applicable law.

21.     Defendants incorporate Paragraphs 72, 77-81, and 116 from Relator's Complaint by reference.

22.     The alleged violations have been subjected to CMS and Department audit or other administrative review or determination, including but not limited to audits and readiness reviews performed by the Department from April 2015 through September 2017.

23.     Theses audits, reviews, and determinations provided CMS and the Department knowledge of Molina's actual provision of SNFist services to Illinois Medicaid plan participants. CMS and the Department continued to make payments to Molina and to renew its contracts with Molina for provision of these services with this knowledge.

24.     The alleged violations are, therefore, barred by applicable law.

**SIXTH DEFENSE**

25.     Relator's claims are barred to the extent they retroactively apply the Illinois False Medicaid Claims Act in violation of the *Ex Post Facto* and Due Process Clauses of the United States Constitution.

26.     In 2017, The Illinois legislature amended the Illinois False Claims Act to modify the damages available for a violation of the statute. *See* P.A. 100-452, § 5, eff. Aug. 25, 2017 (amending 740 ILCS 175/3).

27.     Any retroactive application of this provision of the Illinois False Claims Act violates the *Ex Post Facto* and Due Process Clauses of the United States Constitution.

**SEVENTH DEFENSE**

28.     That portion of the Complaint that seeks damages and/or penalties above and beyond actual damages is unconstitutional because such damages and/or penalties would violate the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

**EIGHTH DEFENSE**

29.     This litigation is precluded by Article II of the Constitution because the False Claims Act's qui tam provision, 31 U.S.C. § 3730, constitutes an unconstitutional delegation of executive power.

**NINTH DEFENSE**

30.     Defendants presently lack sufficient knowledge or information on which to form a belief as to whether they may have additional and as yet unstated affirmative defenses and therefore reserve the right to assert additional affirmative defenses in the event discovery and/or further investigation indicates that such defenses would be warranted.

## <u>DEMAND FOR JURY TRIAL</u>

31.    Defendants demand trial by jury on all issues so triable.


Dated: January 18, 2023                              Respectfully submitted,


*/s/ Quyen L. Ta*
Quyen L. Ta (*pro hac vice*)
KING & SPALDING LLP
50 California Street
Suite 3300
San Francisco, CA 94111
(415) 318-1227
qta@kslaw.com

Kelly L. Perigoe (*pro hac vice*)
KING & SPALDING LLP
633 West Fifth Street
Suite 1600
Los Angeles, CA 90071
(213) 443-4355
kperigoe@kslaw.com